# Exhibit C

Trials@uspto.gov                                        Paper 10
Tel: 571-272-7822                        Entered: November 19, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

PACIFIC MARKET INTERNATIONAL, LLC,
Petitioner,

v.

IGNITE USA, LLC,
Patent Owner.

_____

Case IPR2014-00750
Patent 7,546,933 B2

_____

Before JOSIAH C. COCKS, MITCHELL G. WEATHERLY, and
GEORGE R. HOSKINS, *Administrative Patent Judges.*

WEATHERLY, *Administrative Patent Judge.*


DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

## I.   INTRODUCTION

### A. Background

Pacific Market International, LLC ("PMI" or "Petitioner") filed a
petition (Paper 2, "Pet.") to institute an *inter partes* review of claims 1–16
(the "challenged claims") of U.S. Patent No. 7,546,933 B2 (Ex. 1007, "the
'933 patent").  35 U.S.C. § 311.  Ignite USA, LLC ("Ignite" or "Patent

IPR2014-00750
Patent 7,546,933 B2

Owner") timely filed a Preliminary Response. Paper 6 ("Prelim. Resp.").

The standard for instituting an *inter partes* review is set forth in 35 U.S.C.

§ 314(a), which provides as follows:

> (a) THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

35 U.S.C. § 314(a).

Generally, Ignite contends that the Petition should be denied for all challenged claims. Based on our review of the record, we conclude that PMI has shown a reasonable likelihood it would prevail in demonstrating that at least one of the challenged claims is not patentable.

PMI contends that the challenged claims are unpatentable under 35 U.S.C. § 103 based on the following grounds (Pet. 9–60):

| References | Basis | Claims Challenged |
|---|---|---|
| U.S. Patent No. 3,967,748 ("Albert '748") (Ex. 1001) and U.S. Patent No. 4,094,433 ("Numbers") (Ex. 1002) | § 103 | 1, 2, and 4–7 |
| U.S. Patent No. 4,303,173 ("Nergard") (Ex. 1003) in view of Albert '748 and Numbers | § 103 | 3, 15, and 16 |
| U.S. Patent No. 4,136,799 ("Albert '799") (Ex. 1005) and Numbers | § 103 | 8, 9, 13, and 14 |
| U.S. Patent No. 5,711,452 ("Chaffin") (Ex. 1006) in view of Numbers | § 103 | 10 and 11 |
| Chaffin in view of Albert '748 | § 103 | 10 and 11 |

2

IPR2014-00750
Patent 7,546,933 B2

| References | Basis | Claims Challenged |
|---|---|---|
| Chaffin in view of Numbers and U.S. Patent No. 3,739,938 ("Paz") (Ex. 1004) | § 103 | 12 |
| Chaffin in view of Albert '748 and Paz | § 103 | 12 |

For the reasons described below, we institute an *inter partes* review of claims 1, 2, 4–11, and 13–16, and we do not institute an *inter partes* review of claims 3 and 12.

### B. Related Proceedings

PMI identified, as a related proceeding, the co-pending lawsuit entitled, *Ignite USA, LLC v. Pacific Market International, LLC and Aladdin Industries, LLC*, No. 14-cv-856 (N.D. Ill. Feb. 7, 2014). Pet. 1.

### C. The '933 Patent

The '933 patent relates to a sealed drink container with at least two trigger-actuated apertures in the lid, one through which the user drinks the beverage and another for venting pressure. Ex. 1007, 15:44–59. When the user presses the trigger, the pressure vent opens first and then the drink aperture opens. *Id.* at 20:40–50, Figs. 16–18. The sequential opening of these two apertures releases any hot gases inside the container through the vent rather than the drink aperture. *Id.* at 20:8–13. PMI and Ignite refer to the opening of a vent before opening the drink aperture as "pre-venting." *E.g.*, Pet. 3, Prelim. Resp. 17.

Claims 1, 8, and 15 are independent. Claim 1, which is illustrative, recites:

> 1. A drinking container comprising:
>
>   a container body having a cavity;

3

IPR2014-00750
Patent 7,546,933 B2

> a removable lid covering the cavity, the lid having a drink aperture and a separate vent aperture; and,
>
> a trigger mechanism mechanically connected to a shutter adjacent the drink aperture and to a vent seal, the trigger mechanism independently moving the shutter and the vent seal from a closed position to an open position, the shutter operating to operably close and open access to the cavity through the drink aperture, and the vent seal operating to operably close and open access to the cavity through the vent aperture, wherein the trigger mechanism has an actuation stroke, wherein the vent seal is initially actuated during a first portion of the actuation stroke of the trigger mechanism, and wherein the shutter is initially actuated during a second portion of the actuation stroke of the trigger mechanism, the first portion of the actuation stroke occurring prior in time to the second portion of the actuation stroke.

Ex. 1007, 23:34–53.

## II. ANALYSIS

### A. Claim Interpretation

As a step in our analysis for determining whether to institute a trial, we interpret the claims. For an unexpired patent, we analyze patentability of claims using the broadest reasonable interpretation in light of the specification. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012); 37 C.F.R. § 42.100(b).

#### 1. PMI's Proposed Interpretations

PMI proposes interpretations for "shutter" and "transverse" (Pet. 7–9), and Ignite accepts PMI's proposed interpretations of these terms (Prelim. Resp. 7). Without any dispute regarding the meaning of "shutter" and "transverse," we see no reason to interpret these terms in any manner other than according to the broadest reasonable interpretation. At this stage of the proceeding, we understand PMI's proposed interpretations of "shutter" and

4

IPR2014-00750
Patent 7,546,933 B2

"transverse" to be the broadest reasonable interpretations of the terms in light of the Specification of the '933 patent, and we will analyze the challenged claims using those interpretations. More specifically, we interpret "shutter" to mean "a seal which is movable to shut the drink aperture." That interpretation is consistent with the '933 patent, which describes, for instance, that "shutter 710" operates as a "closing member and seal for the drinking orifice 676 in the upper lid 665." Ex. 1007, 22:4–6. We also interpret "transverse" to mean "situated or lying across" without any requirement of a perpendicular relationship to a reference, such as the longitudinal axis of the container. That interpretation reflects the ordinary and customary meaning of "traverse" as evidenced, for instance, by the dictionary definition supplied by PMI. *See* Ex. 1018.

2. *Ignite's Proposed Interpretations*

Ignite proposes interpretations of "seal," "actuation stroke," and "push-button trigger." Prelim. Resp. 7–10. We address each of these terms below to the extent required by our analysis at this preliminary stage of the proceeding.

a. Seal

Ignite contends that we should interpret "seal" to mean "a member that provides an airtight or watertight closure to prevent the passage of liquid or gas." *Id.* at 7–8 (citing dictionary definition supplied in Ex. 2001 and portions of the Specification consistent with that definition at Ex. 1007, 13:51–54, 6:27, and 12:20–22). At this stage of the proceeding, we agree that Ignite's proposed interpretation is the broadest reasonable interpretation of "seal."

5

IPR2014-00750
Patent 7,546,933 B2

### b. Actuation Stroke

Ignite contends that we should interpret "actuation stroke" to mean "linear movement (i.e., movement in a straight line) of the trigger between the normal position and the fully actuated position." Prelim. Resp. 8. PMI does not propose an interpretation of "actuation stroke." We note that "actuation stroke" is a characteristic of the "trigger mechanism." Ex. 1007, 23:46–47.

Ignite argues that portions of the Specification describing the "relevant embodiment" require that we interpret "actuation stroke" to refer to "linear movement." Prelim. Resp. 8–9. The Specification states: "The actuation stroke of the trigger mechanism 520 is defined as the movement of the trigger 610 a distance between the normal or closed position (see FIG. 16) and the fully actuated position (see FIG. 18)." Ex. 1007, 20:56–60. The Specification further explains that the actuation stroke "occurs through lateral movement of the trigger 610 in a transverse direction to the longitudinal axis of the container body 512." *Id.* at 22:65–67. Ignite contends that the inventor acted as his own lexicographer regarding "actuation stroke" and that the inventor, thus, expressly limited "actuation stroke" to "linear movement." Prelim. Resp. 9.

As noted above, we interpret claims according to their broadest reasonable interpretation that is consistent with the specification, but we take care not to incorporate limitations that appear only in the specification. *In re Prater*, 415 F.2d 1393, 1404–05 (CCPA 1969). Additionally, the Court of Appeals for the Federal Circuit recently has noted that:

> To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning. . . . It is not enough for a patentee to

6

IPR2014-00750
Patent 7,546,933 B2

> simply disclose a single embodiment or use a word in the same
> manner in all embodiments, the patentee must "clearly express
> an intent" to redefine the term.

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal citations omitted).

Following these principles, we decline to narrow "actuation stroke" to "linear movement." The portions of the Specification that Ignite relies upon do not require that we limit the "actuation stroke" to "linear movement" because they do not express a clear intent to redefine "actuation stroke" as limited to linear movement. In fact, the Specification never expressly uses "linear" to describe the movement of any portion of the trigger mechanism. Rather, the Specification is consistent with "actuation stroke" referring to movement of the trigger from an open to a closed position.

We recognize that Figures 16 and 18 illustrate a trigger that moves along a linear path. We consider this disclosure, however, merely to support the express limitations of the actuation stroke as being "linear" as recited in dependent claim 10 and independent claim 15. "[N]ormally . . . limitations stated in dependent claims are not to be read into the independent claim from which they depend." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999). Additionally, "different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Id.* Here, the express recitation of "linear" in claims 10 and 15 presumptively favors an interpretation of "actuation stroke" that is broader than "linear actuation stroke." Ignite does not address or rebut that presumption.

For these reasons, we discern no suitable reason to interpret "actuation stroke" to mean anything other than its plain meaning—i.e., the path through

7

IPR2014-00750
Patent 7,546,933 B2

which the trigger mechanism travels as the vent seal and shutter move
between the closed and open positions.

### c. Push-button Trigger

Ignite contends that we should interpret "push-button trigger" to mean
"a trigger that is operated by pushing a button." Prelim. Resp. 9 (citing
dictionary definition supplied in Ex. 2002 and a portion of the Specification
consistent with that definition at Ex. 1007, 2:6–11). At this stage of the
proceeding, we agree that Ignite's proposed interpretation is the broadest
reasonable interpretation of "push-button trigger."

### B. The Challenges to Patentability

PMI challenges the patentability of claims 1–16, all claims of the
'933 patent, on the grounds that the challenged claims are obvious in light of
various combinations of six references: Albert '748, Numbers, Nergard,
Chaffin, Albert '799, and Paz. Pet. 12–59. The Supreme Court in *KSR Int'l
Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) reaffirmed the framework for
determining obviousness as set forth in *Graham v. John Deere Co.*, 383 U.S.
1 (1966). As observed by the Court in *KSR*, the factual inquiries set forth in
*Graham* that are applied for establishing a background for determining
obviousness under 35 U.S.C. § 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at
   issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating
   obviousness or nonobviousness.

8

IPR2014-00750
Patent 7,546,933 B2

*KSR*, 550 U.S. at 406. At this stage of the proceeding, the record does not permit us to consider fully all four *Graham* factors because Ignite is not yet permitted to submit any new testimonial evidence. 37 C.F.R. § 42.107(c). Nevertheless, we consider PMI's obviousness challenges in light of these principles based on the evidence that it has proffered, while recognizing that Ignite will have an opportunity to submit countervailing evidence in connection with any claims for which we institute a trial.

### 1. Claims 1, 2, and 4–7 — Obviousness in view of Albert '748 and Numbers

Claim 1 is an independent claim. Claims 2 and 4–7 depend directly from claim 1. PMI contends that Albert '748 in combination with Numbers renders all these claims unpatentable as obvious. Pet. 12–21. We understand that in challenging claims 1, 2, and 4–7 as obvious over Albert '748 in view of Numbers, PMI relies on Numbers only "[t]o the extent the valve member 30 of Albert '748 is not considered a drink aperture 'shutter'." Pet. 16. We determine that PMI has shown sufficiently that Albert '748's valve member 30 constitutes the claimed shutter. Therefore, PMI's contingent reliance on Numbers is not required to establish obviousness of claims 1, 2, and 4–7. Thus, we decline to institute *inter partes* review based on grounds including Numbers, and instead analyze whether the challenged claims are obvious over Albert '748 alone.

Ignite first argues that PMI fails to identify how the combination of Albert '748 and Numbers teaches or suggests "the trigger mechanism *independently moving* the shutter and the vent seal." Prelim. Resp. 22–23. Ignite also contends that the combination of Albert '748 and Numbers fails to render claims 1, 2, and 4–7 obvious because Albert '748 and Numbers fail to teach the claimed "actuation stroke." Prelim. Resp. 23–27. Ignite also

9

IPR2014-00750
Patent 7,546,933 B2

argues in support of the patentability of dependent claim 7 based upon limitations introduced in that claim. *Id.* at 26–27. We separately address Ignite's argument in favor of patentability of claim 7 based on limitations that appear solely in claim 7.

### a. Ignite's Arguments Relating to Claims 1, 2, and 4–7

PMI sets forth in detailed claim charts the way in which Albert '748 describes every element of claims 1, 2, and 4–7. Pet. 15–21. For example, PMI demonstrates how Albert '748 teaches a mechanism that independently opens relief valve 78 and then valve member 30. Pet. 16 (citing Ex. 1001, 4:67–5:6).

Ignite contends that the combination of Albert '748 and Numbers fails to teach a trigger mechanism having an "actuation stroke," so long as we adopt Ignite's proposed interpretation of "actuation stroke" as requiring "linear movement." Prelim. Resp. 22–26. As explained in part II.A.2.b above, we do not interpret "actuation stroke," as recited in claims 1, 2, and 4–7 to require "linear movement." Accordingly, we are persuaded at this early stage of the proceeding that PMI has demonstrated a reasonable likelihood that it would prevail with respect to its challenge that Albert '748 alone renders claims 1, 2, and 4–6 unpatentable as obvious under § 103. We also conclude that Ignite's arguments discussed in this section are not persuasive, and we analyze Ignite's argument directly solely to claim 7 below.

### b. Ignite's Separate Argument Regarding Claim 7

Claim 7 depends upon claim 1 and further recites "a deflector plate adjacent the vent aperture, wherein the deflector plate directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the

10

IPR2014-00750
Patent 7,546,933 B2

container body." Ex. 1007, 24:5–8. PMI contends that knob 96 of Albert
'748 constitutes the claimed deflector because it would redirect vapor
expelled from opening 88 in a "360 degree pattern . . . with most of the
vapor being redirected in a direction transverse (i.e., lying across, not
parallel) to the longitudinal axis of the body of the container 10." Pet. 21
(citing testimony from Mr. Aron D. Dahlgren, P.E. at Ex. 1015 ¶ 62).

Ignite counters that even if we were to accept PMI's contention as
true, the "entire 360° pattern would still be in a plane parallel to the
longitudinal axis of the container, not transverse as required." Prelim.
Resp. 27. Ignite includes an annotated version of Figure 2 from Albert '748,
which is reproduced below.

**Albert '748**



Ignite annotates Albert '748's Figure 2 to depict the direction in
which vapor expelled from opening 88 allegedly would flow
upon striking knob 96.

*Id.*

IPR2014-00750
Patent 7,546,933 B2

Ignite fails to persuade us because vapor flowing in a 360-degree pattern also would flow necessarily in directions that are transverse to the longitudinal axis of the container. The 360-degree flow pattern is three-dimensional in all directions in the plane illustrated on the left hand portion of Ignite's annotated version of Albert '748's Figure 2. Therefore, at least some of the vapor would be flowing in various directions transverse to the longitudinal axis of the container, including those characterized as perpendicular. In fact, any direction in that plane that is not parallel to the longitudinal axis of the container would meet the "transverse" requirement of claim 7. As discussed above, we have already determined that *inter partes* review is warranted for claim 1, the claim from which claim 7 depends. Accordingly, we are persuaded at this early stage of the proceeding that PMI has demonstrated a reasonable likelihood that it would prevail with respect to its challenge that Albert '748 renders claim 7 unpatentable as obvious under § 103.

> 2. *Claims 3, 15, and 16 — Obviousness in view of Nergard, Albert '748, and Numbers*

PMI provides argument, detailed claim charts with citations to prior art, and testimony that support its challenge that claims 3, 15, and 16 are unpatentable as obvious over the combination of Nergard, Albert '748, and Numbers. Pet. 21–37 (citing Ex. 1015 ¶¶ 63–81). For reasons similar to those expressed in part II.B.1.a above,[1] we find that PMI has provisionally included Numbers in its challenge and that it is unnecessary to consider Numbers as part of PMI's challenge. Accordingly, we review PMI's

---

[1] PMI identifies Nergard's valve head structure 20 as the "shutter" recited in claim 3, which we determine to describe sufficiently the claimed shutter.

IPR2014-00750
Patent 7,546,933 B2

challenge to claims 3, 15, and 16 as being based solely upon Nergard and
Albert '748.

> a. Claims 15 and 16

PMI provides argument, detailed claim charts with citations to prior
art, and testimony that purportedly illustrate how the combination of
Nergard and Albert '748 teaches each requirement of independent claim 15
and claim 16, the only claim depending from claim 15. Pet. 29–37;
Ex. 1015 ¶¶ 76–84. Ignite raises a number of arguments to counter PMI's
challenge, and we address each in turn below.

> (1) *Nergard's Alleged Failure to Describe the "Vent Seal"*

PMI contends that Nergard teaches the "vent seal" of independent
claim 15 in the form of an O-ring that is not numbered but is illustrated as
being on actuating member 23 between the inner wall of housing 25 and
collar 32. Pet. 29–30 (citing Ex. 1003, Figures 7 and 8). PMI proffers
evidence to support its contention in the form of testimony from Mr.
Dahlgren, P.E., who explains while discussing the vent seal of claim 3:
"Nergard discloses . . . an O-ring (vent seal). The O-ring is not numbered
but clearly illustrated." *See* Ex. 1015 ¶ 63 (regarding Nergard's teaching of
O-ring as "vent seal" for claim 3); *see also id.* ¶¶ 76, 80, 82 (at pp. 40–41)
and 83 (identifying O-ring that meets the limitation of a "vent seal" recited
in claim 15). Other than the alleged O-ring shown in Nergard's Figures 7
and 8, PMI also contends that Albert '748 teaches using "an O-ring to seal
the sidewall vent aperture," Pet. 31, and Mr. Dahlgren characterizes relief

13

IPR2014-00750
Patent 7,546,933 B2

valve 78 of Albert '748 as a "pressure relief valve" that permits steam to be relieved through "opening 88." Ex. 1015 ¶ 82 at pp. 42–43.[2]

Ignite counters that the structure that PMI identifies as an O-ring is not an "O-ring" and cannot serve as the claimed vent seal. Prelim. Resp. 30–32. Ignite provides three arguments in support of its contention. First, Nergard's collar 32 refers to both the specified structure and the unnumbered structure that PMI identifies as the vent seal, which Nergard fails to describe as "resilient." *Id*. at 30–31. Second, Nergard describes other structures as resilient seals, implying that the absence of disclosure of collar 32 as being resilient establishes that collar 32 and the alleged O-ring are not seals. *Id*. at 31. Third, a skilled artisan would not use a seal at Nergard's opening 24. *Id*. at 31–32.

At this stage, we find that Ignite's arguments regarding Nergard's teachings are unsupported by evidence. To the extent that Ignite is able to provide evidence in support of these positions later, we will weigh that evidence appropriately. Accordingly, based on the current record, we are not persuaded by Ignite's argument that Nergard does not teach a vent seal.

### (2) Nergard's Alleged Failure to Describe a "Push-button Trigger"

Ignite contends that Nergard fails to describe the recited "push-button trigger" of independent claim 15. Prelim. Resp. 32–33. We find Ignite's argument unpersuasive because the argument fails to address the challenge as presented by PMI, which is based on the combination of Nergard and Albert '748. For example, PMI identifies the manner in which Albert '748

---

[2] PMI identifies Albert '748's valve 78 as the vent seal in connection with independent claim 1. Pet. 16 (citing Ex. 1001, 4:67–5:6). Ignite does not contest, at this stage in the proceeding, that Albert '748 discloses a vent seal.

IPR2014-00750
Patent 7,546,933 B2

teaches "pre-venting" (Pet. 54, 57–58) and the "push-button trigger" (*id.* at 52, 55–56). Ignite does not address the adequacy of PMI's showing, which we conclude to be sufficient at this stage of the proceeding.

### (3) PMI's Alleged Failure to Set Forth Prima Facie Obviousness

Ignite argues that PMI has failed to carry its burden to set forth a prima facie case of obviousness and that PMI's challenge amounts to "mere conclusory statements" without "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." Prelim. Resp. 33–34 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). Ignite contends that the only reason upon which PMI bases its argument for incorporating features of Albert '748 into Nergard is that the two references "are in the same field of art, both use a sidewall vent aperture and a drink aperture in the top of the lid, and both teach use of an O-ring to seal the sidewall vent aperture and a drink opening seal to close a drink opening via a trigger mechanism." *Id.* at 34–35 (citing Pet. 25 and Ex. 1015 ¶¶ 72 and 80). Ignite argues that two references being in the same art and having similar features is not "sufficient 'reason . . . to combine the elements in the way the claimed new invention does' as required by *KSR*." Prelim. Resp. 34–35. Ignite neither provides a citation to *KSR* nor analyzes why *KSR* supports its argument.

Our review of *KSR* reveals that Ignite misquotes *KSR*, which states:

Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion

IPR2014-00750
Patent 7,546,933 B2

claimed by the patent at issue. To facilitate review, this
analysis should be made explicit.

*KSR,* 550 U.S. at 418. Of course, at this stage of the proceeding, the record
is incomplete because Ignite has not yet had the opportunity to submit new
testimonial evidence regarding, among other things, the level of skill in the
art, how a skilled artisan would view the teachings of the prior art, what was
or was not within the background knowledge of a skilled artisan, or whether
any secondary considerations weigh against a conclusion of obviousness.

Conversely, PMI has provided evidence including testimony that
could support a conclusion that a skilled artisan would have found the
subject matter of claims 15 and 16 obvious. *See* Pet. 29–37; Ex. 1015
¶¶ 76–84. For example, PMI has identified teachings within Albert '748 of
problems with drink containers having a drink and vent but which do not
pre-vent gases from the container before opening the drink aperture. *E.g.,*
Pet. 12 (citing Ex. 1001, 1:14–25). PMI also identifies how Albert '748
teaches to solve those problems by pre-venting the interior of the container
before opening the drink aperture. *E.g.,* Pet. 12 (citing Ex. 1001, 2:37–43).
PMI contends that Nergard also teaches a drink container having a vent and
a drink aperture, but one that suffers the problem identified by Albert '748.
Pet. 23. Albert '748's description of the recognized problem with drink
containers like Nergard's and Albert '748's proposed solution of that
problem provide a sufficient showing that Albert '748's teachings suggest
modifying Nergard to add pre-venting. Accordingly, on the record before
us, we determine that PMI has shown successfully a reasonable likelihood
that it would prevail in its challenge that claims 15 and 16 are unpatentable
as directed to obvious subject matter in light of the combination of Nergard
and Albert '748.

IPR2014-00750
Patent 7,546,933 B2

      b. Claim 3

Claim 3 depends from claim 1 and further recites: "a vent chamber between the vent seal and the vent aperture, the vent chamber having a cross-sectional area greater than a cross-sectional area of the vent aperture." Ex. 1007, 23:58–61. PMI provides argument, claim charts with citations to prior art, and testimony that purportedly illustrate how the combination of Nergard and Albert '748 teaches each requirement of claim 3, including those elements recited in independent base claim 1. Pet. 21–29; Ex. 1015 ¶¶ 63–75.

PMI contends that Nergard illustrates the vent chamber of claim 3 as the space within housing 25 shown in Figure 8, which is reproduced below.



Nergard's Figure 8 is a partial cross sectional view of Nergard's mug lid and valve assembly focusing on the mechanism for opening the valve in the lid, and illustrated with the valve open.

Ex. 1003, 4:54–55. PMI identifies an "O-ring" illustrated next to Nergard's collar 32 on actuating member 23 in Nergard's Figure 8 as the claimed vent seal and the space within Nergard's housing 25 as the vent chamber. Pet. 21–22. PMI also contends that "an open lower end of the housing [25] serves as a vent aperture." Id. at 22. Based on this mapping of Nergard's structure to the claimed elements, PMI concludes that "the interior space of the housing which serves as the vent chamber is located between the O-ring

IPR2014-00750
Patent 7,546,933 B2

(vent seal) and the open lower end (vent aperture) of the housing as recited in claim 3." *Id.* at 23 (citing Ex. 1015 ¶ 67).

PMI argues that "housing 25 (vent chamber) of Nergard has a cross-sectional area greater than the cross-sectional area of the open lower end (vent aperture) of the housing." Pet. 22. PMI relies upon Mr. Dahlgren's analysis of the cross-sectional areas of the housing and its open lower end. *Id.* at 23 (citing Ex. 1015 ¶¶ 65, 66, and 68). Ignite does not contest PMI's contentions regarding the relative cross-sectional areas of the open lower end of housing 25 and the other portions of housing 25. Prelim. Resp. 37–40. Nonetheless, we review PMI's argument and evidence to determine whether PMI has demonstrated that its challenge to claim 3 meets the requirements of § 314(a). 37 C.F.R. § 42.108(c).

Exhibit 1021, which is an annotated version of Nergard's Figure 7 and is reproduced below, graphically summarizes Mr. Dahlgren's testimony.



FIG. 7

Exhibit 1021 illustrates a cross section of Nergard's lid annotated to label dimensions for Mr. Dahlgren's analysis of the cross-sectional areas of Nergard's housing 25 (X1 and X2) and the open lower end (Y) of housing 25.

Mr. Dahlgren labels the relevant dimensions of Nergard's housing 25 as X1 and X2, and the dimension of the open lower end of housing 25 as Y. Ex. 1015 ¶ 65. Mr. Dahlgren measures dimension X1 to be 1.9 cm, X2 to be 3.1 cm, and dimension Y to be 1.4 cm and concludes that the cross-sectional area of the vent chamber (housing 25) is greater than the cross-sectional area

IPR2014-00750
Patent 7,546,933 B2

of the vent aperture (i.e., the open lower end of housing 25). Ex. 1015 ¶ 66.
He reasons that measuring these dimensions is sufficient to demonstrate
cross-sectional areas based on an assumption that the width of housing 25 is
constant. *Id.* Mr. Dahlgren relies upon Nergard's Figure 7 as if it were
drawn to scale to conclude that the cross-sectional area of the open lower
end of housing 25 is less than the cross-sectional areas of other portions of
housing 25.

At the outset, we conclude that PMI may rely upon relative
dimensions shown in Nergard's illustrations to describe qualitative size
relationships among elements. Normally, however, "patent drawings do not
define the precise proportions of the elements and may not be relied on to
show particular sizes if the specification is completely silent on the issue."
*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956
(Fed. Cir. 2000). Nergard does not indicate and Mr. Dahlgren does not
testify that Nergard's drawings were made to scale. Therefore, PMI may not
rely upon Nergard's illustrations to show particular sizes. Nevertheless,
even when patent drawings are not drawn to scale, they may be used to
establish relative sizes and relationships between the various components
which are clearly depicted in those drawings. *See, e.g.*, *Vas-Cath Inc. v.
Mahurkar*, 935 F.2d 1555, 1565 (Fed. Cir. 1991).

We conclude, however, that Mr. Dahlgren underestimates the cross-
sectional area of the open lower end of housing 25. More specifically, Mr.
Dahlgren does not measure the full extent of the open lower end, which we
identify as Y' in the annotated version of Exhibit 1021 reproduced
immediately below. Nergard's lever 26 does not reduce the size of the
opening in the open lower end of housing 25. Therefore, we conclude that it

19

IPR2014-00750
Patent 7,546,933 B2

is improper for PMI to rely upon dimension Y as a surrogate for defining the cross-sectional area of the open lower end of housing 25.



FIG. 7

An annotated version of Exhibit 1021 illustrates a cross section of Nergard's lid with indicated dimension Y' being a more accurate surrogate for the cross-sectional area of the open lower end of housing 25 than dimension Y.

Without offering evidence of dimension Y', PMI fails to proffer evidence of the cross-sectional area of the open lower end of housing 25. We, therefore, determine that PMI has failed to provide evidence establishing the relationship between the cross-sectional areas of the "vent aperture" and the "vent chamber." Accordingly, we are not persuaded that PMI has demonstrated a reasonable likelihood that it would prevail in connection with its challenge that the combination of Nergard and Albert '748 renders claim 3 unpatentable as obvious under § 103.

3.  *Claims 8, 9, 13, and 14 — Obviousness in view of Albert '799 and Numbers*

Claim 8 is an independent claim directed to a "drinking container" that largely recites elements similar to those recited in independent claim 1, a container body, a removable lid, and a trigger. *Compare* Ex. 1007, 23:34–53 *with id.* at 24:9–31. Claims 9, 13, and 14 depend directly or indirectly from claim 8. *Id.* at 24:32–34 (claim 9), 24:46–54 (claims 13 and 14). PMI

20

IPR2014-00750
Patent 7,546,933 B2

provides detailed claim charts and testimony to support its challenge that claims 8, 9, 13, and 14 are unpatentable as obvious over the combination of Albert '799 and Numbers. Pet. 36–42 (citing Ex. 1015 ¶¶ 85–99). PMI contends that Albert '799 teaches every element of claims 8, 9, 13, and 14 as set forth in its claim charts. Pet. 39–45. PMI relies on Numbers only "[t]o the extent the valve member 33 of Albert '799 is not considered a drink aperture 'shutter.'" Pet. 40. We determine that PMI has shown sufficiently that Albert '799's valve member 33 constitutes the claimed shutter. Therefore, PMI's contingent reliance on Numbers is not required to establish obviousness of claims 8, 9, 13, and 14. For reasons similar to those expressed in part II.B.1.a above, we find that PMI provisionally has included Numbers in its challenge to the patentability of claims 8, 9, 13, and 14 and that it is unnecessary to consider Numbers as part of PMI's challenge. Accordingly, we review PMI's challenge to claims 8, 9, 13, and 14 as being based solely upon Albert '799.

Ignite contends that the combination of Albert '799 and Numbers fails to teach a trigger mechanism having an "actuation stroke," so long as we adopt Ignite's proposed interpretation of "actuation stroke" as requiring "linear movement." Prelim. Resp. 41–44. As explained in part II.A.2.b above, we do not interpret "actuation stroke" as recited in claim 8 to require "linear movement." Furthermore, claims 9, 13, and 14 do not add expressly such a requirement. Accordingly, we are persuaded at this early stage of the proceeding that PMI has demonstrated a reasonable likelihood that it would prevail with respect to its challenge that Albert '799 renders claims 8, 9, 13, and 14 unpatentable as obvious under § 103.

IPR2014-00750
Patent 7,546,933 B2

### 4. Claim 10 — Obviousness in view of Chaffin and Albert '748

Claim 10 depends from claim 8 and further recites in pertinent part:
"wherein the actuation stroke of a portion of the trigger connected to one of
the vent seal and the shutter of the trigger is linear and transverse to a
longitudinal axis of the container body." Ex. 1007, 24:35–38. PMI
contends that Chaffin describes all elements of dependent claim 10 and its
base claim 8 except that Chaffin fails to teach the pre-venting feature that
Albert '748 teaches via its lost-motion trigger mechanism. Pet. 54 (citing
Ex. 1006, Figs. 9–12); *see also* Pet. 51–52 (identifying Chaffin's teachings
of the basic elements of claim 8) and *id.* at 56 (identifying Chaffin's
teaching of linear actuation stroke). PMI contends that it would have been
obvious to incorporate the "lost motion" of Albert '748 into Chaffin's
actuator rod 152 "at a location between the L-shaped valve arms 161 on
which the fluid supply valve head 162' and the vent valve head 162" are
mounted." PMI also contends that Chaffin's actuator rod 152 moves
linearly as valve members 162' and 162" are opened. Pet. 54–55.

Ignite counters that Chaffin requires linear movement of its actuator to
move simultaneously its drink and vent valves linearly, but that Albert '748
teaches away from linear movement of its trigger mechanism. Prelim.
Resp. 50. We are not persuaded because Albert '748 does not disparage the
use of linear movement in a trigger mechanism.

Ignite next argues that PMI's proposed modification of Chaffin is
"unintelligible" because "there is no structure labeled '161' in the figures of
Chaffin." *Id.* at 51. We unpersuaded because Chaffin describes that its
actuator rod 152 is operatively connected to a pair of valve members 160,
each of which includes an L-shaped valve arm 161 having a valve head 162

IPR2014-00750
Patent 7,546,933 B2

mounted on the end. Ex. 1006, 5:48–52. While arms 161 are not numbered in Chaffin's figures, they are described in sufficient detail to identify them in Chaffin's actuator element 150.

Ignite also argues that PMI has failed to meet its burden of establishing that Chaffin and Albert '748 are "properly combinable." Prelim. Resp. 51. Ignite contends that "the mechanisms of Albert '748 and Chaffin are drastically different. Chaffin requires linear actuation and Albert '748 requires downwardly declining actuation." *Id.* At this stage of the proceeding, we are persuaded that a skilled artisan would have found it obvious to incorporate the lost-motion mechanism of Albert '748, which moves in a linear path, into Chaffin's linearly actuated trigger mechanism. PMI identifies evidence that Albert '748 suggested the utility of its lost-motion mechanism to add a pre-venting to drink cup technology. Pet. 12 (citing Ex. 1001, 1:14–25 and 2:37–43). PMI contends that Chaffin also teaches a drink container having a vent and a drink aperture, but one that suffers the problem identified by Albert '748. Pet. 54. Albert '748's description of the recognized problem with drink containers like Chaffin's and Albert '748's proposed solution of that problem provide a sufficient showing that Albert '748's teachings suggest modifying Chaffin to add pre-venting. Accordingly, on the record before us, we determine that PMI has shown successfully a reasonable likelihood that it would prevail in its challenge that the combination of Chaffin and Albert '748 renders claim 10 unpatentable as obvious under § 103.

### 5. *Claim 11 — Obviousness in view of Chaffin and Albert '748*

Claim 11 depends from claim 8 and further recites in pertinent part: "a vent chamber between the vent seal and the vent aperture, and wherein

IPR2014-00750
Patent 7,546,933 B2

the trigger extends partially through the vent chamber." Ex. 1007, 24:39–42.
PMI contends that Chaffin teaches these limitations and supports that
contention with documentary and testimonial evidence. Pet. 58–59 (citing
Ex. 1006, 4:47–53, 5:10–21; Ex. 1015 ¶¶ 125 and 126). Ignite counters that
Chaffin fails to describe the limitation that "the trigger extends partially
through the vent chamber." *See* Prelim. Resp. 54–55. Ignite contends that
"[n]o part of the trigger of Chaffin extends through the vent chamber" that is
highlighted in yellow in the annotated version of Chaffin's Figure 5, which
appears below. *Id.* at 54.



**Fig. 5**

Ignite highlights in yellow a portion of Chaffin's structure near
vent aperture 45, which Ignite contends to correspond to the
claimed "vent chamber."

*Id.*

At this stage of the proceeding, we are not persuaded by Ignite's
argument because it identifies vent aperture 45 as the claimed "vent
chamber" rather than PMI's mapping of Chaffin's "elongated vent chamber
27," to the vent chamber of claim 11. Pet. 58 (citing Ex. 1006, 4:47–53).
Vent chamber 27 is a chamber into which valve member 55, which is part of
actuator element 50 (the trigger mechanism), partially extends as shown in

24

IPR2014-00750
Patent 7,546,933 B2

Chaffin's Figure 5. Accordingly, on the record before us, we determine that PMI has shown successfully a reasonable likelihood that it would prevail in its challenge that the combination of Chaffin and Albert '748 renders claim 11 unpatentable as obvious under § 103.

### 6. *Claim 12 — Obviousness in view of Chaffin, Albert '748, and Paz*

Claim 12 depends from claim 11, which depends from claim 8, and further recites in pertinent part: "a trigger seal opposing the vent seal, the trigger seal sealing the joint between the trigger and an exterior of the lid." Ex. 1007, 24:43–45. PMI acknowledges that Chaffin does not illustrate "use of a seal sealing between the stem portion 51 and the sidewall 21 where it exits the sidewall to the exterior of the cover 10." Pet. 59. PMI argues that a skilled artisan would have been motivated "to look to the teachings of Paz . . . which uses a sealed plunger 26 (trigger) extending through a cover 12 to actuate vent and drink opening seals 31." *Id.* Ignite counters that Paz fails to disclose a trigger seal. Prelim. Resp. 57.

On the record before us in this proceeding, we are persuaded by Ignite's argument. In this proceeding, PMI wholly fails to identify how Paz teaches a "trigger seal." Even if we were to find that Paz describes a trigger seal at the location where Paz's plunger 26 passes through cover 12, PMI wholly fails to identify how or why such a "trigger seal" would be adapted from Paz into Chaffin. Accordingly, we are not persuaded that PMI has demonstrated a reasonable likelihood that it would prevail in connection with its challenge that the combination of Chaffin, Albert '748, and Paz renders claim 12 unpatentable as obvious under § 103.

IPR2014-00750
Patent 7,546,933 B2

### 7. Obviousness of Claims 10–12 in light of Combinations Including Chaffin and Numbers

PMI also contends that the combination of Chaffin and Numbers renders claims 10 and 11 obvious. Pet. 45–54 (claim 10), 57–58 (claim 11). PMI also contends that Paz teaches the limitations recited solely in dependent claim 12 and is combined properly with Chaffin and Numbers. *Id.* at 59. PMI acknowledges that Chaffin fails to describe pre-venting. Pet. 48. PMI contends, however, that

> incorporating the pre-venting approach of Numbers in Chaffin only requires a slight leftward repositioning of the outlet valve seat 29 of the fluid supply chamber 26 (and perhaps a slight elongation of the valve head 56 used in the fluid supply chamber 26 as also done in the modified Fig. 4 of PMI-1023 to 1025).

*Id.* at 50–51 (citing Ex. 1015 ¶¶ 112 and 113). PMI relies entirely upon the similarity of Chaffin and Numbers as the reasoning to support its contention that it would have been obvious to alter Chaffin to include structures from Numbers. Pet. 51.

We are not persuaded that PMI has demonstrated why a skilled artisan would have found it obvious to use the pre-venting approach of Numbers—spacing 74 between inclined surface 70 and cam portion 72—in Chaffin's venting mechanisms. More specifically, we are not persuaded that "repositioning of the outlet valve seat 29 of the fluid supply chamber 26" equates to Numbers's use of spacing 74 to accomplish pre-venting. Accordingly, we are not persuaded that PMI has demonstrated a reasonable likelihood that it would prevail in connection with its challenge that the combination of Chaffin and Numbers renders claims 10 and 11 unpatentable as obvious under § 103. For at least the same reasons, we are not persuaded

IPR2014-00750
Patent 7,546,933 B2

that PMI has demonstrated a reasonable likelihood that it would prevail in its challenge that the combination of Chaffin, Numbers, and Paz renders claim 12, which depends from claim 11, unpatentable as obvious under § 103.

### III. CONCLUSION

For the reasons expressed above, we determine that PMI has shown that it is reasonably likely to prevail in establishing that claims 1, 2, 4–11, and 13–16 are unpatentable as obvious. We also determine that PMI has not shown that it is reasonably likely to prevail with respect to its challenges to the patentability of claims 3 and 12.

### IV. ORDER

For the reasons given, it is:

ORDERED that *inter partes* review is instituted with respect to PMI's challenge that Albert '748 renders claims 1, 2, and 4–7 unpatentable as obvious under § 103;

FURTHER ORDERED that *inter partes* review is instituted with respect to PMI's challenge that Albert '799 renders claims 8, 9, 13, and 14 unpatentable as obvious under § 103;

FURTHER ORDERED that *inter partes* review is instituted with respect to PMI's challenge that the combination of Chaffin and Albert '748 renders claims 10 and 11 unpatentable as obvious under § 103;

FURTHER ORDERED that *inter partes* review is instituted with respect to PMI's challenge that the combination of Nergard and Albert '748 renders claims 15 and 16 unpatentable as obvious under § 103;

FURTHER ORDERED that no other grounds of unpatentability alleged in the Petition are authorized for this *inter partes* review; and

27

IPR2014-00750
Patent 7,546,933 B2

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '933 patent is instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is given of the institution of a trial.

IPR2014-00750
Patent 7,546,933 B2

PETITIONER:

George C. Rondeau, Jr.
DAVIS WRIGHT TREMAINE LLP
GeorgeRondeau@dwt.com

Kelly J. Hollowell
STITES & HARBISON PLLC
khollowell@stites.com

PATENT OWNER:

Stephen M. Schaetzel
Gregory J. Carlin
Jessica Keesee
Warren J. Thomas
MEUNIER CARLIN & CURFMAN, LLC
sschaetzel@mcciplaw.com
gcarlin@mcciplaw.com
jkeesee@mcciplaw.com
wthomas@mcciplaw.com