Exhibit F

Trials@uspto.gov                                                        Paper 56
Tel: 571-272-7822                                          Entered: November 13, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

PACIFIC MARKET INTERNATIONAL, LLC,
Petitioner,

v.

IGNITE USA, LLC,
Patent Owner.

———————————————

Case IPR2014-00750
Patent 7,546,933 B2

———————————————

Before JOSIAH C. COCKS, MITCHELL G. WEATHERLY, and
JAMES A. WORTH, *Administrative Patent Judges.*

WEATHERLY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)*

## I.  INTRODUCTION

### A. BACKGROUND

Pacific Market International, LLC ("PMI") filed a Petition (Paper 2,
"Pet.") requesting an *inter partes* review of claims 1–16 of U.S. Patent No.
7,546,933 B2 (Ex. 1007, "the '933 patent").  PMI supported the Petition
with a declaration from Aron D. Dahlgren, P.E. (Ex. 1015).  Ignite USA,
LLC ("Ignite") timely filed a Preliminary Response.  Paper 6 ("Prelim.

IPR2014-00750
Patent 7,546,933 B2

Resp.").  On November 19, 2014, based on the record before us at the time, we instituted an *inter partes* review of claims 1, 2, 4–11, and 13–16, Paper 10 ("Institution Decision" or "Dec."), on the following grounds:

| Reference(s) | Basis | Claims |
|---|---|---|
| U.S. Patent No. 3,967,748 ("Albert '748") (Ex. 1001) | § 103 | 1, 2, and 4–7 |
| U.S. Patent No. 4,136,799 ("Albert '799") (Ex. 1005) | § 103 | 8, 9, 13, and 14 |
| U.S. Patent No. 5,711,452 ("Chaffin") (Ex. 1006) in view of Albert '748 | § 103 | 10 and 11 |
| U.S. Patent No. 4,303,173 ("Nergard") (Ex. 1003) in view of Albert '748 | § 103 | 15 and 16 |

Dec. 27.

After we instituted review, PMI Ignite filed a Patent Owner Response, Paper 24 ("Resp."), in opposition to the Petition, supported by the declaration of Lee A. Swanger, Ph.D., P.E. (Ex. 2008).  PMI filed a Reply in support of the Petition, Paper 28 ("Reply"), supported by two additional declarations from Mr. Dahlgren (Exs. 1026, 1027).

Ignite also filed a Motion to Exclude certain evidence proffered by PMI.  Paper 40 ("Motion" or "Motion to Exclude").  PMI opposed the Motion to Exclude.  Paper 45 ("Mot. Opp.").  Ignite filed a Reply in support of the Motion.  Paper 51 ("Mot. Reply").  Ignite did not move to amend any claim in the '933 patent.

We heard oral argument on June 17, 2015.  A transcript is entered as Paper 55 ("Tr.").

IPR2014-00750
Patent 7,546,933 B2

For the reasons expressed below, we conclude that PMI has demonstrated, by a preponderance of evidence, that all claims for which review has been instituted are unpatentable as obvious under 35 U.S.C. § 103. We also deny Ignite's Motion to Exclude.

B. RELATED MATTERS

PMI identified, as a related proceeding, the co-pending lawsuit, *Ignite USA, LLC v. Pacific Market International, LLC*, No. 14-cv-856 (N.D. Ill. filed Feb. 7, 2014). Pet. 1.

C. THE '933 PATENT

The '933 patent relates to a sealed drink container with at least two trigger-actuated apertures in the lid, one through which the user drinks the beverage and another for venting pressure. Ex. 1007, 15:44–59. When the user presses the trigger, the pressure vent opens first and then the drink aperture opens. *Id.* at 20:40–50, Figs. 16–18. The sequential opening of these two apertures releases any hot gases inside the container through the vent rather than the drink aperture. *Id.* at 20:8–13. PMI and Ignite refer to the opening of a vent before opening the drink aperture as "pre-venting." *E.g.*, Pet. 3, Resp. 37.

Claims 1, 8, and 15, which are independent and representative, recite:

1. A drinking container comprising:

a container body having a cavity;

a removable lid covering the cavity, the lid having a drink aperture and a separate vent aperture; and,

a trigger mechanism mechanically connected to a shutter adjacent the drink aperture and to a vent seal, the trigger mechanism independently moving the shutter and the vent seal from a closed position to an open position, the shutter operating to operably close and open access to the cavity

3

IPR2014-00750
Patent 7,546,933 B2

through the drink aperture, and the vent seal operating to operably close and open access to the cavity through the vent aperture, wherein the trigger mechanism has an actuation stroke, wherein the vent seal is initially actuated during a first portion of the actuation stroke of the trigger mechanism, and wherein the shutter is initially actuated during a second portion of the actuation stroke of the trigger mechanism, the first portion of the actuation stroke occurring prior in time to the second portion of the actuation stroke.

Ex. 1007, 23:34–53.

8. A drinking container comprising:

a container body having a cavity;

a removable lid covering the cavity of the container body, the lid having a drink aperture and a vent aperture, a shutter that is moveable from a normally closed position to an open position, the shutter operably closing the drink aperture from the cavity in the closed position, the shutter positioned within the lid and below the drink aperture, and a vent seal that is moveable from a normally closed position to an open position, the vent seal operably closing the vent aperture from the cavity in the closed position, the vent seal positioned within the lid and below the vent aperture; and,

a trigger mechanically connected to the shutter and the vent seal, the trigger having an actuation stroke, wherein the vent seal is actuated during a first portion of the actuation stroke of the trigger, wherein the shutter is actuated during a second portion of the actuation stroke of the trigger, and wherein the first portion of the actuation stroke occurs prior in time to the second portion of the actuation stroke during movement of the shutter and the vent seal from the normally closed position to the open position.

*Id*. at 24:9–31.

4

IPR2014-00750
Patent 7,546,933 B2

> 15. A drinking container comprising:
>
> a container body having a cavity and a removable lid covering the cavity, the lid having a drink aperture and a vent aperture, a shutter operably closing the drink aperture from the cavity, a vent seal operably closing the vent aperture from the cavity, the lid further having a push-button trigger mechanically connected to the shutter and the vent seal to open and close the shutter and vent seal during actuation of the trigger, wherein the portion of the trigger directly connected to the shutter and the vent seal has a linear actuation stroke transverse to a longitudinal axis of the container body, and wherein the vent seal is actuated during a first portion of the actuation stroke of the trigger, wherein the shutter is actuated during a second portion of the actuation stroke of the trigger, and wherein the shutter remains in a closed position during the first portion of the actuation stroke of the trigger.

*Id.* at 24:55–25:4.

## II.   CLAIM INTERPRETATION

"A claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015) ("We conclude that Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA."). When applying that standard, we interpret the claim language as it would be understood by one of ordinary skill in the art in light of the specification. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). Thus, we give claim terms their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning 'is the meaning that the term would have to a person of ordinary skill in the art in question.'" Only terms which are in

5

IPR2014-00750
Patent 7,546,933 B2

controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

A. OUR PRIOR INTERPRETATION OF CLAIM TERMS

At the urging of one or both of the parties, we interpreted a number of claim terms as expressed in the Institution Decision including "shutter," "transverse," "seal," "actuation stroke," and "push-button trigger." Dec. 4–8. After our Institution Decision, the parties expressly dispute only our prior interpretation of "push-button trigger." Resp. 6–9; Reply 4–6. For the purposes of this Final Written Decision, we maintain our prior interpretations of "shutter," "transverse," "seal," and "actuation stroke," and we address only the parties' arguments regarding "push-button trigger" below.

B. PUSH-BUTTON TRIGGER

Independent claim 15 is the only claim that expressly recites a "push-button trigger." *Compare* Ex. 1007, 24:55–25:4 (claim 15), *with id.* at 23:34–24:54 (claims 1–14), 25:5–26:3 (claim 16). In our Institution Decision, we adopted Ignite's proposed interpretation of "push-button trigger" as meaning "a trigger that is operated by pushing a button." Dec. 8. Ignite seeks to clarify its initially proposed interpretation such that "push-button trigger" means "a push-button that operates in a linear fashion transferring the input force to the trigger mechanism along the same direction, i.e., perpendicular to the touch surface of the push-button (or transverse to the longitudinal axis of the container recited in the claims)." Resp. 9. Ignite proposes its clarification out of concern that PMI seeks to "stretch the term beyond its broadest reasonable interpretation." Resp. 6.

IPR2014-00750
Patent 7,546,933 B2

Ignite cites as the basis for its concern that Mr. Dahlgren testified on cross examination that a push-button means "[s]omething that one pushes," Ex. 2010, 94:15–17, and can refer to Nergard's lever, Ex. 2011, 80:5–7.

Ignite relies upon a lay dictionary definition and testimony of Dr. Swanger to support its contention that a skilled artisan would understand "push-button" to refer to a button, knob, or disk (but not a lever) that exerts force "in a direction generally perpendicular to the touch surface of the button." Resp. 6–7 (citing Ex. 2002; Ex. 2008 ¶ 37). Ignite also relies upon the Specification describing trigger member 610 as being pushed "radially inward." Resp. 8 (citing Ex. 1007, 20:17–21). Ignite further contends that its clarified interpretation is warranted because claim 15 recites "a pushbutton trigger that has a linear actuation stroke transverse to a longitudinal axis of the container body." Resp. 8.

PMI responds that our original interpretation of "push-button trigger" was "appropriate." Reply 4. PMI also argues that Ignite's new interpretation of "push-button trigger" is (1) unsupported by the claims, specification, and drawings of the '933 patent, (2) inconsistent with our interpretation of "actuation stroke," and (3) an improper attempt to require linear movement of part of the trigger mechanism for those claims not reciting such a limitation. *Id.* at 5–6. For reasons expressed below, we agree with PMI and decline to modify our interpretation of "push-button trigger."

By its plain meaning, "push-button" is used as an adjective to modify the noun "trigger." The Specification refers to an exemplary trigger as trigger member 610 in lid assembly 514, which a user would operate by pressing a flattened surface. Ex. 1007, 20:17–21, Fig. 14 (reproduced in pertinent part below left). As shown in Figure 15 (reproduced in pertinent

IPR2014-00750
Patent 7,546,933 B2

part below right), trigger 610 is only one item within a complex trigger assembly 520, which also includes main body portion 694, transverse portion 696, trigger spring 644, and arms 708 among other elements. *Id.* at 18:64–19:6. Transverse portion 696 of trigger 610 "operates as a push-button actuator" for trigger mechanism 520 and sealing mechanism 518. *Id.* at 19:64–20:1.




| The pertinent portion of Figure 14 of the '933 patent is a perspective view illustrating trigger 610 in lid assembly 514. | The pertinent portion of Figure 15 of the '933 patent is an exploded perspective view illustrating elements of trigger assembly 520. |

Based on our review of the Specification, we conclude that trigger member 610 is merely an exemplary embodiment of a trigger, and we take care not to incorporate limitations into the claims that appear only in the specification. *See In re Prater*, 415 F.2d 1393, 1404–05 (CCPA 1969). We recognize that the Specification describes trigger 610 as moving "radially," which would be in a direction transverse to the longitudinal axis of the container. Nevertheless, we do not consider this disclosure to limit "push-button trigger" so narrowly as Ignite proposes.

> To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain

IPR2014-00750
Patent 7,546,933 B2

> and ordinary meaning. It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must "clearly express an intent" to redefine the term.

*Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal citations omitted). If anything, the Specification merely provides support for the express limitation in claim 15 requiring a trigger that "has a linear actuation stroke transverse to a longitudinal axis of the container body." Accordingly, we do not conclude that "push-button trigger" alone requires a trigger to move along a linear actuation stroke in a particular direction.

## III. THE CHALLENGES TO PATENTABILITY

We instituted a review of the patentability of claims 1, 2, 4–11, and 13–16 of the '933 patent on the grounds that those claims may be obvious in light of various combinations of up to two of three prior art references: Albert '748, Nergard, Albert '799, and Chaffin. Dec. 8–27.

The Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) reaffirmed the framework for determining obviousness as set forth in *Graham v. John Deere Co.*, 383 U.S. 1 (1966). As observed by the Court in *KSR*, the factual inquiries set forth in *Graham* that are applied for establishing a background for determining obviousness under 35 U.S.C. § 103(a) are summarized as follows:

1. Determining the scope and content of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

IPR2014-00750
Patent 7,546,933 B2

> 4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

*KSR*, 550 U.S. at 406.  With these standards in mind, we address each challenge below.

### A. THE PARTIES' POST-INSTITUTION ARGUMENTS

In our Institution Decision, we concluded that PMI demonstrated a reasonable likelihood that it would prevail in showing that: (1) Albert '748 rendered claims 1, 2, and 4–7 obvious, Dec. 9–12; (2) the combination of Nergard and Albert '748 rendered claims 15 and 16 obvious, *id.* at 13–16; (3) Albert '799 rendered claims 8, 9, 11, 13, and 14 obvious, *id.* at 20–21; and (4) Chaffin and Albert '748 rendered claims 10 and 11 obvious, *id.* at 22–23.

We must now determine whether PMI has established by a preponderance of the evidence that these combinations of prior art render claims 1, 2, 4–11, and 13–16 unpatentable as obvious.  35 U.S.C. § 316(e).  In this connection, we previously instructed Ignite that "any arguments for patentability not raised in the [Patent Owner Response] will be deemed waived."  Paper 11, 2–3; *see also* 37 C.F.R. 42.23(a) ("Any material fact not considered denied may be considered admitted.").  Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief."  Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

Ignite argues that Albert '748 fails to describe the "mechanically connected" trigger of independent claim 1, Resp. 49–54, and the "deflector plate" of dependent claim 7, *id.* at 54–55.  Ignite also argues that Albert '799

10

IPR2014-00750
Patent 7,546,933 B2

fails to describe the "mechanically connected" trigger of independent claim 8. *Id*. at 56–57. Ignite also contends that Nergard does not describe the "push-button trigger" or "vent seal" recited in independent claim 15. *Id*. at 10–12 (addressing "push-button trigger"), 37–39 (addressing "vent seal"). Ignite further argues that it is improper to combine Nergard and Albert '748 or modify Nergard to include features of Albert '748. *Id*. at 12–37. Lastly, Ignite contends that the combination of Chaffin and Albert '748 fails to describe "a vent chamber between the vent seal and the vent aperture . . . and wherein the trigger extends partially through the vent chamber" as recited in dependent claim 11. *Id*. at 58–60.

Ignite does not present persuasive evidence or argument on the remaining elements of the claims, that is, those elements other than the "mechanically connected" trigger, "deflector plate," "push-button trigger," "vent seal," and "vent chamber." *See id*. at 9–60. Accordingly, with regard to all other limitations of the claims, the record now contains unrebutted arguments and evidence presented by PMI regarding the merits of the teachings of Albert '748 (for claims 1, 2, and 4–7), Nergard combined with Albert '748 (for claims 15 and 16), Albert '799 (for claims 8, 9, 13, and 14), and Chaffin combined with Albert '748 (for claims 10 and 11). We agree with and adopt Petitioner's factual contentions set forth in the Petition and the Reply with regard to these limitations. We find that the preponderance of the evidence of record developed at trial supports our conclusion that PMI has set forth how the alleged prior art teaches or suggests those other limitations of the reviewed claims. Accordingly, we do not address these other limitations in our discussion below.

IPR2014-00750
Patent 7,546,933 B2

B. Obviousness of Claims 1, 2, and 4–7 in View of Albert '748

Claim 1 is an independent claim, and each of claims 2 and 4–7
depends directly from claim 1. We preliminarily determined that PMI had
established a reasonable likelihood of showing that Albert '748 renders all
these claims unpatentable as obvious. Dec. 9–12. Ignite contends that
Albert '748 fails to render claims 1, 2, and 4–7 obvious because Albert '748
does not describe a trigger "mechanically connected" to the "shutter."
Resp. 51–56. Ignite also separately argues in support of the patentability of
dependent claim 7 based upon limitations introduced in that claim. *Id.*
at 56–57. We address each argument below.

1. *Claims 1, 2, and 4–6*

PMI sets forth in detailed claim charts the way in which Albert '748
describes every element of claims 1, 2, and 4–6. Pet. 12–20. PMI identifies
Albert '748's valve member 30 and the associated O-ring 32 on movable
member 38 as the claimed shutter. *Id.* at 16–17. PMI identifies O-ring
pressure relief valve 78 as the "vent seal," which is carried on plunger 76.
*Id.* at 16–17; Reply 16 (citing Ex. 1001, 4:33–36). Movable member 38
rides within bore 74 of plunger 76 in a manner that constitutes a "lost
motion" relationship between plunger 76 and movable member 38. Pet. 16
(citing Ex. 1001, 4:67–5:6). The combination of movable member 38 and
plunger 76 are identified as the claimed trigger mechanism. Pet. 16;
Ex. 1015 ¶ 45. Figure 2 of Albert '748, which is reproduced below,
illustrates aperture shutter (O-ring 32 on valve 30), vent seal (O-ring 78) and
the mechanism resulting in a lost-motion relationship between the shutter
and the vent seal.

IPR2014-00750
Patent 7,546,933 B2



Figure 2 of Albert '748 is an enlarged fragmentary sectional view that illustrates a two-seal mechanism in which O-ring 78 unseals before O-ring 32 when knob 96 is pressed.

Ignite contends that PMI identifies movable member 38 and plunger 76 as the "trigger mechanism" and valve member 30 as the "drink aperture shutter." Resp. 49–50. Claim 1 requires that the trigger be "mechanically connected" to the "shutter adjacent the drink aperture" and the "vent seal." Ex. 1007, 23:38–39. Ignite argues that Albert '748's valve member 30 (i.e., the identified shutter) is not "mechanically connected" to movable member 38 (i.e., the identified trigger). Resp. 50. Ignite contends that valve member 30 and movable member 38 are "a single, integrally formed component." *Id*. at 52 (citing Ex. 1001, Figs. 2, 5; Ex. 2008 ¶ 85). Ignite's argument implies that the shutter and trigger must be separate components to be capable of being mechanically connected. Resp. 52–54.

Ignite's argument is unpersuasive. Ignite mischaracterizes PMI's mapping of Albert '748 to the claimed shutter, trigger, and vent seal. PMI identifies valve 30 and O-ring 32 as the shutter and member 38 and plunger 76 as the trigger. Pet. 16–17. Albert '748 describes a space between

13

IPR2014-00750
Patent 7,546,933 B2

abutment shoulder 100 on movable member 38 and abutment end 98 on plunger 76. Ex. 1001, 4:63–66. Because this space between these abutments exists, when a user of Albert '748's cup presses knob 96, O-ring 78 unseals a vent first and then O-ring 32 unseals a drink opening.[1] Pet. 17 (citing Ex. 1001, 4:67–5:6). PMI persuades us that the trigger (Albert '748's plunger 76 combined with member 38) is mechanically connected to both the shutter (O-ring 32 on valve 30) and the vent seal (O-ring 78). The '933 patent describes essentially the same type of "mechanically connected" relationship between vent seal 683, which is an O-ring seated on shaft 694 of the trigger mechanism 520. Ex. 1007, 19:36–39, Figs. 15–18.

As stated in part II.A above, we are persuaded that PMI has identified how Albert '748 describes all other elements of claims 1, 2, and 4–6. Accordingly, we conclude that PMI has demonstrated by a preponderance of the evidence that Albert '748 renders claims 1, 2, and 4–6 unpatentable as obvious under § 103.

### 2. Claim 7

Claim 7 depends upon claim 1 and further recites "a deflector plate adjacent the vent aperture, wherein the deflector plate directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the container body." Ex. 1007, 24:5–8. PMI contends that knob 96 of Albert '748 constitutes the claimed deflector because it would redirect vapor expelled from opening 88 in a "360 degree pattern . . . with most of the vapor being redirected in a direction transverse (i.e., lying across, not

---

[1] Albert '748 discloses that this spacing provides for a "lost motion relationship" between plunger 76 and movable member 38, i.e., the mechanism which provides for pre-venting of pressure from hot coffee. Ex. 1001, 2:44–48, 4:67–5:6.

14

IPR2014-00750
Patent 7,546,933 B2

parallel) to the longitudinal axis of the body of the container

10." Pet. 21 (citing Ex. 1015 ¶ 62). The pertinent portion of

Figure 2 of Albert '748, reproduced at right, illustrates how a

flange on knob 96 would, when pressed by a user, be in a

position (shown in dotted lines) to deflect vapor emanating

from opening 88.



Ignite contends that claim 7 requires that "all—not just 'most'—of the
vapor be expelled in the transverse direction." Resp. 55. Ignite supports its
argument primarily with testimony from Dr. Swanger. *Id*. (citing Ex. 2008
¶¶ 80–84). Ignite also relies on the following passage from the
Specification: "Specifically, the vent deflector plate 731 *prevents any vapor
from being directed upwardly from the vent aperture 682, and rather directs
it sideways away from the user*." Resp. 55 (quoting Ex. 1007, 18:7–10
emphasis added). Based on this passage, Ignite argues that claim 7 requires
all vapor to be directed transversely because the "obvious purpose of the
deflector plate is to protect the user by directing hot gases away from the
user." Resp. 55.

Ignite's argument is unpersuasive. First, claim 7 recites a structure,
the "deflector plate" that "directs vapor being expelled out of the vent
aperture transverse to a longitudinal axis of the container body." Claim 7
does not recite that the deflector plate "prevents" vapor from being directed
along the longitudinal axis or that "all" vapor is directed transversely.
Rather, claim 7 merely requires that the plate direct vapor transversely.
Because the claim is open-ended (by reciting "comprising"), the claim
limitation is met by any deflector that directs some vapor in the recited
direction. We have broadly interpreted "transverse" as meaning "situated or

IPR2014-00750
Patent 7,546,933 B2

lying across," Dec. 5, and Ignite does not contest that interpretation, Resp. 54–55. Ignite also does not dispute that knob 96 of Albert '748 directs most of the vapor in the transverse direction. Resp. 56–57.

Knob 96 of Albert '748 deflects vapor in a 360-degree flow pattern in all directions in the plane illustrated by the line on the left hand portion of Ignite's annotated version of Albert '748's Figure 2, which is reproduced below, at right. Therefore, most of the vapor flows in various directions transverse to the longitudinal axis of the container, and a small amount flows in the direction defined by the longitudinal axis of the container. Any direction in that plane, however, that is not parallel to the longitudinal axis of the container meets the "transverse" requirement of claim 7.



Albert '748

FIG 2

On the record before us, we are persuaded that PMI has demonstrated by a preponderance of evidence that Albert '748 describes a deflector plate that "directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the container body" as introduced in claim 7. Because of the open-ended nature of claim 7, it is of no import that knob 96 of Albert '748 also directs some of the vapor being expelled from opening 88 in a direction parallel to the longitudinal axis of container 10. As stated in part II.A above, we are persuaded that PMI has identified how Albert '748 describes all other elements of claim 7. Accordingly, we conclude that PMI has demonstrated by a preponderance of the evidence that Albert '748 renders claim 7 unpatentable as obvious under § 103.

16

IPR2014-00750
Patent 7,546,933 B2

C. OBVIOUSNESS OF CLAIMS 15 AND 16 IN VIEW OF THE COMBINATION
OF NERGARD AND ALBERT '748

PMI provides argument, detailed claim charts with citations to prior
art, and testimony that illustrate how the combination of Nergard and Albert
'748 teach each requirement of claims 15 and 16. Pet. 29–36. Ignite raises a
number of arguments to counter PMI's challenge, and we address each in
turn below.

1. *Nergard's Alleged Failure to Describe a "Push-button Trigger"*
*or a "Vent Seal"*

Ignite contends that Nergard fails to describe the recited "push-button
trigger" or the "vent seal" of independent claim 15. Resp. 10–12 (regarding
"push-button trigger"), 37–39 (regarding "vent seal"). We find Ignite's
arguments unpersuasive because Ignite fails to address the challenge as
presented by PMI, which is based on the combination of Nergard and Albert
'748. *See generally In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir.
1986) (non-obviousness cannot be established by attacking references
individually when rejection is based upon the teachings of a combination of
references). For example, PMI identifies the manner in which Albert '748
teaches the "push-button trigger" in the form of its knob 96, Pet. 33–34
(citing Ex. 1001, 4:47–50), and a "vent seal" in the form of O-ring 78,
Pet. 35 (citing Ex. 1001, 4:67–5:6); Reply 14 (citing Ex. 1001, 4:31–36,
Fig. 2). Ignite fails to address whether Albert '748 describes the claimed
"push-button trigger" or "vent seal." Resp. 10–12 (regarding "push-button
trigger"), 37–39 (regarding "vent seal"). We, therefore, are not persuaded by
Ignite's argument that Nergard's alleged failure to describe ether a "push-
button trigger" or a "vent seal" defeats PMI's challenge to claims 15 and 16
as obvious over the combination of Nergard and Albert '748.

17

IPR2014-00750
Patent 7,546,933 B2

> 2. *Alleged Defects in the Combination of Nergard and Albert '748*

Ignite proffers three primary arguments against the propriety of combining teachings of Nergard and Albert '748 to arrive at the drinking container of claims 15 and 16. First, Ignite argues that PMI has failed to carry its burden to set forth a prima facie case of obviousness. Resp. 12–18. Second, Ignite argues that PMI fails to establish that a skilled artisan would have been motivated to combine Nergard and Albert '748. *Id*. at 18–34. Third, Ignite argues that a skilled artisan would have had no reason to modify Nergard to include the lost-motion mechanism of Albert '748. *Id*. at 35–37. For the reasons expressed below, we find all three arguments to be unpersuasive.

> a) PMI's Alleged Failure to Establish a Prima Facie Case of Obviousness Based on Nergard and Albert '748

We previously found unpersuasive Ignite's argument that PMI had failed to make out a prima facie case that claims 15 and 16 were obvious over Nergard and Albert '748. Dec. 15–16. Nevertheless, Ignite reasserts its argument and contends that PMI does not provide "*articulated reasoning with some rational underpinning* to support the legal conclusion of obviousness." Resp. 12 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). According to Ignite, "whether a combination *could* be made is not the relevant inquiry; rather, the question is whether a person of skill actually *would* do so." *Id*. at 12–13 (citing *InTouch Techs., Inc. v. VGO Comm'ns., Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)). Ignite relies, in particular, on the following passage from the *InTouch* decision:

> A reason for combining disparate prior art references is a critical component of an obviousness analysis; *this analysis should be made explicit*. It can be important to identify a reason that would have prompted a person of ordinary skill in

18

IPR2014-00750
Patent 7,546,933 B2

> the relevant field to *combine the elements* in the way the
> claimed new invention does . . . .

*Id*. at 13 (quoting *InTouch*, 751 F.3d at 1351 (citations and internal quotation
marks omitted)(emphasis added)). Ignite contends that the *InTouch* decision
thus requires that PMI provide reasoning why a skilled artisan would have
incorporated the push-button trigger mechanism of Albert '748 into Nergard.

Ignite argues that the obviousness of using Albert '748's push-button
trigger in Nergard's container is not supported by the suggestion in Albert
'748 that it is desirable to use pre-venting in containers like Nergard's.
Resp. 14–15. According to Ignite, the only reasoning that PMI argued on
this point is that "a person of skill would be motivated to look to the
teachings of Albert '748 for how to modify the actuating member 23 of
Nergard to accomplish pre-venting." *Id*. at 14–15 (citing Pet. 25). Ignite
argues that PMI's statement is not sufficient reasoning but rather a
"conclusory statement" unsupported by sufficient reasoning under *InTouch*.
Resp. 14. Ignite also criticizes Mr. Dahlgren's testimony about the reason to
substitute Albert '748's push-button for Nergard's lever as being "circular."
Resp. 15–16 (citing Ex. 1015 ¶ 78; Ex. 1026 ¶ 14). Because of PMI's
allegedly faulty reasoning for substituting Albert '748's push-button for
Nergard's lever, Ignite concludes that PMI has used impermissible hindsight
to reconstruct the claimed drinking container from "disparate" prior art
references and that we should, therefore, find in its favor. Resp. 16–17.

PMI argues that we should reject Ignite's arguments for two reasons.
First, PMI contends that it sufficiently explained why a skilled artisan would
have found it obvious to substitute Albert '748's push-button for Nergard's
lever. Reply 6–8. Second, PMI contends that Ignite's reliance on *InTouch* is
misplaced because that decision relates to combining elements from

IPR2014-00750
Patent 7,546,933 B2

"disparate" prior art references rather than simple substitution of known elements from closely related prior art such as Nergard and Albert '748. *Id.* at 6–7.

Regarding PMI's second argument, we agree that the *InTouch* decision is inapposite because the prior art references at issue in *InTouch* were "disparate" and Nergard and Albert '748 are closely related to each other. When an obviousness challenge involves more than "the mere application of a known technique to a piece of prior art ready for the improvement," a more explicit analysis of reasons to combine prior art elements should occur to facilitate review. *KSR*, 550 U.S. at 417–18. For reasons expressed below, we conclude that because PMI has established that Nergard and Albert '748 are closely related, not disparate prior art references, the *InTouch* decision is inapposite.

Regarding PMI's first argument, Nergard indisputably describes a drinking container without the claimed pre-venting feature. Ex. 1003, 4:39–5:2. PMI relies upon Mr. Dahlgren's testimony and express language in Albert '748 to establish that a skilled artisan, upon reviewing Albert '748 and Nergard would be motivated to improve Nergard's drinking container by adding the push-button-actuated, lost-motion mechanism of Albert '748. Reply 8 (citing Ex. 1026 ¶¶ 6–10). Albert '748 recognizes the problems associated with opening a drink aperture without first relieving pressure through another valve (i.e., without pre-venting) when it criticizes two prior art patents that:

> both disclose manually operable valves in drinking receptacle covers but do not provide any means by which steam and pressure may be relieved from the interior of the container before the drinking valve is opened. Consequently, both prior art devices, as disclosed in these patents, concurrently provide

20

IPR2014-00750
Patent 7,546,933 B2

> for the relief of drinking liquid and steam or pressure so that the
> operation of these valves is dangerous, especially when hot
> coffee is contained in the container and the valve is opened
> such as to cause the hot liquid to gush out and burn the person
> attempting to drink therefrom.

Ex. 1001, 1:14–25. Nergard describes a drink container that suffers from

this problem. Albert '748 proposes an improvement to drinking containers

like Nergard as follows:

> Accordingly, it is an object of the present invention to
> provide a novel drinking receptacle valve means which is
> operable initially to relieve pressure in the drinking receptacle
> and subsequently to open the drinking receptacle valve after the
> pressure has been relieved so as to provide for safety of persons
> drinking hot coffee from such receptacles.

*Id.* at 2:37–43. Mr. Dahlgren testifies that a skilled artisan would have,

therefore, considered it obvious to modify Nergard's drinking container by

adding Albert '748's pre-venting mechanism, which Albert '748 describes in

great detail. Ex. 1026 ¶ 8. He also explains that a skilled artisan would have

expected the modified version of Nergard to work for the intended purpose

of pre-venting the pressure inside Nergard's container. *Id.* Ignite does not

address persuasively Mr. Dahlgren's testimony or Albert '748's express

suggestion to modify drinking containers such as Nergard's.

Based on our review of the record, we are persuaded by PMI's

argument and evidence that PMI has articulated a reason with rational

underpinning to support its challenge to claims 15 and 16 as being

obviousness over Nergard and Albert '748.

b) Motivation to Combine Nergard and Albert '748

Ignite argues that because Nergard describes a mug with a handle and

a lever-actuated trigger, Nergard discourages using the push-button trigger

21

IPR2014-00750
Patent 7,546,933 B2

of Albert '748. Resp. 18–25. Ignite relies upon Nergard's improvement over earlier containers designed by Mr. Nergard that lacked handles and included push-button triggers by adding a handle and replacing the push-button with a lever. *Id.* at 19–20 (citing Ex. 2003, 1:25–34, Fig. 1). Because Nergard's handle and lever are allegedly critical to Nergard's drinking container, Ignite contends that a skilled artisan would not replace Nergard's lever with a push-button as taught by Albert '748 or the lost-motion mechanism connected to Albert '748's push-button. *Id.* at 20–22.

Ignite further argues that claims 15 and 16 are not obvious over Nergard and Albert '748 because substituting Albert '748's push-button-actuated, lost-motion trigger for Nergard's lever would change impermissibly Nergard's principle of operation and render Nergard's mug "inoperable for its intended purpose." *Id.* at 25. (citing *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959), *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984), and *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007)). To support this argument, Ignite proffers extensive evidence regarding human factors such as grip strength in an attempt to establish that Nergard's lever 26 is an essential component of Nergard's mug because substituting a push-button for the lever would make Nergard's mug too difficult to use. Resp. 26–33 (citing Ex. 2008 ¶¶ 14, 39, 49–51, 54–59, 61–71). Ignite contends that its evidence establishes that Nergard's lever results in "as much as a five-fold reduction in the force necessary to activate the actuating member 23" when compared to using a push-button substituted from Albert '748. Resp. 33. Ignite then concludes that "Nergard therefore teaches away from [PMI's] proposed substitution." *Id.* at 34.

22

IPR2014-00750
Patent 7,546,933 B2

Ignite's argument is unpersuasive. PMI persuasively argues that the law does not require that a proposed modification to a prior art reference be optimal. Reply 8–9; *In re Gurley*, 27 F.3d 551, 552–53 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."). PMI supplies evidence that containers having handles with a push-button actuated valve were known alternatives to Nergard's lever actuated valve. Reply 9–10 (citing Exs. 1028, 1029). Ignite's expert, Dr. Swanger, agreed that substituting the push-button of Albert '748 for Nergard's lever would have been "simple" for a skilled artisan. Ex. 1032, 223:2–5, 246:1–8. PMI also provides evidence that a user would be able to apply the force required to open a modified Nergard container in which a button was substituted for the lever. Reply 10–11 (citing Ex. 1026 ¶ 17). We agree with PMI that, as established by the evidence of record, a skilled artisan would have considered levers and push-button actuators to be well known alternatives and that substituting a push-button for a lever would have been simple and yielded predictable results.

        c) Whether to Modify Nergard to Add Lost-Motion Feature of Albert '748

Ignite also argues that a skilled artisan would not have modified Nergard's actuating member 23 to include the lost-motion mechanism of Albert '748 because, according to Dr. Swanger, Nergard's member 23 is too short to accommodate Albert '748's lost-motion mechanism. Resp. 35–37 (citing Ex. 2008 ¶¶ 72–76). Ignite contends that Mr. Dahlgren oversimplifies the modification of Nergard's actuating member 23 to include lost-motion and overestimates the amount of space available for the

23

IPR2014-00750
Patent 7,546,933 B2

modification.  Resp. 36 (citing Ex. 1015 ¶ 80; Ex. 2008 ¶ 76; Ex. 2011, 67:1–69:25; Ex. 2013).

PMI argues that not only would it have been possible to add Albert '748's lost-motion mechanism to Nergard, it did so by purchasing a commercial version of Nergard's mug and modifying it to include the lost-motion mechanism of Albert '748.  Reply 11–13 (citing Ex. 1027 ¶ 21). Albert '748 expressly recommends using pre-venting in drink containers to avoid the dangers associated with simultaneous opening of a drink aperture and a vent aperture.  Ex. 1001, 1:14–25.  Albert '748 describes its lost-motion mechanism as the preferred manner of avoiding such dangers by pre-venting vapor before opening the drink aperture.  *Id*. at 1:34–59, 2:37–48, 4:67–5:6.  During his deposition, Mr. Dahlgren testified that because implementing a lost-motion mechanism involves removing material, it necessarily would have been possible to add such a mechanism to Nergard's actuating member 23.  Ex. 2011, 67:11–21.  Dr. Swanger agrees that it would have been possible to incorporate a lost-motion mechanism into Nergard's lid.  Ex. 1031, 120:24–121:3.  Additionally, both experts agree that simply shortening Nergard's actuating member 23 to create a gap between Nergard's camming surfaces 28 and 29 would implement a lost-motion mechanism.  Ex. 1027 ¶ 32; Ex. 1032, 271:15–274:9.

Based on our review of the evidence and argument, we are persuaded that a skilled artisan would have possessed sufficient skill to modify Nergard's actuating member 23 to incorporate a lost-motion mechanism as suggested by Albert '748.  We are also persuaded that Albert '748 expressly suggests such a modification by recommending that a pre-venting feature be added to the lid of containers like Nergard's.

IPR2014-00750
Patent 7,546,933 B2

### 3. *Conclusion*

For the reasons stated above, we conclude that PMI has demonstrated by a preponderance of evidence that the combination of Nergard and Albert '748 renders claims 15 and 16 unpatentable as obvious.

D. OBVIOUSNESS OF CLAIMS 8, 9, 13 AND 14 IN VIEW OF ALBERT '799

Independent claim 8 recites, among other limitations, "a trigger mechanically connected to the shutter and the vent seal." Ex. 1007, 24:22–23. Claim 8 further recites in pertinent part: "the shutter positioned within the lid and below the drink aperture, and . . . the vent seal positioned within the lid and below the vent aperture." Ex. 1007, 24:15–21. We preliminarily determined that PMI had established a reasonable likelihood of showing that Albert '799 renders claims 8, 9, 13, and 14 unpatentable as obvious. Dec. 20–21.

PMI provides a detailed claim chart and testimony to support its challenge that claims 8, 9, 13, and 14 are unpatentable as obvious over Albert '799. Pet. 37–54 (citing Ex. 1015 ¶¶ 85–92). PMI contends that Albert '799 teaches every element of claims 8, 9, 13, and 14 as set forth in its claim chart. Pet. 39–54. For example, PMI identifies Albert '799's valve member 33 with disk 34 as the shutter, O-ring 37 as the vent seal, and pushbutton 36 with bar 32 as the trigger. *Id*. at 37–38. Albert '799's annotated Figure 4, shown below, illustrates these elements.

IPR2014-00750
Patent 7,546,933 B2



Figure 4 from Albert '799 is a perspective view illustrating elements of operating unit 12 including pushbutton 36, bar 32, valve member 33, O-ring 37, and leaf spring 38.

Ignite argues that Albert '799 does not describe a trigger "mechanically connected" to the "shutter and the vent seal." Resp. 56–57. Ignite contends that PMI identifies bar 32 as the trigger and valve member 33 as the shutter. *Id*. at 56. Because these two elements are "integrally formed" they do not have the "mechanically connected" relationship that is required in independent claim 8. *Id*. at 56–57 (citing Ex. 1005, 6:5–6, 6:15–18). Ignite thus argues that two items being formed integrally as a single piece is not a type of mechanical connection between those two items.

We are persuaded that PMI has demonstrated that Albert '799 describes a trigger that is mechanically connected to the vent seal and the aperture shutter. Initially, we note that we consider PMI to identify the claimed trigger as pushbutton 36 with bar 32, not just bar 32 because the trigger includes the structure that the user touches (i.e., pushbutton 36). O-ring 37 (the vent seal) is press fitted onto pushbutton 36 (part of the trigger)

26

IPR2014-00750
Patent 7,546,933 B2

and, therefore, is mechanically connected to the trigger in the same way that the '933 patent describes vent seal 683 being mechanically connected to trigger 610. Bar 32, although integrally formed with pushbutton 36 and valve 33, functionally connects Albert '799's vent seal (O-ring 37) to the aperture shutter (valve 33 with disk 34 and abutment plate 35) and converts a force applied to pushbutton 36 into motion of valve 33, disk 34, and abutment plate 35. Ex. 1005, Fig. 4, 6:11–26. Additionally, when a user of Albert '799's cup presses button 36, bar 32 moves, which then causes valve 33 to open drink opening 27. 6:58–7:9. Thus, in a functional and mechanical sense, O-ring seal 37 and valve 33 are both connected via pushbutton 36 and bar 32 (the trigger).

As stated in part II.A above, we are persuaded that PMI has identified how Albert '799 describes all other elements of independent claim 8 and dependent claims 9, 13, and 14. Ignite does not argue that PMI fails to establish that Albert '799 describes the limitations introduced in dependent claims 9, 13, and 14. Accordingly, we are persuaded that PMI has demonstrated by a preponderance of evidence that Albert '799 renders claims 8, 9, 13, and 14 unpatentable as obvious under § 103.

E. OBVIOUSNESS OF CLAIMS 10 AND 11 IN VIEW OF THE COMBINATION OF CHAFFIN AND ALBERT '748

1. *Claim 10*

Claim 10 depends from claim 8 and further recites in pertinent part: "wherein the actuation stroke of a portion of the trigger connected to one of the vent seal and the shutter of the trigger is linear and transverse to a longitudinal axis of the container body." Ex. 1007, 24:35–38. PMI contends that Chaffin describes all elements of dependent claim 10 and its base claim 8 except that Chaffin fails to teach the pre-venting feature that Albert '748

IPR2014-00750
Patent 7,546,933 B2

teaches via its lost-motion trigger mechanism. Pet. 54 (citing Ex. 1006, Figs. 9–12); *see also* Pet. 51–52 (identifying Chaffin's teachings of the basic elements of claim 8); *id*. at 56 (identifying Chaffin's teaching of linear actuation stroke). PMI contends that it would have been obvious to incorporate the "lost motion" of Albert '748 into Chaffin's actuator rod 152 "at a location between the L-shaped valve arms 161 on which the fluid supply valve head 162' and the vent valve head 162" are mounted . . . ." *Id*. at 54–55. PMI also contends that Chaffin's actuator rod 152 moves linearly as valve members 162' and 162" are opened. *Id*.

We previously found that PMI had established a reasonable likelihood of prevailing in showing that the combination of Chaffin and Albert '748 rendered claim 10 obvious. Dec. 22–23. Ignite proffers no argument or evidence that claim 10 remains patentable in view of the combination of Chaffin and Albert '748. *See* Resp. 58–60. Accordingly, we are persuaded that PMI has demonstrated by a preponderance of evidence that the combination of Chaffin and Albert '748 renders claim 10 unpatentable as obvious under § 103.

### 2. *Claim 11*

Claim 11 depends from claim 8 and further recites in pertinent part: "a vent chamber between the vent seal and the vent aperture, and wherein the trigger extends partially through the vent chamber." Ex. 1007, 24:39–42. PMI contends that Chaffin teaches these limitations and supports that contention with documentary and testimonial evidence. Pet. 58–59 (citing Ex. 1006, 4:47–53, 5:10–21; Ex. 1015 ¶¶ 125–26). We previously found that PMI had established a reasonable likelihood of prevailing in showing

IPR2014-00750
Patent 7,546,933 B2

that the combination of Chaffin and Albert '748 rendered claim 11 obvious.
Dec. 23–25.

Ignite counters with two arguments. First, the combination of Chaffin and Albert '748 fails to describe a "vent chamber *between* the vent seal and the vent aperture." Resp. 58. Second, the combination of Chaffin and Albert '748 fails to describe a trigger that extends "partially through the vent chamber." *Id*. at 60. Ignite's first argument relies upon an implied interpretation of "between the vent seal and the vent aperture" and the physical extent of the vent chamber taught by Chaffin. Ignite's second argument depends upon the physical extent of the vent chamber taught by Chaffin. We address each argument below.

    a) The Extent of the Valve Chamber Described by Chaffin

Ignite contends that Chaffin's valve head 56 can assume one of three relevant positions within vent chamber 27 and that the vent chamber is not between the vent seal and vent aperture in any of these three positions. Resp. 58. PMI illustrates these three positions of valve head 56 within vent chamber 27 (highlighted in yellow) in PMI's annotated and modified versions of Chaffin's Figure 5, reproduced below. Reply 22.



Annotated Chaffin Figure 5 depicts valve head 56 fully closed.

Modified and annotated Chaffin Figure 5 depicts valve head 56 partially opened.

Modified and annotated Chaffin Figure 5 depicts valve head 56 fully opened.

29

IPR2014-00750
Patent 7,546,933 B2

PMI identifies the entire chamber highlighted in yellow as vent chamber 27 and notes that valve head 56 reciprocates within chamber 27 from fully closed (leftmost figure above) to fully opened (rightmost figure above). *Id.* at 21 (citing Ex. 1006, 4:46–53, Figs. 4, 5).

Chaffin describes elongated vent chamber 27 as being "provided with an inlet valve seat 28 and an outlet valve seat 29." Ex. 1006, 4:51–52. Chaffin also describes vent chamber 27 as having an "outlet port" that "is disposed flush with the vent aperture 45." *Id.* at 5:34–35. Chaffin also states that as "can best be seen by reference to FIGS. 4 and 5, the valve stem 57, the helical spring 58 and the elongated valve head 56 are dimensioned to project into . . . vent chamber 27." *Id.* at 5:10–13. Chaffin, thus, describes stem 57 and spring 58 as projecting into vent chamber 27 in Figure 4 (when valve 56 is fully open) and Figure 5 (when valve 56 is fully closed). Accordingly, we determine that PMI has identified correctly the extent of Chaffin's vent chamber 27 as the portion that is highlighted in PMI's annotated and modified versions of Chaffin's Figure 5.

Ignite unpersuasively characterizes PMI's contentions as solely identifying the trigger as "actuator unit 14 including T-shaped actuator element 50 with handle element 51." Resp. 60. More accurately, PMI contends that Chaffin stem 57 and spring 58 are part of a trigger mechanism. Pet. 58. Both stem 57 and spring 58 extend into the highlighted vent chamber 27 as shown in the annotated and modified versions of Chaffin's Figure 5. Accordingly, we conclude that PMI has established by a preponderance of the evidence that Chaffin describes a trigger that extends partially through the vent chamber as recited in claim 11.

30

IPR2014-00750
Patent 7,546,933 B2

b) "between the vent seal and the vent aperture"

Neither party expressly interprets "between the vent seal and the vent aperture." Ignite implies that, for the vent chamber to be "between the vent seal and the vent aperture," the vent chamber must be located entirely in the space between the vent seal and the vent aperture. *See* Resp. 58–59. PMI contends that "claim 11 simply defines the valve chamber as extending between the vent seal and the vent aperture." Reply 21. For the reasons expressed below, we agree with PMI.

The colorized version of a portion of Figure 16 of the '933 patent, which appears below right, illustrates the physical extent of the "vent chamber" described in the '933 patent and how it is positioned "between the vent seal and the vent aperture" as recited in claim 11. The description of vent chamber 738 in the Specification, with annotations correlating to our colorized Figure 16, states:

> The vent chamber 738 [yellow] is an enclosed chamber that is located beneath the vent aperture 682 [green] and *between* the vent seal 683 [blue] and the vent aperture 682 [green]. The vent chamber 738 [yellow] provides a chamber with an increased volume capacity to lower the pressure and volume of the vapor/gas as it is expelled past the vent seal 683 [blue] but before it exits through the vent aperture 682



[green]. The vent chamber 738 [yellow] has a cross-sectional area greater than a cross-sectional area of the vent aperture 682 [green]. The vent chamber 738 [yellow] has a first entrance

IPR2014-00750
Patent 7,546,933 B2

> aperture 739 at one end that provides an entrance to the vent
> chamber 738 [yellow] from the liquid receptacle 516 of the
> container body 512, a second exit aperture (the vent aperture
> 682 [green]), and a third access aperture 743 to provide access
> to the interior of the lid assembly 514 for the trigger 610.

Ex. 1007, 17:51–64 (emphasis added). The Specification further states that "trigger seal 685 [red] also operates as an end wall for the vent chamber 738 [yellow]." *Id*. at 19:33–35. Accordingly, we determine that vent chamber 738 (yellow) is not located solely and entirely between vent seal 683 (blue) and vent aperture 682 (green). Instead, vent chamber 738 (yellow) also extends past vent aperture 682 (green) to trigger seal 685 (red), which closes access aperture 743. We, therefore, conclude that Ignite's implied interpretation of "between" is unpersuasive because it is inconsistent with the way in which the Specification illustrates the claimed invention. Instead, we conclude that Chaffin's vent chamber 27 meets the claimed limitation of "between the vent seal and the vent aperture" because Chaffin's vent chamber 27 extends between valve seat 28 (located at the vent seal) and valve seat 29 (located at the vent aperture).

c) Conclusion

For the reasons stated above, we conclude that PMI has established by a preponderance of the evidence that the combination of Chaffin and Albert '748 renders claim 11 unpatentable as obvious under 35 U.S.C. § 103.

IV. IGNITE'S MOTION TO EXCLUDE

We have reviewed Ignite's Motion to Exclude, PMI's Opposition to the Motion, and Ignite's Reply in support of the Motion. Based on our review, we deny the Motion in all respects for one or both of the following reasons: (1) the Motion is moot because it seeks to exclude evidence not

32

IPR2014-00750
Patent 7,546,933 B2

considered or relied upon in rendering this Decision or (2) the Motion addresses issues more appropriate to determining the weight ascribed to the evidence rather than the admissibility of evidence. In rendering this Decision, we determine and ascribe the appropriate weight to all proffered evidence and, when appropriate, comment upon the weight ascribed.

## V. CONCLUSION

For the reasons expressed above, we determine that PMI has shown by a preponderance of the evidence that claims 1, 2, 4–11, and 13–16 of the '933 patent are unpatentable as obvious.

## VI. ORDER

For the reasons given, it is:

ORDERED that claims 1, 2, 4–11, and 13–16 of the '933 patent are held *unpatentable*;

FURTHER ORDERED that Ignite's Motion to Exclude is *denied*; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00750
Patent 7,546,933 B2

PETITIONER:

George C. Rondeau, Jr.
DAVIS WRIGHT TREMAINE LLP
GeorgeRondeau@dwt.com

Kelly J. Hollowell
Joel T. Beres
STITES & HARBISON, PLLC
khollowell@stites.com
jberes@stites.com


PATENT OWNER:

Stephen M. Schaetzel
Gregory J. Carlin
Jessica Keesee
Warren J. Thomas
MEUNIER CARLIN & CURFMAN, LLC
sschaetzel@mcciplaw.com
litdocketing@mcciplaw.com
gcarlin@mcciplaw.com
jkeesee@mcciplaw.com
wthomas@mcciplaw.com