# Exhibit G

Trials@uspto.gov                                    Paper 56
Tel: 571-272-7822                      Entered: September 28, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

PACIFIC MARKET INTERNATIONAL, LLC,
Petitioner,

v.

IGNITE USA, LLC,
Patent Owner.

———————————

Case IPR2014-00561
Patent 7,997,442 B2

———————————

Before JOSIAH C. COCKS, MITCHELL G. WEATHERLY, and
JAMES A. WORTH, *Administrative Patent Judges.*

WEATHERLY, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)*

## I.   INTRODUCTION

### A. BACKGROUND

Pacific Market International, LLC ("PMI") filed a Petition (Paper 1,
"Pet.") requesting an *inter partes* review of claims 1–19 of U.S. Patent No.
7,997,442 B2 (Ex. 1006, "the '442 patent").  PMI supported the Petition
with a declaration from Aron D. Dahlgren, P.E. (Ex. 1014).  Ignite USA,
LLC ("Ignite") timely filed a Preliminary Response.  Paper 8 ("Prelim.

IPR2014-00561
Patent 7,997,442 B2

Resp.").  On Septermber 30, 2014, based on the record before us at the time, we instituted an *inter partes* review of claims 1, 2, 4–10, and 14–19, Paper 9 ("Institution Decision" or "Dec."), on the following grounds:

| References | Basis | Claims |
|---|---|---|
| U.S. Patent No. 3,967,748 ("Albert '748") (Ex. 1001) | § 103 | 1, 2, 4–8, 10, 14, and 15 |
| U.S. Patent No. 4,303,173 ("Nergard") (Ex. 1003) in view of Albert '748 | § 103 | 16–19 |
| U.S. Patent No. 4,136,799 ("Albert '799") (Ex. 1005) | § 103 | 9 |

Dec. 21.

After we instituted review, PMI Ignite filed a Patent Owner Response, Paper 28 ("Resp."), in opposition to the Petition and supported by the declaration of Lee A. Swanger, Ph.D., P.E. (Ex. 2008).  PMI filed a Reply in support of the Petition, Paper 32 ("Reply"), supported by three additional declarations from Mr. Dahlgren (Exs. 1022–24).

Ignite also filed a Motion to Exclude certain evidence proffered by PMI.  Paper 44 ("Motion" or "Motion to Exclude").  PMI opposed the Motion to Exclude.  Paper 49 ("Mot. Opp.").  Ignite filed a Reply in support of the Motion.  Paper 52 ("Mot. Reply").  Ignite did not move to amend any claim in the '442 patent.

Oral argument was conducted on June 17, 2015.  A transcript is entered as Paper 55 ("Tr.").

For the reasons expressed below, we conclude that PMI has demonstrated, by a preponderance of evidence, that all claims for which review has been instituted are unpatentable as obvious under 35 U.S.C. § 103.  We also deny Ignite's Motion.

IPR2014-00561
Patent 7,997,442 B2

B. Related Matters

PMI identified, as a related proceeding, the co-pending lawsuit, *Ignite USA, LLC v. Pacific Market International, LLC*, No. 14-cv-856 (N.D. Ill. Feb. 7, 2014). Pet. 1.

C. The '442 Patent

The '442 patent relates to a sealed drink container with at least two trigger-actuated apertures in the lid, one through which the user drinks the beverage and another for venting pressure. Ex. 1006, 15:44–59. When the user presses the trigger, the pressure vent opens first and then the drink aperture opens. *Id.* at 20:40–50, Figs. 16–18. The sequential opening of these two apertures releases any hot gases inside the container through the vent rather than the drink aperture. *Id.* at 20:8–13. PMI and Ignite refer to the opening of a vent before opening the drink aperture as "pre-venting." *E.g.*, Pet. 3, Resp. 39.

Claims 1, 8, and 16, which are independent and representative, recite:

1. A drinking container comprising:

a container body having a cavity;

a removable lid covering the cavity, the lid having a drink aperture and a separate vent aperture; and,

a trigger mechanism mechanically connected to a drink aperture shutter and to a vent seal, the trigger mechanism moving the shutter and the vent seal from a closed position to an open position,

wherein the trigger mechanism has an actuation stroke,

wherein the vent seal is initially actuated during a first portion of the actuation stroke of the trigger mechanism, and

wherein the shutter is initially actuated during a second portion of the actuation stroke of the trigger mechanism, the first

IPR2014-00561
Patent 7,997,442 B2

portion of the actuation stroke being initiated prior in time to the initiation of the second portion of the actuation stroke.

Ex. 1006, 23:33–47 (with line breaks added for clarity).

8. A drinking container comprising:

a container body having a cavity;

a removable lid covering the cavity of the container body, the lid having a drink aperture and a vent aperture, a shutter that is moveable between a closed position and an open position, and a vent seal that is moveable between a closed position and an open position; and

a trigger mechanically connected to the shutter and the vent seal, the trigger having an actuation stroke,

wherein the vent seal is actuated during a first portion of the actuation stroke of the trigger,

wherein the shutter is actuated during a second portion of the actuation stroke of the trigger, and

wherein the first portion of the actuation stroke is initiated prior in time to the initiation of second portion of the actuation stroke.

*Id.* at 24:4–19 (with line breaks added for clarity).

16. A drinking container comprising:

a container body having a cavity and

a removable lid covering the cavity, the lid having

a drink aperture and a vent aperture,

a shutter operably closing the drink aperture from the cavity,

a vent seal operably closing the vent aperture from the cavity,

the lid further having a push-button trigger that has a linear actuation stroke transverse to a longitudinal axis of the container body, the trigger being mechanically connected

4

IPR2014-00561
Patent 7,997,442 B2

> to the shutter and the vent seal to open and close the shutter and vent seal during actuation of the trigger,

> wherein the vent seal is initially actuated during a first portion of the actuation stroke of the trigger,

> wherein the shutter is initially actuated during a second portion of the actuation stroke of the trigger.

*Id*. at 24:49–64 (with line breaks added for clarity).

## II.  CLAIM INTERPRETATION

"A claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015) ("We conclude that Congress implicitly approved the broadest reasonable interpretation standard in enacting the AIA.").  When applying that standard, we interpret the claim language as it would be understood by one of ordinary skill in the art in light of the specification.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010).  Thus, we give claim terms their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question." (internal quotation marks omitted)).  Only terms which are in controversy need to be construed, and then only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999).

### A. Our Prior Interpretation of Claim Terms

At the urging of one or both of the parties, we interpreted a number of claim terms as expressed in the Institution Decision including "shutter," "transverse," "seal," "actuation stroke," and "push-button trigger."  Dec. 4–

5

IPR2014-00561
Patent 7,997,442 B2

8. After our Institution Decision, the parties dispute only our prior
interpretation of "push-button trigger." Resp. 7–11; Reply 4–6. For the
purposes of this Final Written Decision, we maintain our prior
interpretations of "shutter," "transverse," "seal," and "actuation stroke," and
we address only the parties' arguments regarding "push-button trigger"
below.

   B. Push-Button Trigger

   Independent claim 16 is the only claim that expressly recites a "push-
button trigger." In our Institution Decision, we adopted Ignite's proposed
interpretation of "push-button trigger" as meaning "a trigger that is operated
by pushing a button." Dec. 8. Ignite seeks to clarify its initially proposed
interpretation such that "push-button trigger" means "a push-button that
operates in a linear fashion transferring the input force to the trigger
mechanism along the same direction, i.e., perpendicular to the touch surface
of the push-button (or transverse to the longitudinal axis of the container
recited in the claims)." Resp. 11. Ignite proposes its clarification out of
concern that PMI seeks to "stretch the term beyond its broadest reasonable
interpretation." Resp. 8. Ignite cites as the basis for its concern that Mr.
Dahlgren testified on cross examination that a push-button means
"[s]omething that one pushes," Ex. 2010, 94:15–17, and can refer to
Nergard's lever, Ex. 2011, 80:5–7.

   Ignite relies upon a lay dictionary definition and testimony of Dr.
Swanger to support its contention that a skilled artisan would understand
"push-button" to refer to a button, knob, or disk (but not a lever) that exerts
force "in a direction generally perpendicular to the touch surface of the
button." Resp. 8–9 (citing Ex. 2002; Ex. 2008 ¶ 37). Ignite also relies upon

6

IPR2014-00561
Patent 7,997,442 B2

the Specification describing trigger member 610 as being pushed "radially inward." Resp. 10 (citing Ex. 1006, 20:17–21). Ignite further contends that its clarified interpretation is warranted because claim 16 recites "a pushbutton trigger that has a linear actuation stroke transverse to a longitudinal axis of the container body." Resp. 10.

PMI responds that our original interpretation of "push-button trigger" was "appropriate." Reply 4. PMI also argues that Ignite's new interpretation of "push-button trigger" is (1) unsupported by the claims, specification, and drawings of the '442 patent, (2) inconsistent with our interpretation of "actuation stroke," and (3) an improper attempt to require linear movement of part of the trigger mechanism for those claims not reciting such a limitation. *Id*. at 5–6. For reasons expressed below, we agree with PMI and decline to modify our interpretation of "push-button trigger."

By its plain meaning, "push-button" is used as an adjective to modify the noun "trigger." The Specification refers to an exemplary trigger as trigger member 610 in lid assembly 514, which a user would operate by pressing a flattened surface. Ex. 1006, 20:17–21, Fig. 14 (reproduced in pertinent part at top right). As shown in Figure 15 (reproduced in pertinent part at bottom right) trigger 610 is only one item within a complex trigger assembly 520, which also includes main body portion 694, transverse portion 696, trigger spring 644, and arms 708 among other elements. *Id*. at 18:64–19:6. Transverse portion 696 of trigger 610 "operates



7

IPR2014-00561
Patent 7,997,442 B2

as a push-button actuator" for trigger mechanism 520 and sealing mechanism 518.  *Id*. at 19:64–20:1.

Trigger member 610 is, however, merely an exemplary embodiment of a trigger, and we take care not to incorporate limitations that appear only in the specification.  *In re Prater*, 415 F.2d 1393, 1404–05 (CCPA 1969). We recognize that the Specification describes trigger 610 as moving "radially," which would be in a direction transverse to the longitudinal axis of the container.  Nevertheless, we do not consider this disclosure to limit "push-button trigger" so narrowly as Ignite proposes.

> To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning.  . . .  It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must "clearly express an intent" to redefine the term.

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal citations omitted).  If anything, the Specification merely provides support for the express limitation in claim 16 requiring a trigger that "has a linear actuation stroke transverse to a longitudinal axis of the container body."  Accordingly, we do not conclude that "push-button trigger" alone requires a trigger to move along a linear actuation stroke in a particular direction.

### III. THE CHALLENGES TO PATENTABILITY

We instituted a review of the patentability of claims 1, 2, 4–10, and 14–19 of the '442 patent on the grounds that those claims may be obvious in light of various combinations of up to two of three prior art references: Albert '748, Nergard, and Albert '799.  Dec. 8–20.

IPR2014-00561
Patent 7,997,442 B2

The Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) reaffirmed the framework for determining obviousness as set forth in *Graham v. John Deere Co*., 383 U.S. 1 (1966). As observed by the Court in *KSR*, the factual inquiries set forth in *Graham* that are applied for establishing a background for determining obviousness under 35 U.S.C. § 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

*KSR*, 550 U.S. at 406. With these standards in mind, we address each challenge below.

A. The Parties' Post-Institution Arguments

In our Institution Decision, we concluded that PMI demonstrated a reasonable likelihood that it would prevail in showing that: (1) Albert '748 rendered claims 1, 2, 4–8, 14, and 15 obvious, Dec. 9–12; (2) the combination of Nergard and Albert '748 rendered claims 16–19 obvious, *id*. at 13–19; and (3) Albert '799 rendered claim 9 obvious, *id*. at 19–20. We must now determine whether PMI has established by a preponderance of the evidence that these combinations of prior art render claims 1, 2, 4–10, and 14–19 unpatentable as obvious. 35 U.S.C. § 316(e).

Our governing statute and Rules "clearly place some onus on the patent owner, once trial is instituted, to address the material facts raised by the petition as jeopardizing patentability of the challenged claims." *Johnson*

9

IPR2014-00561
Patent 7,997,442 B2

*Health Tech Co. Ltd. v. Icon Health & Fitness, Inc.*, Case IPR2013-00463, slip op. at 12 (PTAB Jan. 29, 2015) (Paper 41). We previously instructed Ignite that "any arguments for patentability not raised in the [Patent Owner Response] will be deemed waived." Paper 10, 2–3. Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

Ignite argues that Albert '748 fails to describe the "mechanically connected" trigger of independent claims 1 and 8, Resp. 51–56, and the "deflector plate" of dependent claim 7, *id.* at 56–57. Ignite also argues that Albert '799 fails to describe the "mechanically connected" trigger recited in dependent claim 9. *Id.* at 58–59. Ignite also contends that Nergard does not describe the "push-button trigger" or "vent seal" recited in independent claim 16. *Id.* at 12–14 (addressing "push-button trigger"), 39–40 (addressing "vent seal"). Ignite further argues that it is improper to combine Nergard and Albert '748 or modify Nergard to include features of Albert '748. *Id.* at 14–39.

Ignite does not present persuasive evidence or argument on the remaining elements of the claims, that is, those elements other than the "mechanically connected" trigger, "deflector plate," "push-button trigger," and "vent seal." *See id.* at 11–60. Accordingly, with regard to all other limitations of the claims, the record now contains unrebutted arguments and evidence presented by PMI regarding the merits of the teachings of Albert '748 (for claims 1, 2, 4–8, 10, 14, and 15), Nergard combined with Albert '748 (for claims 16–19), and Albert '799 (for claim 9). In this connection,

IPR2014-00561
Patent 7,997,442 B2

we agree with and adopt Petitioner's factual contentions set forth in the
Petition at pages 12–60 with regard to these limitations. We find that the
preponderance of the evidence of record developed at trial supports our
conclusion that PMI has set forth how the alleged prior art teaches or
suggests those other limitations of the reviewed claims. Accordingly, we do
not address these other limitations in our discussion below.

B. OBVIOUSNESS OF CLAIMS 1, 2, 4–8, 10, 14, AND 15 IN VIEW OF
ALBERT '748

Claims 1 and 8 are independent claims. Claims 2 and 4–7 depend
from claim 1, and claims 10, 14, and 15 depend, directly or indirectly, from
claim 8. We preliminarily determined that PMI had established a reasonable
likelihood of showing that Albert '748 renders all these claims unpatentable
as obvious. Dec. 9–12. Ignite contends that Albert '748 fails to render
claims 1, 2, 4–6, 8, 10, 14, and 15 obvious because Albert '748 does not
describe a trigger "mechanically connected" to the "shutter." Resp. 51–56.
Ignite also argues in support of the patentability of dependent claim 7 based
upon limitations introduced in those claims. *Id.* at 56–57. We address each
argument below.

1. *Claims 1, 2, 4–6, 8, 10, 14, and 15*

PMI sets forth in detailed claim charts the way in which Albert '748
describes every element of claims 1, 2, 4–6, 8, 10, 14, and 15. Pet. 12–28.
PMI identifies Albert '748's valve member 30 and the associated O-ring 32
on movable member 38 as the claimed shutter. *Id.* at 16–18. PMI identifies
O-ring pressure relief valve 78 as the "vent seal," which is carried on
plunger 76. *Id.* at 16–17; Reply (citing Ex. 1001, 4:33–36). Movable
member 38 is rides within bore 74 of plunger 76 in a manner that constitutes
a "lost motion" relationship between plunger 76 and movable member 38.

11

IPR2014-00561
Patent 7,997,442 B2

Pet. 17 (citing Ex. 1001, 4:67–5:6). The combination of movable member 38 and plunger 76 are identified as the claimed trigger mechanism. Pet. 16, 23, Ex. 1014 ¶¶ 45, 58. Figure 2 of Albert '748, which is reproduced below, illustrates aperture shutter (O-ring 32 on valve 30), vent seal (O-ring 78) and the mechanism resulting in a lost-motion relationship between the shutter and the vent seal.



FIG.2

Figure 2 of Albert '748 is an enlarged fragmentary sectional view that illustrates a two-seal mechanism in which O-ring 78 unseals before O-ring 32 when knob 96 is pressed.

Ignite contends that PMI identifies movable member 38 and plunger 76 as the "trigger mechanism" and valve member 30 as the "drink aperture shutter." Resp. 51–52. Claims 1 and 8 both require that the trigger be "mechanically connected" to the "drink aperture shutter" and the "vent seal." Ex. 1006, 23:37–38 (claim 1), 24:11–12 (claim 8). Ignite argues that Albert '748's valve member 30 (i.e., the identified shutter) is not "mechanically connected" to movable member 38 (i.e., the identified trigger). Resp. 51. Ignite contends that valve member 30 and movable member 38 are "a single, integrally formed component." *Id*. at 54 (citing Ex. 1001, Figs. 2, 5;

12

IPR2014-00561
Patent 7,997,442 B2

Ex. 2008 ¶ 85). Ignite's argument implies that the shutter and trigger must be separate components to be able to be mechanically connected. Resp. 55–56.

Ignite's argument is unpersuasive. Ignite mischaracterizes PMI's mapping of Albert '748 to the claimed shutter, trigger, and vent seal. PMI identifies valve 30 and O-ring 32 as the shutter and member 38 and plunger 76 as the trigger. Pet. 16–18. Albert '748 describes a space between abutment shoulder 100 on movable member 38 and abutment end 98 on plunger 76. Ex. 1001, 4:63–66. Because of this space between these abutments, when a user of Albert '748's cup presses knob 96, O-ring 78 unseals a vent first and then O-ring 32 unseals a drink opening.[1] Pet. 17 (citing Ex. 1001, 4:67–5:6). PMI persuades us that the trigger (Albert '748's plunger 76 combined with member 38) is mechanically connected to both the shutter (O-ring 32 on valve 30) and the vent seal (O-ring 78). The '442 patent describes essentially the same type of "mechanically connected" relationship between vent seal 683, which is an O-ring seated on shaft 694 of the trigger mechanism 520. Ex. 1006, 19:36–39, Figs. 15–18.

As stated in part II.A above, we are persuaded that PMI has identified how Albert '748 describes all other elements of claims 1, 2, 4–6, 8, 10, 14, and 15. Accordingly, we conclude that PMI has demonstrated by a preponderance of the evidence that Albert '748 renders claims 1, 2, 4–6, 8, 10, 14, and 15 unpatentable as obvious under § 103.

---

[1] Albert '748 discloses that this spacing provides for a "lost motion relationship" between plunger 76 and movable member 38, i.e., the mechanism which provides for pre-venting of pressure from hot coffee. Ex. 1001, 2:44–48, 4:67–5:6.

IPR2014-00561
Patent 7,997,442 B2

### 2. Claim 7

Claim 7 depends upon claim 1 and further recites "a deflector plate adjacent the vent aperture, wherein the deflector plate directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the container body." Ex. 1006, 23:66–24:2. PMI contends that knob 96 of Albert '748 constitutes the claimed deflector because it would redirect vapor expelled from opening 88 in a "360 degree pattern . . . with most of the vapor being redirected in a direction transverse (i.e., lying across, not parallel) to the longitudinal axis of the body of the container 10." Pet. 21 (citing Ex. 1014 ¶ 57). The pertinent portion of Figure 2 of Albert '748, reproduced at right, illustrates how a flange on knob 96 would, when pressed by a user, be in a position (shown in dotted lines) to deflect vapor emanating from opening 88.



Ignite contends that claim 7 requires that "all—not just 'most'—of the vapor be expelled in the transverse direction." Resp. 56. Ignite supports its argument primarily with testimony from Dr. Swanger. *Id.* (citing Ex. 2008 ¶¶ 80–84). Ignite also relies on the following passage from the Specification:

> The deflector plate 731 directs vapor being expelled out of the vent aperture 682 transverse to the longitudinal axis of the container body 512 and away from the user. Specifically, the vent deflector plate 731 *prevents any vapor from being directed upwardly from the vent aperture 682, and rather directs it sideways away from the user*.

Resp. 57 (quoting Ex. 1006, 18:4–10 with emphasis). Based on this passage, Ignite argues that claim 7 requires all vapor to be directed

IPR2014-00561
Patent 7,997,442 B2

transversely because the "obvious purpose of the deflector plate is to protect the user by directing hot gases away from the user."  Resp. 57.

Ignite's argument is unpersuasive.  First, claim 7 recites a structure, the "deflector plate" that "directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the container body."  Claim 7 does not recite that the deflector plate "prevent" vapor from being directed along the longitudinal axis or that "all" vapor is directed transversely.  Rather, claim 7 merely requires that the plate direct vapor transversely.  Because the claim is open-ended (by reciting "comprising"), the claim limitation is met by any deflector that directs some vapor in the recited direction.  We have broadly interpreted "transverse" as meaning "situated or lying across," Dec. 5, and Ignite does not contest that interpretation, Resp. 56–57.  Ignite also does not dispute that knob 96 of Albert '748 directs most of the vapor in the transverse direction.  Resp. 56–57.

Knob 96 of Albert '748 deflects vapor in a 360-degree flow pattern in all directions in the plane illustrated by the line on the left hand portion of Ignite's annotated version of Albert '748's Figure 2, which is reproduced below right.  Therefore, at least some of the vapor would be flowing in various directions transverse to the longitudinal axis of the container, including some flow in the direction defined by the longitudinal axis of the container.  Any direction in that plane, however, that is not parallel to the longitudinal axis of the container would meet the "transverse" requirement of claim 7.



IPR2014-00561
Patent 7,997,442 B2

On the record before us, we are persuaded that PMI has demonstrated by a preponderance of evidence that Albert '748 describes a deflector plate that "directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the container body" as introduced in claim 7. Because of the open-ended nature of claim 7, it is of no import that knob 96 of Albert '748 also directs some of the vapor being expelled from opening 88 in a direction parallel to the longitudinal axis of container 10. As stated in part II.A above, we are persuaded that PMI has identified how Albert '748 describes all other elements of claim 7. Accordingly, we conclude that PMI has demonstrated by a preponderance of the evidence that Albert '748 renders claim 7 unpatentable as obvious under § 103.

### C. OBVIOUSNESS OF CLAIMS 16–19 IN VIEW OF THE COMBINATION OF NERGARD AND ALBERT '748

PMI provides argument, detailed claim charts with citations to prior art, and testimony that illustrate how the combination of Nergard and Albert '748 teach each requirement of claims 16–19. Pet. 51–60. Ignite raises a number of arguments to counter PMI's challenge, and we address each in turn below.

#### 1. *Nergard's Alleged Failure to Describe a "Push-button Trigger" or a "Vent Seal"*

Ignite contends that Nergard fails to describe the recited "push-button trigger" or the "vent seal" of independent claim 16. Resp. 12–14 (regarding "push-button trigger"); 39–41 (regarding "vent seal"). We find Ignite's arguments unpersuasive because Ignite fails to address the challenge as presented by PMI, which is based on the combination of Nergard and Albert '748. For example, PMI identifies the manner in which Albert '748 teaches the "push-button trigger" in the form of its knob 96, Pet. 55–56 (citing

16

IPR2014-00561
Patent 7,997,442 B2

Ex. 1001, 4:47–50), and a "vent seal" in the form of O-ring 78, Pet. 16, 23 (citing Ex. 1001, 4:67–5:6); Reply 14 (citing Ex. 1001, 4:31–36, Fig. 2). Ignite fails to address whether Albert '748 describes the claimed "push-button trigger" or "vent seal." Resp. 12–14 (regarding "push-button trigger"); 39–41 (regarding "vent seal"). We, therefore, are not persuaded by Ignite's argument that Nergard's alleged failure to describe ether a "push-button trigger" or a "vent seal" defeats PMI's challenge to claims 16–19 as obvious over the combination of Nergard and Albert '748.

### 2. Alleged Defects in the Combination of Nergard and Albert '748

Ignite proffers three primary arguments against the propriety of combining teachings of Nergard and Albert '748 to arrive at the drinking container of claims 16–19. First, Ignite argues that PMI has failed to carry its burden to set forth a prima facie case of obviousness. Resp. 14–20. Second, Ignite argues that PMI fails to establish that a skilled artisan would have been motivated to combine Nergard and Albert '748. *Id.* at 20–36. Third, Ignite argues that a skilled artisan would have had no reason to modify Nergard to include the lost-motion mechanism of Albert '748. *Id.* at 36–39. For the reasons expressed below, we find all three arguments to be unpersuasive.

### a) PMI's Alleged Failure to Establish a Prima Facie Case of Obviousness Based on Nergard and Albert '748

We previously found unpersuasive Ignite's argument that PMI had failed to make out a prima facie case that claims 16–19 were obvious over Nergard and Albert '748. Dec. 17–19. Nevertheless, Ignite reasserts its argument and contends that PMI does not provide "*articulated reasoning with some rational underpinning* to support the legal conclusion of obviousness." Resp. 14 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

17

IPR2014-00561
Patent 7,997,442 B2

418 (2007)). According to Ignite, "whether a combination *could* be made is not the relevant inquiry; rather, the question is whether a person of skill actually *would* do so." *Id*. at 14–15 (citing *InTouch Technologies, Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)). Ignite relies, in particular, on the following passage from the *InTouch* decision:

> A reason for combining disparate prior art references is a critical component of an obviousness analysis; *this analysis should be made explicit*. It can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to *combine the elements* in the way the claimed new invention does because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.

*Id*. at 15 (quoting *InTouch*, 751 F.3d at 1351). Ignite contends that the *InTouch* decision thus requires that PMI provide reasoning why a skilled artisan would have incorporated the push-button trigger mechanism of Albert '748 into Nergard.

Ignite argues that the obviousness of using Albert '748's push-button trigger in Nergard's container is not supported by the suggestion in Albert '748 that it is desirable to use pre-venting in containers like Nergard's. Resp. 16–17. According to Ignite, the only reasoning that PMI argued on this point is that "a person of skill would be motivated to look to the teachings of Albert '748 for how to modify the actuating member 23 of Nergard to accomplish pre-venting." *Id*. at 17 (citing Pet. 31, 43, 53). Ignite argues that PMI's statement is not sufficient reasoning but rather a "conclusory statement" unsupported by sufficient reasoning under *InTouch*. Resp. 16. Ignite also criticizes Mr. Dahlgren's testimony about the reason to substitute Albert '748's push-button for Nergard's lever as being "circular."

18

IPR2014-00561
Patent 7,997,442 B2

Resp. 17–18 (citing Ex. 1014 ¶ 102; Ex. 1023 ¶ 14[2]). Because of PMI's allegedly faulty reasoning for substituting Albert '748's push-button for Nergard's lever, Ignite concludes that PMI has used impermissible hindsight to reconstruct the claimed drinking container from "disparate" prior art references and that we should, therefore, find in its favor. *Id.* at 18–19.

PMI argues that we should reject Ignite's arguments for two reasons. First, PMI contends that it sufficiently explained why a skilled artisan would have found it obvious to substitute Albert '748's push-button for Nergard's lever. Reply 6–8. Second, PMI contends that Ignite's reliance on *InTouch* is misplaced because that decision relates to combining elements from "disparate" prior art references rather than simple substitution of known elements from closely related art such as Nergard and Albert '748. *Id.* at 6–7.

Regarding PMI's second argument, we agree that the *InTouch* decision is inapposite to this case because the prior art references at issue in *InTouch* were "disparate" and Nergard and Albert '748 are closely related to each other. The Supreme Court noted that when an obviousness challenge involves more than "the mere application of a known technique to a piece of prior art ready for the improvement" a more explicit analysis of reasons to combine prior art elements should occur to facilitate review. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417–18 (2007). For reasons expressed immediately below, we conclude that PMI has established that Nergard and Albert '748 are closely related, not disparate prior art references, and thus the *InTouch* decision is inapposite to this case.

---

[2] On page 18 of the its Patent Owner Response, Ignite inaccurately cites Ex. 1012 ¶ 14 for Mr. Dahlgren's testimony that appears at Ex. 1023 ¶ 14.

IPR2014-00561
Patent 7,997,442 B2

Regarding PMI's first argument, Nergard indisputably describes a drinking container that does not pre-vent pressure inside the container before opening its drinking aperture.  Ex. 1003, 4:39–5:2.  PMI relies upon Mr. Dahlgren's testimony and express language in Albert '748 to establish that a skilled artisan, upon reviewing Albert '748 and Nergard would be motivated to improve Nergard's drinking container by adding the push-button-actuated, lost-motion mechanism of Albert '748.  Reply 8 (citing Mr. Dahlgren's Revised Supplemental Declaration, Ex. 1023 ¶¶ 6–10).  Albert '748 recognizes the problems associated with opening a drink aperture without first relieving pressure through another valve (i.e., without pre-venting) when it criticizes two prior art patents that:

> both disclose manually operable valves in drinking receptacle covers but do not provide any means by which steam and pressure may be relieved from the interior of the container before the drinking valve is opened.  Consequently, both prior art devices, as disclosed in these patents, concurrently provide for the relief of drinking liquid and steam or pressure so that the operation of these valves is dangerous, especially when hot coffee is contained in the container and the valve is opened such as to cause the hot liquid to gush out and burn the person attempting to drink therefrom.

Ex. 1001, 1:14–25.  Nergard describes a drink container that suffers from this problem.  Albert '748 proposes an improvement to drinking containers like Nergard as follows:

> Accordingly, it is an object of the present invention to provide a novel drinking receptacle valve means which is operable initially to relieve pressure in the drinking receptacle and subsequently to open the drinking receptacle valve after the pressure has been relieved so as to provide for safety of persons drinking hot coffee from such receptacles.

20

IPR2014-00561
Patent 7,997,442 B2

*Id*. at 2:37–43. Mr. Dahlgren testifies that a skilled artisan would have, therefore, considered it obvious to modify Nergard's drinking container by adding the Albert '748's pre-venting mechanism, which Albert '748 describes in great detail. Ex. 1023 ¶ 8. He also explains that a skilled artisan would have expected the modified version of Nergard to work for the intended purpose of pre-venting the pressure inside Nergard's container. *Id*. Ignite does not address persuasively Mr. Dahlgren's testimony as set forth in his Revised Supplemental Declaration or the express suggestion in Albert '748 to modify drinking containers such as Nergard's.

Based on our review of the record, we are persuaded by PMI's argument and evidence that PMI has articulated a reason with rationale underpinning to support its challenge to claims 16–19 as being obviousness over Nergard and Albert '748.

### b) Motivation to Combine Nergard and Albert '748

Ingite argues that because Nergard describes a mug with a handle and a lever-actuated trigger, Nergard discourages using the push-button trigger of Albert '748. Resp. 20–27. Ignite relies upon Nergard's improvement over earlier containers designed by Mr. Nergard that lacked handles and included push-button triggers by adding a handle and replacing the push-button with a lever. *Id*. at 21–22 (citing Ex. 2007, 1:25–34, Fig. 1). Because Nergard's handle and lever are allegedly critical to Nergard's drinking container, Ignite contends that a skilled artisan would not replace Nergard's lever with a push-button as taught by Albert '748 or the lost-motion mechanism connected to Albert '748's push-button. *Id*. at 22–24.

Ignite further argues that claims 16–19 are not obvious over Nergard and Albert '748 because substituting Albert '748's push-button-actuated,

IPR2014-00561
Patent 7,997,442 B2

lost-motion trigger for Nergard's lever would change impermissibly Nergard's principle of operation and render Nergard's mug "inoperable for its intended purpose." *Id*. at 27. (citing *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959), *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984), and *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007)). To support this argument, Ignite proffers extensive evidence regarding human factors such as grip strength in an attempt to establish that Nergard's lever 26 is an essential component of Nergard's mug because substituting a push-button for the lever would make Nergard's mug too difficult to use. Resp. 28–34 (citing Ex. 2008 ¶¶ 14, 39, 49–51, 54–59, 61–71). Ignite contends that its evidence establishes that Nergard's lever results in "as much as a five-fold reduction in the force necessary to activate the actuating member 23" when compared to using a push-button substituted from Albert '748. Resp. 34–35. Ignite then concludes that "Nergard therefore teaches away from [PMI's] proposed substitution." *Id*. at 36.

Ignite's argument is unpersuasive. PMI persuasively argues that the law does not require that a proposed modification to a reference be optimal. Reply 8–9; *In re Gurley*, 27 F.3d 551, 552–53 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use"). PMI supplies evidence that containers having handles with a push-button actuated valve were known alternatives to Nergard's lever actuated valve. Reply 9–10 (citing Ex. 1025, 1026). Ignite's expert, Dr. Swanger, agreed that substituting the push-button of Albert '748 for Nergard's lever would have been "simple" for a skilled artisan. Ex. 1029, 223:2–5, 246:1–8. PMI also provides evidence that a user would be able to apply the force required

22

IPR2014-00561
Patent 7,997,442 B2

to open a modified Nergard container in which a button was substituted for the lever.  Reply 10–11 (citing Ex. 1024 ¶ 17).  We agree with PMI that, as established by the evidence of record, a skilled artisan would have considered levers and push-button actuators to be well known alternatives and that substituting a push-button for a lever would have been simple and yielded predictable results.

      c)  No Reason to Modify Nergard to Add Lost-Motion Feature of Albert '748

Ignite also argues that a skilled artisan would not have modified Nergard's actuating member 23 to include the lost-motion mechanism of Albert '748 because, according to Dr. Swanger, Nergard's member 23 is too short to accommodate Albert '748's lost-motion mechanism.  *Id.* (citing Ex. 2008 ¶¶ 72–76).  Ignite contends that Mr. Dahlgren oversimplifies the modification of Nergard's actuating member 23 to include lost-motion and overestimates the amount of space available for the modification.  Resp. 38 (citing Ex. 1014 ¶ 104; Ex. 2008 ¶ 76; Ex. 2011, 67:1–69:25; Ex. 2013).

PMI argues that not only would it have been possible to add Albert '748's lost-motion mechanism to Nergard, it did so by purchasing a commercial version of Nergard's mug and modifying it to include the lost-motion mechanism of Albert '748.  Reply 11–13 (citing Ex. 1024 ¶ 21).  Albert '748 expressly recommends using pre-venting in drink containers to avoid the dangers associated with simultaneous opening of a drink aperture and a vent aperture.  Ex. 1001, 14–25.  Albert '748 describes its lost-motion mechanism as the preferred manner of avoiding such dangers by pre-venting vapor before opening the drink aperture.  *Id.* at 1:34–59, 2:37–48, 4:67–5:6.  During his deposition, Mr. Dahlgren testified that because implementing a lost-motion mechanism involves removing material, it necessarily would

IPR2014-00561
Patent 7,997,442 B2

have been possible to add such a mechanism to Nergard's actuating member 23. Ex. 2011, 67:11–21. Dr. Swanger agrees that it would have been possible to incorporate a lost-motion mechanism into Nergard's lid. Ex. 1028, 120:24–121:3. Additionally, both experts agree that simply shortening Nergard's actuating member 23 to create a gap between Nergard's camming surfaces 28 and 29 would implement a lost-motion mechanism. Ex. 1024 ¶ 32; Ex. 1029, 271:15–274:9.

Based on our review of the evidence and argument, we are persuaded that a skilled artisan would have possessed sufficient skill to modify Nergard's actuating member 23 to incorporate a lost-motion mechanism as suggested by Albert '748. We are also persuaded that Albert '748 expressly suggests such a modification by recommending that a pre-venting feature be added to the lid of containers like Nergard's.

### 3. Conclusion

For the reasons stated above, we conclude that PMI has demonstrated by a preponderance of evidence that the combination of Nergard and Albert '748 renders claims 16–19 unpatentable as obvious.

### D. OBVIOUSNESS OF CLAIM 9 IN VIEW OF ALBERT '799

Claim 9 depends from claim 8 and further recites in pertinent part: "the shutter is positioned within the lid and below the drink aperture, and wherein the vent seal is positioned within the lid and below the vent aperture." Ex. 1006, 24:20–23. Claim 8 recites, among other limitations, "a trigger mechanically connected to the shutter and the vent seal." Ex. 1006, 24:11–12. We preliminarily determined that PMI had established a reasonable likelihood of showing that Albert '799 renders claim 9 unpatentable as obvious. Dec. 19–20.

IPR2014-00561
Patent 7,997,442 B2

PMI provides a detailed claim chart and testimony to support its challenge that claim 9 is unpatentable as obvious over Albert '799. Pet. 36–42 (citing Ex. 1014 ¶¶ 79–86). PMI contends that Albert '799 teaches every element of claim 9 as set forth in its claim chart. Pet. 38–42. PMI identifies Albert '799's valve member 33 with disk 34 as the shutter, O-ring 37 as the vent seal, and pushbutton 36 with bar 32 as the trigger. *Id*. at 39–40. Albert '799's Figure 4, reproduced below, illustrates these elements.



Figure 4 from Albert '799 is a perspective view illustrating elements of operating unit 12 including pushbutton 36, bar 32, valve member 33, and O-ring 37.

Ignite argues that Albert '799 does not describe a trigger "mechanically connected" to the "shutter and the vent seal." Resp. 58–59. Ignite contends that PMI identifies bar 32 as the trigger and valve member 33 as the shutter. *Id*. at 58. Because these two elements are "integrally formed" they do not have the "mechanically connected" relationship that is required in claim 9. *Id*. at 58–59 (citing Ex. 1005, 6:5–6, 6:15–18). Ignite

25

IPR2014-00561
Patent 7,997,442 B2

thus argues that two items being formed integrally as a single piece is not a type of mechanical connection between those two items.

We are persuaded that PMI has demonstrated that Albert '799 describes a trigger that is mechanically connected to the vent seal and the aperture shutter. Initially, we note that we consider PMI to identify the claimed trigger as pushbutton 36 with bar 32, not just bar 32 because the trigger includes the structure that the user touches (i.e., pushbutton 36). O-ring 37 (the vent seal) is press fitted onto pushbutton 36 (part of the trigger) and, therefore, is mechanically connected to the trigger in the same way that the '442 patent describes vent seal 683 being mechanically connected to trigger 610. Bar 32, although integrally formed with pushbutton 36 and valve 33, functionally connects Albert '799's vent seal (O-ring 37) to the aperture shutter (valve 33 with disk 34 and abutment plate 35) and converts a force applied to pushbutton 36 into motion of valve 33, disk 34, and abutment plate 35. Ex. 1005, Fig. 4, 6:11–26. Additionally, when a user of Albert '799's cup presses button 36, bar 32 moves, which then causes valve 33 to open drink opening 27. 6:58–7:9. Thus, in a functional and mechanical sense, O-ring seal 37 and valve 33 are both connected via pushbutton 36 and bar 32 (the trigger).

As stated in part II.A above, we are persuaded that PMI has identified how Albert '799 describes all other elements of claim 9. Accordingly, we are persuaded that PMI has demonstrated by a preponderance of evidence that Albert '799 renders claim 9 unpatentable as obvious under § 103.

## IV. IGNITE'S MOTION TO EXCLUDE

We have reviewed Ignite's Motion to Exclude, PMI's Opposition to the Motion, and Ignite's Reply in support of the Motion. Based on our

26

IPR2014-00561
Patent 7,997,442 B2

review, we deny the Motion in all respects for one or both of the following reasons: (1) the Motion is moot because it seeks to exclude evidence not considered or relied upon in rendering this Decision or (2) the Motion addresses issues more appropriate to determining the weight ascribed to the evidence rather than the admissibility of evidence. In rendering this Decision, we determine and ascribe the appropriate weight to all proffered evidence and, when appropriate, comment upon the weight ascribed.

## V.  CONCLUSION

For the reasons expressed above, we determine that PMI has shown by a preponderance of the evidence that claims 1, 2, 4–10, and 14–19 are unpatentable as obvious.

## VI. ORDER

For the reasons given, it is:

ORDERED that claims 1, 2, 4–10, and 14–19 of the '442 patent are held *unpatentable*;

FURTHER ORDERED that Ignite's Motion to Exclude is *denied*;

FURTHER ORDERED that pursuant to 35 U.S.C. § 318(b), upon expiration of the time for appeal of this decision, or the termination of any such appeal, a certificate shall issue canceling claims 1, 2, 4–10, and 14–19 in U.S. Patent No. 7,997,442 B2; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00561
Patent 7,997,442 B2

PETITIONER:

George C. Rondeau, Jr.
DAVIS WRIGHT TREMAINE LLP
georgerondeau@dwt.com

Kelly J. Hollowell
STITES & HARBISON, PLLC
khollowell@stites.com

PATENT OWNER:

Stephen M. Schaetzel
Gregory J. Carlin
Warren J. Thomas
Jessica Keesee
MEUNIER CARLIN & CURFMAN, LLC
sschaetzel@mcciplaw.com
gcarlin@mcciplaw.com
wthomas@mcciplaw.com
jkeesee@mcciplaw.com