**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IGNITE USA, LLC,

     Plaintiff,

v.

PACIFIC MARKET INTERNATIONAL,
LLC

         Defendant.

Civil Action No. 14-cv-856

Judge Edmund Chang

**JURY TRIAL DEMANDED**

**PACIFIC MARKET INTERNATIONAL, LLC'S
OPENING CLAIM CONSTRUCTION BRIEF**

36978512v.2

## TABLE OF CONTENTS

Page

I.   PROCEDURAL HISTORY ................................................................................. 1

II.  THE '442 PATENT ......................................................................................... 1

III. LEGAL STANDARD ....................................................................................... 2

IV.  ANALYSIS ..................................................................................................... 3

     A.   "vent seal" ........................................................................................... 4

     B.   "vent chamber" ................................................................................... 4

     C.   "between [the vent seal and the vent aperture]" ................................ 5

     D.   "cross-sectional area" ......................................................................... 8

          1.   Law of Indefiniteness ................................................................ 8

          2.   The Record Regarding Cross-Sectional Area ......................... 10

          3.   Claim 3 is Indefinite ............................................................... 15

          4.   PMI's Proposed Construction of "Cross-Sectional Area" ...... 17

V.   CONCLUSION ............................................................................................... 18

36978512v.2

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)..................................................................................9

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003)..................................................................................2

*Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008)..................................................................................5

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)................................................................................10

*Dow Chemical Co. v. Nova chemicals Corp. (Canada)*,
    803 F.3d 620, 625 (Fed. Cir. 2016).....................................................................10, 11

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009)................................................................................18

*GE Lighting Solutions, LLC v. Lights of Am. Inc.*,
    2016 WL 6301307 (Fed. Cir. Oct. 27, 2016).........................................................10

*Halliburton Energy Servs. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)..................................................................................9

*Interval Licensing, LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014).........................................................................10, 17

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)..............................................................................10, 16, 17

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008)..................................................................................5

*Pall Corp. v. Micron Separations, Inc.*,
    66 F.3d 1211 (Fed. Cir. 1995)....................................................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................6, 8, 12

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
    315 F.3d 1335 (Fed. Cir. 2003)..................................................................................3

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008)................................................................................10

*Renishaw PLC v . Marpass Societo 'per Azioni*,
    158 F.3d 1243, 1250 (Fed. Cir. 1988).................................................................12, 18

36978512v.2

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013)........................................................................3

*Smart Systems Innovation, LLC v. Chicago Transit Authority, et al.*,
2016 WL 109985 (N.D. Ill. 2016) ................................................................4, 7

*Starhome GmbH v. AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014)..........................................................................3

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013).....................................................................2, 3

*Teleflex, Inc. v. Ficasa M. Am. Corp.*,
249 F.3d 1313 (Fed. Cir. 2002)........................................................................5

*Teleflex, Inc. v. Ficosa N. Am. Corp*,
299 F.3d 1313 (Fed. Cir. 2002)........................................................................7

*Teva Pharm USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)......................................................................11

*TomTom, Inc. v. Adolph*,
790 F.3d 1315 (Fed. Cir. 2015)........................................................................5

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997)........................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)..........................................................................3

*Wellman, Inc. v. Eastman Chem. Co.*,
642 F.3d 1355 (Fed. Cir. 2011)......................................................................10

**Statutes**

35 U.S.C. §103 ...................................................................................................1

35 U.S.C. § 112(b) .............................................................................................9

Pacific Market International, LLC ("PMI") submits the following Opening Claim Construction Brief.

## I.   PROCEDURAL HISTORY

Ignite USA, LLC ("Ignite") filed this lawsuit on February 7, 2014, alleging that PMI infringed claims 16-19 of U.S. Patent No. 7,997,442. (JA 1-31). PMI filed and the PTAB granted a petition for *Inter Partes* Review of the '442 Patent and this lawsuit was stayed in the meantime. On September 20, 2015, the PTAB issued its Final Written Decision in the '442 IPR, finding all claims for which review was instituted, including claims 1, 2, 4-10, and 14-19, to be unpatentable as obvious under 35 U.S.C. §103.[1] Following the PTAB's decision, Ignite amended its complaint and alleged that PMI infringed two different claims of the '442 Patent than originally asserted, claims 3 and 12.

## II.   THE '442 PATENT

The '442 Patent relates to hot beverage mugs. The specification of the '442 Patent describes a problem in hot beverage mugs; namely, that hot gases or vapors within the receptacle of the mug need to be released prior to the user drinking the beverage. (JA 26 at 15:44-59). The specification of the '442 Patent describes travel containers having at least two apertures, a vent aperture and a drink aperture. (JA 19 at 1:43-54). The containers include a trigger mechanism that follows an "actuation stroke" to first open the vent aperture and release the hot gases and vapors, and then to open the drink aperture and allow the user to drink the beverage contained within the receptacle. (JA 19 at 1:63 -2:3). The hot gases are therefore released through the vent aperture prior to the user drinking the beverage to prevent the hot vapors from spraying through

---

[1] The PTAB also issued a Final Written Decision in an *Inter Partes* Review of a related patent, U.S. Patent No. 7,546,933. The '442 Patent is a continuation of the '933 Patent and has the same specification and figures. In the '933 IPR, the PTAB also invalidated all claims for which review was initiated, including claims 3 and 11, which are identical to claims 3 and 12 of the '442 Patent.

1

the drink aperture and injuring the user. This process is called "two-stage venting" or "pre-venting."

The PTAB invalidated in the '442 IPR all of the Patent's claims drawn to pre-venting. As a result, the invention of claims 3 and 12 is not pre-venting. Rather, those claims only cover specific embodiments of pre-venting mugs.

- Claim 3: "The drinking container of claim 1, further comprising a vent chamber between the vent seal and the vent aperture, the vent chamber having a cross-sectional area greater than a cross-sectional area of the vent aperture."

- Claim 12: "The drinking container of claim 8, further comprising a vent chamber between the vent seal and the vent aperture, and wherein the trigger extends partially through the vent chamber."

The Patent teaches that when a user first engages the trigger on the side of the mug ("first portion of the actuation stroke"), the vent seal is actuated and, as a result, gases and vapors enter the vent chamber where they are dissipated and then released out of the mug through the vent aperture. (JA 28 at 20:8-13). Claims 3 and 12 are drawn to the configuration and features of the vent seal, vent aperture, vent chamber and trigger.

The parties dispute and submit for construction the following claim terms: "vent seal," "vent chamber," "between the vent seal and the vent aperture," and "cross-sectional area."

## III.    LEGAL STANDARD

To construe claim language in a patent, courts "first look to, and primarily rely on[ ] the intrinsic evidence," which "includ[es] the claims themselves, the specification, and the prosecution history of the patent." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013) (citations omitted). When analyzing the intrinsic evidence, the Court begins with the language of the claims themselves, applying a "heavy presumption that claim terms take on their ordinary meaning as viewed by one of ordinary skill in the art." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citations and quotations omitted). A

2

claim term takes on its ordinary meaning unless the patentee demonstrates an intent to deviate from that meaning, such as by "act[ing] as his own lexicographer" or by "disavow[ing] the full scope of a claim term either in the specification or during prosecution." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (citations and quotations omitted).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); see also *Sunovion Pharms.*, 731 F.3d at 1276 (noting that the intrinsic evidence is "usually dispositive" (citations omitted)). In such cases, "it is improper to rely on extrinsic evidence," which includes dictionary definitions, expert testimony, inventor testimony, and other "evidence that is external to the patent and file history." *Vitronics*, 90 F.3d at 1583-84 (citations omitted). Extrinsic evidence, however, may be considered "if needed to assist in determining the meaning or scope of technical terms in the claims." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995) (citation omitted). In other words, it may be consulted to ensure that a court's construction of a claim "is not inconsistent with clearly expressed, plainly apposite and widely held understandings in the pertinent technical field." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1346 (Fed. Cir. 2003) (citation and quotations omitted). Extrinsic evidence in general, however, is considered "less reliable than the patent and its prosecution history in determining how to read claim terms," *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) (citation and quotations omitted), and "may not be used to vary or contradict the claim language" and specification, *Vitronics*, 90 F.3d at 1584 (citation omitted).

## IV. ANALYSIS

The Parties dispute four terms/phrases: (1) "vent seal," (2) "vent chamber," (3) "between the vent seal and the vent aperture," and (4) "cross-sectional area."

3

### A. "vent seal"

| PMI's Proposed Construction | Ignite's Proposed Construction |
|---|---|
| "a member that prevents the passage of gas or vapor" | "a dedicated member that prevents the passage of gases or vapor" |

The Parties' dispute over this term focuses on the word "dedicated." The Patent does not teach, disclose, or specify that the vent seal has to be a "dedicated" member. The Patent does not use the word "dedicated" or any synonym for dedicated to describe the vent seal. Adding that word to the construction of vent seal adds a limitation to the claim that does not exist in the Patent. *Smart Systems Innovation, LLC v. Chicago Transit Authority, et al.*, 2016 WL 109985, *5 (N.D. Ill. 2016) (rejecting proposed construction "because it adds an unstated limitation").

Moreover, the word "dedicated" itself is unclear. *Smart Systems Innovation*, 2016 WL 109985 at *5 ("A separate problem posed by the addition of 'financial construction' is that the term itself would need to be further defined"). What is a "dedicated" member? How would a person of ordinary skill in the art determine if a member were or were not "dedicated?" The purpose of construing claims is to help clarify the scope of the claims, not to add further confusion. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Ignite's proposed construction creates confusion.

### B. "vent chamber"

| PMI's Proposed Construction | Ignite's Proposed Construction |
|---|---|
| "a space to lower the pressure of vapor or gas" | "a space having an entrance and an exit for lowering the pressure of vapor or gas" |

The Parties' dispute over this term focuses on whether its construction should include the additional structural limitations of "having an entrance and an exit," as Ignite proposes. The Patent discloses an embodiment in which the vent chamber has "a first entrance aperture at one

end that provides an entrance to the vent chamber" and "a second exit aperture (the vent aperture) . . . ." (JA 27 at 17:59-62). But there are two reasons why these features of this embodiment cannot be added to the definition of "vent chamber."

First, as quoted above from the Patent, the "exit aperture" **is** the "vent aperture" which is itself a separate element in claims 3 and 12, among other claims. Both claims 3 and 12 recite "a vent chamber between the vent seal and **the vent aperture.**" (emphasis added). It would be nonsensical and improper to construe vent chamber as including the very exit aperture which is recited as a separate claim element. *Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings.")

Second, while "claims must be read in view of the specification," it is not proper to read into a claim a limitation from the specification that the inventors did not see fit to put in themselves. *Teleflex, Inc. v. Ficasa M. Am. Corp.*, 249 F.3d 1313, 1326 (Fed. Cir. 2002); *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1328 (Fed. Cir. 2015) ("[T]his court has repeatedly cautioned against importing limitations from an embodiment into the claims.") Nor is it proper to limit a claim to a preferred embodiment. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.") Ignite's proposed construction does just that by importing the exit feature of one particular embodiment into the claim term "vent chamber."

C.    **"between [the vent seal and the vent aperture]"**

| PMI's Proposed Construction | Ignite's Proposed Construction |
| --- | --- |
| "completely or partially between" | "separating with a flow path" |

PMI believes that the single **word** "between" should be accorded its plain and ordinary meaning. The Federal Circuit has made clear that claim terms should be accorded their "ordinary

5

and customary" meaning. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). The word "between" is commonly understood and is not used in the Patent in any way other than how it is commonly understood.

The reason for PMI's proposed construction of the **phrase** "between the vent seal and the vent aperture" is to address the fact that the Patent clearly teaches that the vent chamber need not be **completely** between the vent seal and vent aperture. Figure 16 illustrates that the vent chamber 738 (highlighted in yellow below) is not located completely between the vent seal 683 (highlighted in blue) and the vent aperture 682 (highlighted in green).[2]



Indeed, the PTAB considered the meaning of "between" in the '933 IPR and rejected "Ignite's implied interpretation of 'between'" as meaning completely between, because the '933 specification and Figure 16, like their identical counterparts in the '442 Patent, specify that the

---

[2] This highlighted reproduction of Figure 16 comes from the PTAB's Final Written Decision in the '933 IPR.

vent chamber "is not located solely and entirely between" the vent seal and vent aperture. (Exh. A - '933 IPR Final Written Decision at 31).

Both Ignite's 30(b)(6) witness Dan Wodka and '442 (and '933) inventor Steve Pinelli also testified in their depositions in this lawsuit that the vent chamber is not completely between the vent seal and vent aperture. (Exh. B - Wodka at 61:3-20; Exh. C - Pinelli at 67:2-70:4).

Ignite's proposed construction of the lone word "between" as meaning "separating with a flow path" has no basis in the '442 Patent. The Patent nowhere defines "between" that way and nowhere suggests that the inventor intended to act as his own lexicographer and change the plain and ordinary meaning of the word "between." *Teleflex, Inc. v. Ficosa N. Am. Corp,* 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claims terms take on their ordinary meaning. We indulge 'a heavy presumption' that a claim term carries it ordinary and customary meaning.")

Ignite's proposed construction is also both nonsensical and conflicts with how "between" is used in Claim 8. As discussed above, the purpose of claim construction is to clarify, not to confuse. (*Supra* at 5). It would not be at all evident to the finder of fact what "separating with a flow path" means. Indeed, as is the case with Ignite's proposed construction of "vent seal" as a "dedicated member," the phrase "separating with a flow path" would require its own definition. *See Smart Systems*, 2016 WL 109985 at * 5 (rejecting proposed construction which would itself "need to be further defined").

Finally, Ignite's proposed construction of the word "between" is inconsistent with how that same word is used in Claim 8: "a shutter that is moveable **between** a closed position and an open position." (JA 30 at 24:8-9). Ignite's proposed construction simply makes no sense for the word "between" as used in Claim 8. "Separating with a flow path" is nonsensical with respect to opening and closing the shutter of Claim 8. Claim 8 uses the word "between" according to its

7

plain and ordinary meaning. "Because claim terms are normally used consistently throughout the Patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. "Between" in Claim 3 should be accorded its pain and ordinary meaning, as in Claim 8, and, with the clarification that as part of the above Claim 3 phrase, the vent chamber can be "completely or partially between" the vent seal and vent aperture.

### D. "cross-sectional area"

| PMI's Proposed Construction | Ignite's Proposed Construction |
|---|---|
| "two-dimensional space inside a perimeter" | plain and ordinary meaning |

The Parties' dispute over this term focuses on whether it renders Claim 3 indefinite. Ignite proposes that "cross-sectional area" be accorded its plain and ordinary meaning, while PMI believes that the term renders the claim indefinite however it is construed, because the '442 Patent does not teach or disclose where on the vent chamber and vent aperture their cross-sectional areas should be measured.

PMI will first summarize the law relating to indefiniteness, then review the intrinsic and extrinsic record regarding the term "cross-sectional area," then explain why that term renders claim 3 indefinite and finally discuss PMI's proposed definition.

### 1. Law of Indefiniteness

A patent must set forth "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b). The purpose of this requirement is to ensure that the public is on notice as to what is covered by the patent, which in turn enables competitors to avoid infringement. *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("The patent statute requires that the scope of the

8

claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent.")

Because a claim's definiteness affects a court's ability to construe a claim, courts often address an indefiniteness challenge, which is a legal question, during claim construction. See e.g., *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013) ("In order to be indefinite, reasonable efforts at claim construction must result in a definition that does not provide sufficient particularity or clarity to inform a skilled artisan of the bounds of the claim." (citation omitted)); and *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008) ("Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." (citation omitted)). Consistent with the statutory presumption of patent validity, the patent's challenger must show indefiniteness by clear and convincing evidence. *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011).

The Supreme Court changed the standard for indefiniteness in 2014. Previously, a claim was indefinite only if it was "insoluably ambiguous" and not amenable to construction. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). The Supreme Court in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014), raised the bar for definiteness, holding that a claim is indefinite if it fails, when "viewed in light of the specification and prosecution history, [to] inform those skilled in the art about the scope of the invention with ***reasonable certainty***." *Id.* (emphasis added). The Court emphasized that "[i]t cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*." *Id*. at 2130 (emphasis in original). The Federal Circuit has held patent claims to be indefinite under this standard numerous times. See e.g., *Interval*

*Licensing, LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *GE Lighting Solutions, LLC v. Lights of Am. Inc.*, 2016 WL 6301307, at *1 (Fed. Cir. Oct. 27, 2016); and *Dow Chemical Co. v. Nova chemicals Corp. (Canada)*, 803 F.3d 620, 625 (Fed. Cir. 2016).

In *Dow Chemical*, the Federal Circuit held that a patent claim was indefinite under *Nautilus* where the patent did not teach how or where to measure "a slope of hardening coefficient," a claim term in a patent on plastic compositions:

> [T]he patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select. Particularly this is so where ***different approaches to measurement are involved.***

*Id.* at 630 (emphasis added); see also *Teva Pharm USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1338 (Fed. Cir. 2015) (claim indefinite because it "does not specify which measure to use and in a typical polymer sample, $M_p$, $M_n$, and $M_w$ have different values.")

### 2. <u>The Record Regarding Cross-Sectional Area</u>

The '442 Patent specification explains "cross-sectional area" twice and those references are set forth *verbatim*:

> Further, as shown in FIG 9, the third aperture **180** has a first cross-sectional area and first volume, and vent chamber **238** has a second cross-sectional area and a second volume. **The cross-sectional area and volume of the vent chamber 238 being larger than that of the third aperture 180. Thus, the size of the vent chamber 238 is substantially larger than the size of the opening to the third aperture 180 such that as the seal mechanism 18 is actuated and gas and/or liquid is released through the third aperture 180 in the lower lid 168, the pressure is dissipated in the vent chamber 238** and is not transferred out through the vent hole **182**, which has generally the same area as the third aperture **180**. This is to prevent a chimney effect through the vent holes. (JA 25 at 13:23-36, emphasis added).

> \* \* \*

> **The vent chamber 738 provides a chamber with an increased volume capacity to lower the pressure and volume of the vapor/gas as it is expelled past the vent seal 683** but before it exits through the vent aperture **683**. (JA 27 at 17:53-58, emphasis added).

10

Claim 3 requires that the "cross-sectional area" of the vent chamber be "greater than a cross-sectional area of the vent aperture." Significantly, the Patent does not teach or disclose that the **cross-sectional area** of the **vent aperture** *vis-à-vis* the vent chamber matters to the claimed invention. The above references teach that it is the relative **volume** of the **"third aperture"** and the vent chamber that matters. Specifically, as highlighted above, it is the increased volume of the vent chamber in comparison to the lower volume **entrance** to the vent chamber that results in "the pressure" being dissipated in the "vent chamber and [ ] not transferred out through the" vent aperture. (JA 25 at 13:28-36). In other words, pressure is "dissipated in the vent chamber" **before** the gases ever reach the vent aperture. Thus, the Patent teaches that relative "volume," is important, not "cross-sectional areas," but that the "volume" of the **vent aperture** does not matter in any event.

It is against this backdrop that the Claim 3 term "cross-sectional area" should be construed. "The construction that stays true to the claim language and most naturally aligns with the Patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316; see also *Renishaw PLC v . Marpass Societo 'per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1988) ("the interpretation to be given a term can only be determined and confirmed with full understanding of what the inventors actually invented and intended to envelop with the claim.") Here, it is apparent that the inventors did not invent anything that depended on the "cross-sectional area" of the vent chamber being greater than the "cross-sectional area" of the vent aperture. Not only does the specification disavow any relevance of the area (or volume) of the vent aperture to the invention, but the Patent is silent on where "cross-sectional area" should even be measured. As a result, the claimed "cross-sectional area[s]" depend entirely on where on the vent chamber and on the vent aperture those areas are measured.

The size of an object's cross-sectional area will vary depending on where the object is cut and where, as a result, the cross-section is revealed. For example, if a loaf of bread is cut in half lengthwise, the resulting cross-sectional area will be different than that if the loaf of bread is cut widthwise, assuming the loaf is not a perfect square. Likewise, if the loaf of bread tapers towards its lengthwise ends, as is typical, the cross-sectional area of an end slice would be different than a cross-sectional area of a slice from the middle of the loaf. If the loaf is cut at angles, that would result in even more cross-sectional areas.

Figure 16 of the '442 Patent depicts a cross-section of the mug that is claimed in the Patent. In the reproduction below, the vent chamber is highlighted in yellow and the vent aperture is highlighted in green:



As can been seen, the size of a cross-sectional area of the vent chamber (yellow) and of the vent aperture (green) will vary based on which cross-section of each object is measured. For example, the cross-sectional area of each will be different if each is cut along the axis of the trigger (610) than if each is cut perpendicular to the axis of trigger. Because the vent chamber and vent

12

aperture are irregularly-shaped, the respective cross-sectional areas will be different, even if each

is cut in the same direction (parallel or perpendicular to the trigger axis, for example), depending

on which part of each is cut.[3] The Figure 16 reproduction from above is overlaid below with a

red line, a blue line and a black line running through different parts of the vent chamber and vent

aperture.



As can be seen, the cross-sectional areas of the vent chamber and the vent aperture are different

for the cross-section defined by each of these lines.

Both '442 Patent inventor Pinelli and Ignite 30(b)(6) witness Wodka testified that the

"cross-sectional areas" of the vent chamber and vent aperture depend on where they are

measured. Inventor Pinelli testified:

Q. Does the vent aperture have a cross-sectional area?

---

[3] As discussed above, cutting at an angle (rather than perpendicular or parallel to the axis of the trigger) would result in potentially an *infinite* number of cross-sectional areas.

* * *

A. Yes.

Q. Does it have different cross-sectional areas depending on where it's measured?

A. Yes.

(Exh. C - Pinelli 72:12-19)

Ingite 30(b)(6) Witness Wodka, testified:

Q. And when you say, depending on the cross-section used in the part, you mean depending on where you, for lack of a better word, sliced the vent chamber, you may get a different measurement of what the cross-sectional area is?

A. Yes.

(Exh. B - Wodka 84:20-85:1).

Wodka testified that he has "beyond ordinary skill in the art." (Exh. B - Wodka 87:9-19). When asked how he would measure the "cross-sectional areas" of the vent chamber and vent aperture, he testified that the decision is subjective:

**Vent Chamber**

Q. How would you decide where to slice the vent chamber to determine the cross-sectional area.

A. You know, personally, I can see many ways in which to put a cross-section through the product to get a definition of the cross-sectional area. It's a common but not limited practice to look at a cross-section that's at the direct center of the product through the trigger.

Q. When you say through the direct center of the product through the trigger, are there different slices you could take through the center of the trigger or is there only one?

A. There are multiple slices you could take. I'm referring most specifically to the cross-section shown in figure 16, if, when viewed from the top of the product, you're finding a center line along the axis of the center of the trigger.

Q. Could you also do a slice that is along the axis that perpendicular to the trigger:

A. To do what purpose, define --

Q. To measure the cross-sectional area of the vent chamber.

14

A. You could

(Exh. B - Wodka 85:18-87:3).

**Vent Aperture**

Q. If you were to measure the cross-sectional area of the vent aperture, what points would you use to do that?

A. In my individual capacity with respect to this cross-section, I would do my best to infer the boundary between the chamber and the aperture because there's nothing in particular within this figure that defines that. So I would have to first define that boundary, at which point I could start to make, you know, additional judgment decisions as necessary to get an area.

(Exh. B - Wodka 87:23-88:13).

### 3.    Claim 3 is Indefinite

Claim 3 is indefinite because the '442 Patent does not inform those skilled in the art about the scope of the invention with "reasonable certainty." Specifically, the Patent does not teach, disclose or even suggest where on the vent chamber or where on the vent aperture a "cross-sectional area" should be measured. This indefiniteness is compounded by the fact that the Patent does not suggest that the relative "cross-sectional areas" of the vent chamber and vent aperture even have anything to do with the invention of claim 3. If someone extraordinarily skilled in the art like Ignite's Wodka would not know where to measure those objects, neither would someone ordinarily skilled in the art. Claim 3 flunks *Nautilus* because it creates "a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement." *Nautilus*, 134 S.Ct. at 2129.

This is no hypothetical problem. Ignite itself recognizes and is attempting to exploit in this lawsuit the indefiniteness of Claim 3. In its Final Infringement Contentions, Ignite proffers three "alternative" theories of infringement, each measuring "cross-sectional areas" from different locations.

15

**Theory #1: Ignite's Final Infringement Contentions, Exh. A, p. 10**



**Theory #2: Ignite's Final Infringement Contentions, Exh. A, p. 10**



**Theory #3: Ignite's Final Infringement Contentions, Exh. A, p. 11**



(Exh. D - Ignite Final Infringement Contentions). This is hardly the "reasonable certainty"

required by *Nautilus. S*ee also *Interval Licensing LLC 766* F.3d at 1371 ("[t]he claims, when read

in light of the specification and the prosecution history, must provide objective boundaries for

those of skill in the art") (citing *Nautilus*, 134 S.Ct. at 2130 & n. 8). PMI and the rest of the

world are left simply to proceed at their own peril in reading and designing around Claim 3.

16

### 4. __PMI's Proposed Construction of "Cross-Sectional Area"__

PMI's proposed construction of the phrase "cross-sectional area" is the "two dimensional space inside a perimeter." This construction will not cure the indefiniteness of Claim 3; no construction will because however defined, a cross-sectional area depends on where it is measured. But PMI's construction is at least based on the specification and does not entail the risk that, left to its unstated plain and ordinary meaning, the phrase gets twisted to mean something it does not. *Renishaw PLC*, 158 F.3d at 1250 ("the interpretation to be given a term can only be determined and confirmed with full understanding of what the inventors actually invented and intended to envelop with the claim.")

The specification itself refers to cross-sectional "area" and cross-sectional "perimeter" interchangeably.

> According to another embodiment, the drinking container has a vent chamber between the vent seal and the vent aperture. The vent chamber has a cross-sectional *perimeter* greater than a cross-sectional *perimeter* of the vent aperture.

(JA 19 at 2:24-27, emphasis added).

> The vent chamber 738 has a cross-sectional *area* greater than a cross-sectional *area* of the vent aperture 682.

(JA 27 at 17:57-59, emphasis added). Construction of "cross-sectional area" must therefore be consistent with the specification's interchangeable use of the terms "perimeter" and "area." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("The interchangeable use of the two terms is akin to a definition equating the two"). Inventor Pinelli testified consistently with the specification, stating that to measure "cross-sectional area," you first "have to know what the perimeter of that area is" and then measure "whatever area is enclosed in that." (Exh. C - Pinelli 72:23-73:20).

## V.     CONCLUSION

For the foregoing reasons, PMI respectfully requests that the Court adopt its proposed

constructions of the above discussed terms and determine that "cross-sectional area" renders

Claim 3 indefinite.

**DATED:** February 10, 2017                    Respectfully submitted,

                                               PACIFIC MARKET INTERNATIONAL, LLC


                                               By:    */s/Patrick T. Muffo*_____
                                                       One of Its Attorneys

Michael R. Levinson
mlevinson@seyfarth.com
Patrick T. Muffo
pmuffo@seyfarth.com
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603
Telephone:     (312) 460-5000
Facsimile:     (312) 460-7000

18

## CERTIFICATE OF SERVICE

I, Patrick T. Muffo, an attorney, certify that I caused the foregoing to be filed

electronically with the Clerk of the Court for the Northern District of Illinois using the Court's

Electronic Case Filing System, which will send notification to the registered participants of the

ECF System as listed in the Court's Notice of Electronic Filing, on February 10, 2017.

> _/s/Patrick T. Muffo_
> Patrick T. Muffo
> 131 South Dearborn Street
> Suite 2400
> Chicago, Illinois 60603
> (312) 469-5000 – Telephone
> (312) 460-7000 – Facsimile
> pmuffo@seyfarth.com

36978512v.2