**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IGNITE USA, LLC,

    Plaintiff,

v.

PACIFIC MARKET INTERNATIONAL,
LLC

              Defendant.

Civil Action No. 1:14-cv-00856

Hon. Edmond E. Chang

**JURY TRIAL DEMANDED**

**MEMORANDUM IN SUPPORT OF PACIFIC MARKET INTERNATIONAL, LLC'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO IGNITE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

<span style="color:red">**PUBLIC REDACTED VERSION**</span>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

PMI'S MOTION FOR SUMMARY JUDGMENT ............................................... 2

A.     Procedural History ................................................................................ 2

B.     The '442 Patent .................................................................................... 3

C.     The '233 and '933 IPRs ....................................................................... 4

D.     The Prior Art ......................................................................................... 5

     1.     Chaffin ...................................................................................... 5

     2.     Albert ....................................................................................... 6

     3.     Combination of Chaffin and Albert ......................................... 8

ARGUMENT ..................................................................................................... 8

     1.     Legal Standards ........................................................................ 8

     2.     Ignite is Collaterally Estopped From Asserting Claims 3 and 12 ....................... 11

     3.     Claims 3 and 12 of the '442 Patent are Invalid Under 35 U.S.C. § 103(a) ......... 13

          A.     Scope and Content of the Prior Art ............................. 13

          B.     Difference Between Claims 1 and 3 and the Prior Art ............. 13

               i.     Chaffin ...................................................... 14

               ii.     Albert ........................................................ 17

          C.     Level of Ordinary Skill in the Art ............................... 17

          D.     Secondary Considerations ........................................... 17

          E.     Conclusion on Obviousness ........................................ 19

     4.     The Court Should Enter Summary Judgment on Ignite's Willfulness Claim and Request for Enhanced Damages .................. 20

CONCLUSION ................................................................................................. 21

IGNITE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ........................ 21

1.    Legal Standard ................................................................................. 21

2.    Operation of the Accused Products .................................................... 22

3.    Whether The Accused Products Have A Vent Chamber Is Disputed ................... 24

      A.    The Expert's Opinions ................................................................ 24

      B.    Colton's Opinion is Inadmissible Ipse Dixit ............................... 25

      C.    The Experts' Conflicting Opinions Cannot Be Resolved on
            Summary Judgment ................................................................... 26

4.    Whether The Accused Products Have a Trigger Mechanically Connected
      To A Drink Aperture and Vent Seal Is Disputed .................................... 32

5.    Conclusion ....................................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. City of Indianapolis*,
    742 F.3d 720 (7th Cir. 2014) ............................................................9, 12

*AG v. Thyssen Krupp Elevator Corp*,
    2014 WL 468897 (D. Del. Feb. 3, 2019) .................................................32

*Allure Energy, Inc. v. Nest Labs, Inc.*,
    2015 WL 11110643 (E.D. Tex, May 11, 2015) .......................................20

*Anderson v., Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...............................................................................8, 9

*Apple, Inc. v. Samsung Electronics Co., et al.*,
    839 F.3d 1034 (Fed. Cir. 2016) ........................................9, 10, 17, 18

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*,
    713 F.3d 1377 (Fed. Cir. 2013) ...............................................................9

*Ball Aerosol and Specialty Container, Inc. v. Ltd. Brands, Inc.*,
    555 F.3d 984 (Fed. Cir. 2009) ...........................................................10, 19

*Carmichael v. Village of Palatine*,
    605 F.3d 451 (7th Cir. 2010) ...................................................................9

*Cellular Commun. Equip. LLC v. HTC Corp.*,
    6:16-cv-363-KNM, 2018 WL 1804518 (E.D. Tex. Apr. 17, 2018) .......33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................9

*Clare v. Chrysler Grp. LLC*,
    819 F.3d 1323 (Fed. Cir. 2016) ..............................................................21

*ClassCo, Inc. v. Apple, Inc.*,
    838 F.3d 1214 (Fed. Cir. 2016) ..............................................................18

*Clearlamp, LLC v. LKQ Corp.*,
    2016 WL 4734389 (N.D. Ill. Nov. 30, 2016) ...................................10, 19

*Dorman Products, Inc. v. Paccar, Inc.*,
    201 F.Supp.3d 663 (E.D. Pa. 2016), *as amended* (Oct. 17, 2016) .........21

*Fellowes, Inc. v. Acco Brands Corp.*,
    10:CV-7587, 2019 WL 1762910 (N.D. Ill. Apr. 22, 2019) ...................................................12

*Greatbatch, Ltd. v. AVX Corporation*,
    2016 WL 7217625 (D. Del. Dec. 13, 2016)...........................................................................20

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    136 S. Ct. 1923 (2016).................................................................................................10, 21

*Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*,
    CV 15-819-LPS-CJB, 2018 WL 1664971 (D. Del. Apr. 6, 2018) .........................................33

*Intellectual Ventures I, LLC, et al. v. Lenovo Group, Ltd., et al.*,
    370 F.Supp.3d 251 (D. Mass 2019) ....................................................................................12

*Kenall Mfg. Co. v. Genlyte Thomas Group LLC*,
    439 F. Supp. 2d 854 (N.D. Ill. 2006) ........................................................................26, 28, 32

*KSR International Co. v. Teleflex, Inc.*,
    500 U.S. 398 (2007)....................................................................................................10, 19

*In re: Kubin*,
    561 F.3d 1351 (Fed. Cir. 2009)...........................................................................................19

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
    285 F. 3d 1353 (Fed. Cir. 2002)..........................................................................................26

*Loggerhead Tools, LLC v. Sears Holding Corporation*,
    2016 WL 6778881 (N.D. Ill. November 15, 2016) ...............................................................21

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    2007 WL 6955272 (S.P. Cal. Oct. 30, 2007)........................................................................21

*Maxlinear, Inc. v. C.F. Crespe, LLC*,
    880 F.3d 1373 (Fed. Cir. 2018)...........................................................................................11

*Microsoft Corp. v. i4i Ltd. Partnership*,
    131 S. Ct. 2238 (2011)......................................................................................................10

*Morningware, Inc. v. Hearthware Home Prod., Inc.*
    898 F. Supp. 2d 1018 (N.D. Ill. 2012) ......................................................................26, 28, 32

*Ohio Willow Wood v. Alps South, LLC*,
    735 F.3d 1333 (Fed. Cir. 2013)......................................................................................11, 12

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ...............................................................................................9

iv

*PPG Industries v. Guardian Industries Corp.*,
    156 F.3d 1351 (Fed. Cir. 1998)...........................................................................................22

*Parallel Networks, L.L.C. v. Abercrombie & Fitch Co.*,
    704 F. 3d 958 (Fed. Cir. 2013)............................................................................................26

*Perfect Web Technologies, Inc. v. InfoUSA, Inc.*,
    587 F.3d 1324 (Fed. Cir. 2009)...........................................................................................10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)...........................................................................................31

*Plumley v. Mockett*,
    836 F.Supp.2d 1053 (C.D. Cal. 2010) ...............................................................................21

*Scott v. Harris*,
    550 U.S. 372 (2007)...................................................................................................8, 19

*Stratoflex v. Aeroquip Corp.*,
    713 F.2d 1530 (1983)...........................................................................................................18

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)..............................................................................................................9

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)...........................................................................................................21

*Timm v. Goodyear Dunlop Tires North America*,
    932 F.3d 986 (7th Cir. 2019) ..............................................................................................25

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
    699 F.3d 1340 (Fed. Cir. 2012)...........................................................................................17

*Weber-Stephen Products, L.L.C. v. Sears Holding Corporation*,
    2015 WL 9304343 (N.D. Ill. 2015) ....................................................................................26

*Wheeler v. Lawson*,
    539 F.3d 629 (7th Cir. 2008) ................................................................................................9

*Whirlpool Corp. v. TST Water, LLC*,
    2018 WL 1536875 (E.D. Tex. Mar. 29, 2018) ...................................................................33

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)...........................................................................................18

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
    122 F.3d 1440 (Fed. Cir. 1997)...........................................................................................21

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed. Cir. 2010).................................................................................10, 18, 19

*XY, LLC v. Trans Ova Genetics, L.C.*,
    890 F.3d 1282 (Fed. Cir. 2018).................................................................................................11

**Statutes**

35 U.S.C. § 103(a) ............................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) ...............................................................................................................8

Fed. R. Civ. P. 56(c)(2)...........................................................................................................9

(https://encyclopedia2.thefreedictionary.com/mechanical-connection) ........................................34

*McGraw-Hill Dictionary of Architecture and Construction* 2003 ................................................34

Rule 56.1 ...........................................................................................................................2, 22

U.S. Patent No. 3,967,748.........................................................................................................1

U.S. Patent No. 7,997,442.........................................................................................................1

U.S. Patent No. 5,711,452.........................................................................................................1

U.S. Patent No. 7,546,933.........................................................................................4, 5, 12, 20

U.S. Patent No. 9,095,233......................................................................................................4, 5

## INTRODUCTION

Plaintiff Ignite USA, LLC ("Ignite") asserts in this lawsuit that Defendant Pacific Market International, LLC ("PMI") willfully infringed Claims 3 and 12 of U.S. Patent No. 7,997,442 (the "'442 Patent"). Summary judgment on Ignite's claim should be entered as follows.

Summary judgment of invalidity should be granted based on Final Written Decisions ("FWD") in two *inter partes* reviews that invalidated claims nearly identical to claims 3 and 12 in two patents that are part of the same family as the '442 Patent. Under recent Federal Circuit case law, those FWDs preclude Ignite from asserting claims 3 and 12 here.

Alternatively, summary judgment of invalidity should be granted because the undisputed evidence shows that Claims 3 and 12 would have been obvious over the combination of two prior art references, Chaffin (U.S. Patent No. 5,711,452) and Albert (U.S. Patent No. 3,967,748). It is evident from the face of Chaffin and Albert themselves, and confirmed by Ignite's own technical experts, that those patents contain every element of claims 3 and 12 of the '442 Patent and that a person of ordinary skill in the art ("POSITA") could have and would have combined the teachings of those two patents.

Finally and at a minimum, summary judgment on Ignite's willfulness claim and request for enhanced damages should be granted because PMI relied on prior art found by the PTAB to invalidate claims nearly identical to claims 3 and 12.

Ignite's Motion for Partial Summary Judgment of Infringement should be denied. There are questions of fact regarding whether the Accused Products contain all of the elements of Claims 3 and 12. In particular, Ignite's Motion asks the Court to resolve in Ignite's favor the disputed opinions of the Parties' experts, which is not permissible on summary judgment.

1

## PMI'S MOTION FOR SUMMARY JUDGMENT

### A.    Procedural History

Ignite owns the '442 Patent, which issued in August 2011 and covers a "Travel Container Having Drinking Orifice and Vent Aperture." (SUMF 4; Ex. 1 - '442 Patent). [1]  In February, 2014, Ignite sued PMI for allegedly infringing Claims 16-19 of the '442 Patent. (ECF 1, Cmplt. ¶ 14). In April 2014, PMI filed a petition for *inter partes* review ("IPR") before the Patent and Trademark Office (PTO) challenging the validity of the '442 Patent, including all asserted claims 16-19. (SUMF 6; Ex. 2 - '442 FWD). The PTO granted the petition in September 2014 and the Court stayed this action pending the IPR. (*Id*. at 2; ECF 39, May 29, 2014 Op. and Or.).  The PTO's Patent Trial and Appeal Board (PTAB) issued its FWD in September 2015, finding all claims for which the PTAB instituted review—Claims 1, 2, 4-10 and 14-19—to be unpatentable as obvious under 35 U.S.C. § 103(a). (SUMF 6; Ex. 2 - '442 FWD at 2). Ignite thereafter amended its complaint, alleging that PMI infringed two other claims of the '442 Patent, 3 and 12, which had not previously been asserted by Ignite. (ECF 73, Am. Cmplt. ¶ 15).

After completion of fact discovery, the parties identified four disputed terms in claims 3 and 12 for construction. (ECF 155, May 29, 2018 Mem. Op. and Or. at 2). The Court held a *Markman* hearing on June 1, 2017, and construed the four terms as follows:

> 1. vent chamber . . . . . . . .a space to lower the pressure of vapor or gas
>
> 2. vent seal . . . . . . . . . . .a member that prevents the passage of gas or vapor
>
> 3. between . . . . . . . . . . . plain and ordinary meaning, "with the clarification that the vent chamber can be 'completely or partially between' the vent seal and the vent aperture"
>
> 4. cross-sectional area . . . plain and ordinary meaning

---

[1] References to PMI's Rule 56.1 Statements will be abbreviated as "SUMF."

Following claim construction, the parties submitted expert reports. Ignite submitted reports from Jonathan S. Colton and G. Paul Neitzel on validity and infringement and from Carrie L. Distler on damages. PMI submitted reports from Mat J. Stein, now deceased, and Sandra M. Troian, on validity and infringement, and from Michael K. Milani on damages.

**B.**     **The '442 Patent**

The '442 Patent is titled "Travel Container Containing Drink Orifice and Vent Aperture." The Patent discloses a hot beverage travel mug that releases hot gases or vapors inside the mug before the user takes a drink from the mug. (SUMF 4; Ex. 1 - '442 Patent at 17:51-64). The specification describes a container with at least two trigger-actuated apertures in the lid: an entrance aperture covered by a vent seal and a drink aperture. (*Id*. at 16:38-53). When the user presses the trigger, the vent seal opens first, releasing the hot gases and vapors, and only after that does the drink aperture open. (*Id*. at Abstract).

This process is called "two-stage venting" or "pre-venting" and allows the hot vapors or gases to escape out of the vent opening instead of exiting through the drink aperture and hitting the user. (ECF 155, May 29, 2018 Mem. Op. and Order at 3). Claim 3 depends from claim 1 and claim 12 depends from claim 8. (*Id*.) Claims 1 and 8 (both of which were invalidated by the PTAB) are directed to pre-venting, but do not require a vent chamber. (SUMF 4; Ex. 1 - '442 Patent at claims 3 and 12; Ex. 2 - '442 FWD at 11-13). Claims 3 and 12 do not claim the process of pre-venting, but rather claim specific embodiments of pre-venting mugs that include a vent chamber. (ECF 155, May 29, 2018 Mem. Op. and Order at 3).

According to Ignite's expert Colton, here is how the vent chamber works. When the vent seal is opened, "the volume available for the gas or vapor increases by the volume of the vent chamber . . .." (SUMF 5, Ex. 3 - Colton Initial Rpt. ¶ 176). The initial pressure of the gas or vapor is reduced as it expands into the area of the vent chamber before it exits the drinking

3

container. (*Id*.) The '442 Patent does not specify, nor does the Court's construction of the term

"vent chamber" require, that pressure be reduced by any particular amount. (SUMF 5; Ex. 4 -

Neitzel Dep. at 25, 65, and 66; *see generally* ECF 155, May 29, 2018 Mem. Op. and Or.; Ex. 1 -

'442 Patent).

    **C.**    **The '233 and '933 IPRs**

    U.S. Patent No. 9,095,233 (the '233 Patent) and U.S. Patent No. 7,546,933 ("the '933

Patent") are part of the '442 Patent family, are also titled "Travel Container Having Drinking

Orifice and Vent Aperture," and also have claims that require a vent seal, vent chamber, vent

aperture, and trigger that extends at least partially through the vent chamber. (SUMF 7; *Compare*

Ex. 5 -'933 Patent and Ex. 6 -'233 Patent *with* Ex. 1 - '442 Patent). The '442 Patent, the '933

Patent and the '233 Patent have the same specification and figures. (*Id*.). The '233 and '933

Patents were subject to two separate IPRs initiated by PMI that culminated in two, separate

FWDs invalidating all claims for which review was instituted. (SUMF 8 and 9; Ex. 10 - '233

FWD and Ex. 7 - '933 FWD).

    '233 Patent. Claims 2, 5, 21 and 22 of the '233 Patent are materially similar to claims 3

and 12 of the '442 Patent and include at least the following same limitations:

| | '442 Patent | '233 Patent |
|---|---|---|
| 1. | "vent chamber between the vent seal and the vent aperture" ('442 Claim 3) | a. "vent chamber between the vent aperture and the vent seal" ('233 Claim 2) <br> b. a vent chamber ". . . between the vent seal and the vent aperture when the seal is in a closed position." ('233 Claims 5, 22) |
| 2. | the vent chamber having "a cross-sectional area greater than a cross-sectional area of vent aperture" ('442 Claim 3) | "the vent chamber having a cross-sectional area greater than a cross-sectional area of the vent aperture" ('233 Claim 21) |
| 3. | "the trigger extends partially through the vent chamber" ('442 Claim 12) | a. "the trigger extending partially through the vent chamber" ('233 Claim 5); <br> b. "the trigger extends at least partially through the vent chamber" ('233 Claim 22) |

The PTAB held these (and other) '233 Patent claims invalid as obvious over Chaffin and Albert. (SUMF 9; Ex. 10 - '233 FWD). The PTAB found that every one of the above limitations was present in a combination of Chaffin and Albert. (*Id.*) The Federal Circuit affirmed the PTAB's Final Written Decision. (SUMF 9, Ex. 11 - Fed. Cir. Order).

'933 Patent. Claim 11 of the '933 Patent includes the same limitations as claim 12 of the '442 Patent and all of the same limitations as claim 3 of the '442 Patent, except the cross-sectional area limitation. The independent claim from which claim 11 depends is narrower than the independent claim from which claim 12 of the '442 Patent depends. Asserted claim 12 of the '442 Patent is therefore broader in scope than claim 11 of the '933 Patent. The PTAB held claim 11 invalid as obvious under Section 103(a) over Chaffin in view of Albert. (SUMF 8; Ex. 7 - '933 FWD). Ignite did not appeal the '933 FWD.

Attached to this brief as an Appendix is a chart comparing the claim terms invalidated in the '233 and '933 IPRs to those at issue here.

**D.    The Prior Art**

This Motion is based in the alternative on Chaffin and Albert, discussed in turn.

1.    Chaffin

Chaffin is titled "Valve Controlled Receptacle Cover." (SUMF 10; Ex. 12 - Chaffin). The invention "relates to a construction for a cover of a drinking glass or mug" that "incorporate[es] valve controlled openings" and "allows the user to drink from the glass while in motion or otherwise occupied, while not accidentally spilling the contents thereof." (Ex. 12 - Chaffin at 1:12-13; 3:29, 46). Chaffin discloses two chambers, a supply chamber (Fig. 4, element 26) and a vent chamber (Fig. 5, element 27):



Chaffin Figure 5 discloses a vent seal, vent chamber, vent aperture and trigger extending partially through the vent chamber. Chaffin references Figure 4 to show the vent chamber of Figure 5 in an open position. As Chaffin explains:

> As can best be seen by reference to FIGS. 4 and 5, the valve stem 57, the helical spring 58 and the elongated valve head 56 are dimensioned to project into the inlet supply chamber 26 and the vent chamber 27 wherein when the helical spring 58 is in its relaxed state, the valve head 56 sealingly engages the inlet 22 and outlet 29 valve seat in a well-recognized manner. However, as shown in FIG. 4, when the helical spring 58 is compressed by the handle element 51, moving the actuator element 50 away from the discrete aperture partitions, the valve head 56 is retracted from engagement with the valve seats 28 and 29 to open up fluid communication through the chambers 26 and 27.

(*Id*. at 5:10-20). Thus, as shown above, when the user pushes the T-shaped actuator (54), the elongated valve head is retracted in the vent chamber (27), creating a greater volume into which gas or vapors expand before exiting through the vent aperture (45). (SUMF 10 and 11; Ex. 12 - Chaffin at Figs. 4 and 5 and 4:27-6:5).

   2. <u>Albert</u>

  Albert is titled "Drinking Receptacle Valve Means" and also relates to a drinking container. (SUMF 17; Ex. 15 - Albert; *see also* Ex. 10 - '233 FWD at 14-16; Ex. 7 - '933 FWD at 12-24; Ex. 2 - '442 FWD at 10-24; and ECF 155, May 29, 2018 Mem. Op. and Or. at 3). An object of the Albert invention is to "provide a novel drinking receptacle valve means which is

operable initially to relieve pressure in the drinking receptacle and subsequently to open the drinking receptacle valve." (*Id*.; Ex. 13 - Colton Dep. at 124 and 265). Here is Albert's Figure 2:



Figure 2 depicts a cross-sectional view of the Albert receptacle cover. (SUMF 18; Ex. 15 - Albert at Fig. 2). The manually engageable knob 96 serves as an actuation member that manipulates the moveable member 38 and the plunger 76 so that a relief valve 78 first opens to release gas and vapors:

> The spacing between the abutment portions 98 and 100 provides for a lost motion relationship between the plunger 76 and the movable member 38 so as to permit initial movement of the relief valve 78 from its position around the enlarged opening 88 so that steam may be relieved before the abutment portion 98 touches the abutment portion 100 and starts to open the valve member 30 relative to the drinking opening 36. (SUMF 18; *Id*. at 4:67-5:6).

Further depressing the knob 96 subsequently opens valve 30, permitting the user to drink the contents of the drinking receptacle. (SUMF 18; *Id*. at 5:12-26). Albert characterizes this aperture as "provid[ing] for safe drinking of the contents of the receptacle such as hot coffee or the like." (*Id*. at 1:47-52). Ignite's expert Colton admitted that "Albert teaches pre-venting." (SUMF 19; Ex. 13 - Colton Dep. at 124 and 265).

3.    Combination of Chaffin and Albert

In light of Albert, a POSITA would have recognized that a gap or space in Chaffin's actuator could be employed to allow an initial opening of the vent aperture, followed by the drink aperture opening, as shown in modified Chaffin Figure 12.  (SUMF 20 and 21; Ex. 16 - Stein Initial Rpt. ¶ 143; Ex. 13 - Colton Dep. at 255-256; Ex. 10 - '233 FWD at 17, 29-30).



Modified Chaffin in          Modified Chaffin in          Modified Chaffin in
Fully Closed Position        Partially Opened Position    Fully Opened Position

(SUMF 20 and 21; Ex. 16 - Stein Initial Rpt. ¶ 143; Ex. 13 - Colton Dep. at 255-256; Ex. 10 - '233 FWD at 17, 29-30).  As illustrated above, a gap in the Chaffin actuator rod 152" allows the vent seal 162" to be engaged first and the drink shutter 162' to be engaged second, thus implementing the "lost motion" relationship of Albert.

## ARGUMENT

**1.    Legal Standards**

Summary Judgment: Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v., Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The

Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that she is entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Collateral Estoppel: Issue preclusion prohibits "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citation omitted). To establish issue preclusion, a defendant must show: (1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). While the Seventh Circuit sets the issue preclusion criteria, Federal Circuit law governs the aspects of issue preclusion that are unique to patent law. *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013) ("whether a particular claim in a patent case is the same as or separate from another claim has special application to patent cases, and we therefore apply our own law to that issue").

Obviousness: Obviousness under 35 U.S.C. § 103(a) is a question of law based on underlying facts. *Apple, Inc. v. Samsung Electronics Co., et al.*, 839 F.3d 1034, 1047 (Fed. Cir.

2016).[2] A determination of whether a patent is invalid as obvious requires consideration of four factors—the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the art, and secondary considerations. *Id.* The defendant must prove obviousness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S. Ct. 2238, 2242 (2011). Where "the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR International Co. v. Teleflex, Inc.*, 500 U.S. 398, 427 (2007); *see also Clearlamp, LLC v. LKQ Corp.*, 2016 WL 4734389, *4 (N.D. Ill. Nov. 30, 2016) ("if there are no genuine issues of material fact as to these [four] issues, determination of invalidity is for the court to decide"). The Court's "legal determination of obviousness may include recourse to logic, judgment, and common sense..." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010) *citing Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) and *Ball Aerosol and Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 993 (Fed. Cir. 2009).

<u>Willfulness and Enhanced Damages</u>: Willful infringement can only be found and enhanced damages can only be awarded where the conduct of an accused infringer was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). Willful conduct must be "egregious," where a party infringes a patent "without any reason to suppose his conduct is arguably defensible." *Id.* at 1933. Ignite must prove willfulness by a preponderance of the evidence. *Id.* at 1934.

---

[2] Section 103(a) provides in relevant part: "A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."

**2.      Ignite is Collaterally Estopped From Asserting Claims 3 and 12**

There are two recent Federal Circuit cases which together warrant summary judgment of invalidity of claims 3 and 12 of the '442 Patent based on collateral estoppel. *XY, LLC v. Trans Ova Genetics, L.C.,* 890 F.3d 1282, 1294 (Fed. Cir. 2018) and *Ohio Willow Wood v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013).

In *XY*, the Federal Circuit held that a Final Written Decision in an IPR that invalidated certain patent claims and was affirmed on appeal collaterally estopped the patent owner from asserting those claims in a separate federal court infringement action against a different defendant. The Court held:

> . . . we find that an affirmance of an invalidity finding, whether from a district court or the Board, has a collateral estoppel effect on all pending or co-pending actions.

890 F.3d at 1294.[3]

In *Ohio Willow Wood*, the Court held that the owner of a medical product patent that was held to be invalid as obvious by the Eastern District of Texas in an infringement action collaterally estopped the patent owner from asserting "substantially similar" claims from another patent in the same family against a different defendant in a different court. The Federal Circuit began by stating:

> Our precedent does not limit collateral estoppel to patent claims that are identical. Rather, it is the identity of the *issues* that were litigated that determines whether collateral estoppel should apply. * * * If the differences between the unadjudicated patent claims and the adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies.

---

[3] *See also Maxlinear, Inc. v. C.F. Crespe, LLC*, 880 F.3d 1373, 1377 (Fed. Cir. 2018) ("We note that the collateral estoppel effect of an administrative decision of unpatentability generally requires the invalidation of related claims that present identical issues of patentability").

11

The Court then quoted the claims from the two patents and found that they "use slightly different language to describe substantially the same invention." *Id.* at 1342. According to the Court, "the mere use of different words in these portions of the claims does not create a new issue of invalidity." *Id.*

Based on these cases, this Court recently held on summary judgment that a patent owner was collaterally estopped from asserting infringement of claims of one patent that were not "meaningfully" different from similar claims of another patent invalidated in a PTAB Final Written Decision that was affirmed on appeal. *Fellowes, Inc. v. Acco Brands Corp.*, 10:CV-7587, 2019 WL 1762910, at *5 (N.D. Ill. Apr. 22, 2019) (Leinenweber); *see also Intellectual Ventures I, LLC, et al. v. Lenovo Group, Ltd., et al.,* 370 F.Supp.3d 251, 257 (D. Mass 2019) (patent owner who did not appeal PTAB Final Written Decision invalidating claim in a microprocessor patent was collaterally estopped from asserting infringement of a similar claim in district court).

This law compels summary judgment. *Adams*, 742 F.3d at 736. There is an "identity of the issues that were litigated" in the '233 and '933 IPRs as are being litigated here. The FWDs in the '233 and the '933 IPRs plainly show that those issues were essential to the PTAB's decisions. The parties litigated in both IPRs whether the '233 and '933 claims were obvious over Chaffin in view of Albert based on the same claim limitations at issue here, and the PTAB decided that they were. (SUMF 8 and 9; Ex. 10 - '233 FWD; Ex. 7 - '933 FWD). Ignite was represented in the IPRs by the same counsel representing it here. The PTAB's FWD in the '233 IPR, which was affirmed on appeal, thus collaterally estops Ignite from proceeding on claims 3 and 12 of the '442 Patent and its FWD in the '933 Patent, which Ignite had the opportunity to appeal but did not, also precludes Ignite on claim 12.

3. **Claims 3 and 12 of the '442 Patent are Invalid Under 35 U.S.C. § 103(a)**

Putting aside the preclusive effect of the '233 and '933 IPRs, the undisputed facts show that claims 3 and 12 would have been obvious over Chaffin in view of Albert. This is an alternative ground for summary judgment.

A. <u>Scope and Content of the Prior Art</u>

Albert and Chaffin disclose each element of claims 3 and 12. Both Albert and Chaffin are directed to drinking containers, as the PTAB found in the '233 and '933 IPRs.[4] (SUMF 10 and 17; *see generally* Ex. 12 - Chaffin; and Ex. 15 - Albert). Albert teaches pre-venting through a "lost motion" operation. (SUMF 18; Ex. 15 - Albert at 1:47-52, 4:67-5:26). Chaffin teaches using a combination of vent seal, vent chamber, vent aperture and trigger mechanism to prevent a mug from accidentally spilling while the user is in motion. (SUMF 10; Ex. 12 - Chaffin at Figs. 4 and 5 and 4:27-6:5).

B. <u>Difference Between Claims 1 and 3 and the Prior Art</u>

Chaffin discloses every element of claims 3 and 12, and independent Claims 1 and 8 from which they depend, with the exception of a first and second portion of the actuation stroke required by independent claims 1 and 8 to achieve pre-venting. (SUMF 10-16; Ex. 12 - Chaffin at Figs. 1, 4-6, 11, 12, 4:27-6:5; *see also* Ex. 10 - '233 FWD at 12-13, 19-33; Ex. 7 - '933 FWD at 10-14, 28-32; Ex. 13 - Colton Dep. at 206, 211). That element is found in Albert. (SUMF 17-19; Ex. 15 - Albert at 2:37-43; 4:67-5:26; *see also* Ex. 10 - '233 FWD at 14-16; Ex. 7 - '933 FWD at 12-24; Ex. 2 - '442 FWD at 10-24; Ex. 13 - Colton Dep. at 124 and 265).

---

[4] In its Final Written Decision in the '442 IPR, the PTAB also found that Albert contained the following claim 1 elements: drink container, trigger, vent seal, drink aperture, drink aperture shutter and trigger mechanically connected to the vent seal and drink aperture shutter. (SUMF 6; Ex. 2 - '442 FWD at 2, 11-13).

i.    Chaffin

Here again is Figure 5 from Chaffin, this time modified as in Figure 4 to show the vent

chamber in the open position, and annotated and colorized to identify the elements of claims 1, 3,

8 and 12 of the '442 Patent. (SUMF 15; Chaffin at Figs. 1, 5, 6; Ex. 10 - '233 FWD at 30-32).



Chaffin meets the following claims 1, 3 and 8 elements.

Drinking Container: Chaffin relates to a drinking container with a container body 12

having a cavity, a removable lid, and a drink aperture. (SUMF 10; *see* Ex. 12 - Chaffin at Fig. 1 -

showing drink receptacle 12, removable lid 10, and a drink aperture 44; *see also* Ex. 10 - '233

FWD at 12-13; Ex. 7 - '933 FWD at 29-30).

Trigger Mechanism/Mechanically Connected: Chaffin's "T-shaped actuator element,"

"valve stem 57," "helical spring 58," and "valve head 56" comprise a trigger mechanism.

(SUMF 11; *see* orange annotation above, and Ex. 12 - Chaffin at 5:10-20; *see also* Ex. 10 -'233

FWD at 26-32; Ex. 7 - '933 FWD at 10-14, 28-30).[5] The valve head "sealingly engages the inlet

22 and outlet 29 valve." (SUMF 12; *see* green annotation above; Ex. 12 - Chaffin at 5:14-16; *see*

---

[5] The valve head 56 in modified Figure 5 occupies part of the vent chamber.

*also* Ex. 10 - '233 FWD at 12-13, 19-33, Ex. 7 - '933 FWD at 28-32). The trigger mechanism is

mechanically connected to a drink aperture shutter and a vent seal (both identified as 55 in

Chaffin Figure 6).[6] (SUMF 11; Ex. 12 - Chaffin at 5:10-20; *see also* Ex. 10 - '233 FWD at 26-32;

Ex. 7 - '933 FWD at 10-14, 28-30).

    <u>Vent Chamber</u>: Chaffin specifies a vent chamber 27. (SUMF 13; *see* yellow annotation

above; Ex. 12 - Chaffin at Fig. 5; 4:49-5:2; *see also* Ex. 13 - '233 FWD at 12-13; and Ex. 7 -

'933 FWD at 10, 11, and 28-32; Ex. 13 - Colton Dep. at 56, 211). It is a space which Ignite's

own experts agree would lower the pressure of vapor or gas because as vapors expand into the

space, their pressure decreases. Ignite's expert Colton testified:

> Q. So assuming that the vent chamber was open and the valve head
> 56 were removed from the valve seat, would the pressure reduce
> from BB to CC?
>
> A. Yes.

(SUMF 13; Ex. 13 - Colton Dep. at 211). Ignite's expert Neitzel agreed:

> When valve head 56 begins to retract from the valve seat 28 . . . the
> internal hot gases, being at a pressure above atmosphere pressure,
> will begin venting to the exterior through the channel leading to 45
> * * * Upon opening, gases will indeed experience separated flow,
> and some energy dissipation, at least initially.

(SUMF 13: Ex. 14 - Neitzel Rpt. ¶¶ 49, 50). Though both Ignite experts opined that the pressure

reduction in Chaffin's vent chamber would be less than that in the vent chamber of the '442

Patent, that is irrelevant because neither the '442 Patent nor the Court's construction of "vent

chamber" requires any specific or minimum pressure reduction. (SUMF 5; Ex. 4 - Neitzel Dep.

at 25, 65, and 66; *see generally* ECF 155, May 29, 2018 Mem. Op. and Or.; Ex. 1 - '442 Patent).

---

[6] *See also* SUMF 12; Ex. 13 - Colton Dep. at 206, admitting that Chaffin valve head 56 "is a vent seal."

Vent Aperture: Chaffin specifies a vent aperture 45. (SUMF 9; *see* red annotation above; Ex. 12 - Chaffin at Fig. 5; 4:49-5:25; *see also* Ex. 10 - '233 FWD at 12-13; and Ex. 7 - '933 FWD at 10, 11, and 28-32). The Court did not construe "vent aperture," but Ignite's Colton testified that a vent aperture is "the boundary between the vent chamber and the external world." (SUMF 13; Ex. 13 - Colton Dep. at 56). Chaffin's vent aperture 45 is the boundary between the vent chamber 27 (in yellow above) and the outside world. (SUMF 13; Ex. 12 - Chaffin at Fig. 5).

"Between" Limitation: At least portion DD of Chaffin's vent chamber (27) is "between" the vent seal 56 and the vent aperture 45, as shown above. (SUMF 14; *see* above annotated drawing, identifying portion DD; Ex. 12 - Chaffin at Fig. 5; *see also* Ex. 10 - '233 FWD at 8, 9, and 24-26; Ex. 7 - '933 FWD at 31-32).

Cross-Sectional Area: The Chaffin vent chamber 27 has at least one cross-sectional area (marked in the above annotated drawing with an "X") that is larger than the cross-sectional area of the vent aperture 45 (marked in the above annotated drawing with a "Y").[7] (SUMF 15; Ex. 12 - Chaffin at Figs. 1, 5, and 6; *see also* Ex. 10 - '233 FWD at 30-32).

Chaffin meets the following claim 12 elements.

"Trigger Extends" Limitation: Chaffin's trigger mechanism, "the helical spring 58 and the elongated valve head 56," are "dimensioned to project into the . . . vent chamber 27," as can be seen when comparing its location in the open position and closed position. (SUMF 16; *see* orange trigger mechanism extending into yellow vent chamber in the above annotated drawing; Ex. 12 - Chaffin at 5:10-13 and Figs. 4 and 5; *see also* Ex. 10 - '233 FWD at 12, 13, 19-28; and Ex. 7 - '933 FWD at 29-32).

---

[7] The area of a circle is $\pi r^2$, where "r" is the circle's radius. Because the radius of the vent chamber at X is longer than the radius of the vent aperture at Y, the cross-sectional area of the vent chamber is larger.

ii.     Albert

Albert's "lost motion relationship between the plunger 76 and the movable member 38" provides the first and second actuation stages of claims 1 and 8 of the '442 Patent and is for the specific purpose of pre-venting, achieved by opening the relief valve first and the drink orifice second. (SUMF 18; *see, e.g.*, Ex. 15 - Albert at 1:34-48; 2:37-43; 4:67-5:26).

C.     Level of Ordinary Skill in the Art

The parties agree, as found by the Court on claim construction, that a POSITA is "a person with a B.S. degree in mechanical engineering, industrial design, or a similar mechanical technology, or a holder of an associates' degree in a mechanical technology with one or more years of experience designing beverageware." (SUMF 21; ECF 155, May 29, 2018 Mem. Op. and Order at 10 n. 8).

D.     Secondary Considerations

While PMI ultimately bears the burden of proving obviousness, Ignite bears the burden of proving secondary considerations. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1068 (Fed. Cir. 2016). Such evidence must be "extensive" and "[i]n the history of our court, we have only once held that evidence of secondary considerations outweighs strong evidence of obviousness." *Id.* at 1068; *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1354 (Fed. Cir. 2012) ("Few cases present such extensive objective evidence of nonobviousness, and thus we have rarely held that objective evidence is sufficient to overcome a prima facie case of obviousness"). Ignite did not cite any evidence of secondary considerations in its Final Validity Contentions. (SUMF 23; Ex. 17 - Supplemental Final Enforceability and Validity Contentions at 8). Ignite's experts did not consider any information related to secondary consideration of nonobviousness. (SUMF 23; Ex. 13 - Colton Dep. at 272-275).

In particular, there is no evidence regarding commercial success or any other marketplace impact of the inventions of claims 3 and 12. While Ignite's mugs were commercially successful, there is no evidence tying such success to pre-venting, let alone to the specific configuration of a vent seal, vent chamber, vent aperture and trigger required by Claims 3 and 12 of the '442 Patent. *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016), *quoting Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) ("For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention"). *See also Stratoflex v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (1983); *Apple*, 839 F.3d at 1068, *quoting WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

Ignite does not market or promote either pre-venting or the specific vent seal, vent chamber, vent aperture and trigger configuration of Claims 3 and 12. (SUMF 24; Ex. 18 - Ignite 30(b)(6), Starr Dep. at 56-57; Ex. 19 - El Saden Dep. at 98-99, Ex. 3). There is no research or survey evidence that any consumer or retail customer of thermal mugs cares about or buys mugs because of pre-venting, let alone because of the specific combination of vent seal, vent chamber, vent aperture or trigger claimed in claims 3 and 12. Ignite's expert Colton opined that pre-venting is unknown to the user. (SUMF 24; Ex. 3 - Colton Initial Rpt. ¶ 79).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[8] Ignite's mugs have many features, including technology covered by a variety of patents other than claims 3 and 12 of the '442 Patent. (SUMF 25; Ex. 20 - Ignite 30(b)(6) Wodka Dep. at 37, Ex. 23). ███

████████████████████████████████████████████████████████

E.     Conclusion on Obviousness

A POSITA would have been motivated to combine Albert's lost motion operation with the valve controlled openings of Chaffin. (SUMF 22; Ex. 13 - Colton Dep. at 255-256). Both patents are directed to the same art. "If a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond" the POSITA's skill. *KSR Int'l. Co.,* 550 U.S. at 408. Ignite expert Colton admitted that a POSITA could "add a lost motion mechanism" of Albert to at least two of the Chaffin embodiments. (SUMF 22; Ex. 13 - Colton Dep. at 255-256). According to Colton, a POSITA would understand that any increase in the volume into which gas or vapors might flow would reduce pressure and such POSITA would therefore have been motivated to apply Albert's lost motion operation to the vent chamber of Chaffin to achieve pre-venting. (*Id.*)

Claims 3 and 12 of the '442 Patent are therefore invalid as obvious based on Chaffin and Albert. *See Wyers*, 616 F.3d at 1240, *citing Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 993 (Fed. Cir. 2009) ("where all of the limitations of the patent were present in the prior art references, and the invention was addressed to a 'known problem;' 'KSR . . . compels the grant of summary judgment of obviousness;'" *In re: Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009) ("where a skilled artisan merely pursues 'known options' from a 'finite number of identified, predicable solutions,' obviousness under § 103 arises") (citations omitted); *Clearlamp*, 2016 WL 4734389, at *11 (summary judgment of obviousness where POSITA with general "knowledge of removing lamps from the vehicle" could do so for the purpose of refurbishing the lamps outside of the vehicle, as claimed in the patent-in-suit).

59544463v.1

Finally, even if the '233 and '933 IPR FWDs are not preclusive, they are at least "persuasive authority." (May 29, 2018 Mem. Op. and Order at 11, n. 10, *citing Clearlamp*, 2016 WL 4734389, at *5 n. 7, granting summary judgment based on obviousness). The PTAB twice invalidated related and nearly identical claims based on Chaffin and Albert, holding that every element in claims 3 and 12 were in those prior art patents and that a POSITA "would have had adequate reason to combine the teachings of Albert with Chaffin in order to harness the lost motion pre-venting benefits taught by Albert and, thus, improve Chaffin's drinking container." (SUMF 22; Ex. 10 - '233 FWD at 37-38; *see also* Ex. 7 - '933 FWD at 27-28).

### 4.    The Court Should Enter Summary Judgment on Ignite's Willfulness Claim and Request for Enhanced Damages[9]

Ignite cannot prove that PMI's alleged infringement was "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate" with respect to claims 3 and 12, after at least May 13, 2014, when PMI filed the '933 IPR. (SUMF 8 and 9). That is when PMI cited a combination of Chaffin and Albert to invalidate claim 11 of the '933 Patent. Claim 11 is (i) identical to claim 12 of the '442 Patent and (ii) includes the "vent chamber," "vent seal," "vent aperture," and "between" limitations of claim 3 of the '442 Patent.

In rejecting a plaintiff's willfulness claim as a matter of law, the Court in *Greatbatch, Ltd. v. AVX Corporation*, 2016 WL 7217625 at *5 (D. Del. Dec. 13, 2016), specifically noted that "the same prior art identified in the legal opinion of the defendant's counsel provided the basis" during *inter partes* review proceedings to invalidate multiple claims of the patent in suit, including the claim from which "the only asserted claim depends." *Id*. at *4.

---

[9] The Court need not reach this part of PMI's Motion if the Court grants summary judgment on either of the other summary judgment grounds.

In *Allure Energy, Inc. v. Nest Labs, Inc.*, 2015 WL 11110643, at *2 (E.D. Tex, May 11, 2015) the Court cited the fact that the PTAB had merely instituted an *inter partes* review in granting summary judgment on willfulness.

And in *Lucent Technologies, Inc. v. Gateway, Inc.*, 2007 WL 6955272, at *7 (S.D. Cal. Oct. 30, 2007) and *Plumley v. Mockett*, 836 F.Supp.2d 1053, 1075 (C.D. Cal. 2010), both courts cited the fact that the Patent Office had initiated reexamination proceedings to support summary judgment on willfulness.

As in all of these cases, PMI acted based on prior art that the PTAB found sufficient not only to initiate review, but also to invalidate Ignite's related and nearly identical patent claims. Under such circumstances, the Court should enter summary judgment on willfulness and enhanced damages. *See also Loggerhead Tools, LLC v. Sears Holding Corporation*, 2016 WL 6778881 at *2 (N.D. Ill. November 15, 2016) (entering summary judgment because "[n]one of the[se] facts show that Defendants' conduct" met the *Halo* standard); *Dorman Products, Inc. v. Paccar, Inc.*, 201 F.Supp.3d 663, 681 (E.D. Pa. 2016), *as amended* (Oct. 17, 2016).

<u>CONCLUSION</u>

The Court should grant PMI's Motion for Summary Judgment.

<u>**IGNITE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

**1.    Legal Standard**

An infringement analysis has two steps. *Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1326 (Fed. Cir. 2016). First, the court construes the asserted claims. Claim construction is a question of law that may involve underlying factual questions. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Second, the court determines whether the accused product meets each limitation of the claim as construed, which is a question of fact. *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). "After the court has defined the

21

claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact." *PPG Industries v. Guardian Industries Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998).

### 2. Operation of the Accused Products

PMI agrees that each of the Accused Products "operate[s] in generally the same way for the purposes of the infringement analysis." (RESP 7; Ignite Br. 3). Here is a brief overview with respect to the two '442 Patent claim limitations disputed on summary judgment.[10]

Vent Chamber: The Accused Products release hot air from within a drink container by passing the air through a passageway into the back of the button that a user pushes inward in order to drink from the container. When the user pushes the button, hot air flows into and through the passageway, hits and deflects off of the back of the button and then exits the container around the button's periphery. (RESP 37; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16; *see also* Ex. 26 - Colton Rebuttal Rpt. ¶¶ 156, 159-162, 168, 173, 176, 178, 180, 181, 184-186, 188, and 189 (distinguishing a "passageway" from a "vent chamber")).[11]  The back of the button thus acts as a deflector plate to reduce the velocity of hot air before it is expelled. (*Id.*)

---

[10] PMI reserves the right to dispute at trial that the Accused Products meet the other limitations of claims 3 and 12.

[11] References to PMI's Responses to Ignite's Rule 56.1 Statements will be abbreviated as "RESP." References to PMI's Statement of Additional Undisputed Material Facts will be abbreviated as "SAUMF."



This "deflector plate" arrangement forces the hot air entering the back of the button to make four, 90 degree turns in succession. (RESP 70-71; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). The hot air undergoes an aerodynamic redirection that reduces the velocity of the gas exiting the mug. (*Id.*) The volume, and hence configuration, of the back of the button decreases as the user pushes the button. (SAUMF 1; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 86-87; Colton Initial. Rpt. ¶ 180). As Colton stated, the volume "will change depending on how far the button is depressed." (*Id*).

Stein opined and Troian agreed that the Accused Products do not have a vent chamber. (SAUMF 1; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 86-87). When hot air first enters the narrow, uniform part of the passageway in the Accused Products (between "A" and "B" in the above graphic), its pressure is reduced. (RESP 15; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-51, 63, 75, and 76; and Ex. 25 - Troian Dep. at 150-151).[12] Virtually all of the pressure is reduced in that narrow passageway before the hot air reaches the space behind the button. (RESP 15; Ex. 23 - Stein Rebuttal Rpt. ¶ 64). When the hot air actually hits the backside of the button, its speed decreases, but its pressure increases. (RESP 15; Ex. 9 - Troian Rpt. ¶¶ 8-16).

---

[12] This area is a "thin annular gap" that is defined by the button's shaft or stem and the surrounding tubular plastic main cap body. (RESP 15; Ex. 23 - Stein Rebuttal. Rpt. ¶ 63).

Mechanically Connected: When the user pushes the button on one of the Accused Products, a drink aperture opens. The button is attached to a stem and the stem is adjacent to an angled surface on a spring base. (RESP 28-30; Ex. 9 - Troian Rpt. ¶ 17). When the user pushes the button, that pushes the stem into that angled surface, sliding it downward. (*Id*.) The drink aperture sits on top of that angled surface so when it slides down, the drink aperture opens. (*Id*.) No mechanical fastener is used to connect the stem and that surface. Stein opined and Troian agreed that neither they nor a POSITA would consider this so-called "cam mechanism" to be a "mechanical connection" because no mechanical connectors or linkage system is used. (*Id*.).

### 3. Whether The Accused Products Have A Vent Chamber Is Disputed

There is a dispute about whether the Accused products have a vent chamber—a space to lower the pressure of vapor or gas.

#### A. The Expert's Opinions

PMI's experts opined that that the Accused Products do not have a vent chamber (RESP 53-55, 60, 70, 71; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). As PMI's expert Stein stated, the Accused Products do not include "the intermediary vent chamber that is required by the '442 Patent." (RESP 53-55; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 63). Rather,"[t]he back of the button is nothing more than a deflector plate known in the prior art, which deflects the vapors towards the periphery of the button." [13] (RESP 60; Ex. 23 - Stein Rebuttal Rpt. ¶ 62). PMI's expert Troian

---

[13] Claim 7 of the '442 Patent recites a "deflector plate adjacent the vent aperture wherein the deflector plate directs vapor being expelled out of the vent aperture transverse to a longitudinal axis of the container body." (Ex. 1 - '442 Patent at 23:66-24:2). In the '442 IPR, the PTAB invalidated this claim as obvious. (SUMF 6; Ex. 2 - '442 FWD at 2, 11-16). The button in the Accused Products is similar to the deflector plate in invalid claim 7, not the vent chamber of claims 3 and 12. (RESP 55, 61; Ex. 23 - Stein Rebuttal Rpt. ¶ 62; Ex. 9 - Troian Rpt. ¶ 15).

agreed, stating that the back of the button provides for "aerodynamic redirection of the high speed gas. . . . ." (RESP 60, 70, 71; Ex. 9 - Troian Rpt. ¶ 15).

Ignite's expert Colton asserted three different and alternative possible vent chambers in the Accused Products, depending on where he drew the line between the vent chamber and vent aperture. (RESP 14; Ex. 3 - Colton Initial Rpt. ¶¶ 178-222). In general, Colton opined that the entire passageway leading to and including the area behind and around the periphery of the button is a vent chamber because pressure is lowered there before the gases exit the container around the button. (RESP 14, 39; Ex. 3 - Colton Initial Rpt. ¶¶ 178-222; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 81-85; Ex. 24 - Stein Dep. at 122-125). Because the configuration and volume of this asserted vent chamber will change depending on how hard/far the user pushes the button, Colton also assumed for purposes of his three alternatives a specific configuration and volume based on assuming one location of the button at one moment in time as it is being pushed. (RESP 14; Ex. 3 - Colton Initial Rpt. ¶¶ 178-222).

>### B. Colton's Opinion is Inadmissible *Ipse Dixit*

To be clear, Colton does not opine that some particular structures in the Accused Products define the vent chamber, as they do in the '442 Patent. (RESP 14; Ex. 3 - Colton Initial Rpt. ¶¶ 178-222; Ex. 1 - '442 Patent at 17:51-64). Indeed, Colton himself states that "[i]n general, a vent chamber is defined by its restrictive entrance and exit, which bound a finite space in which the gas or vapor moves through on its way to the external environment." (RESP 14; Ex. 3 - Colton Initial Rpt. ¶ 174). In his three alternative infringement theories, however, he slices and dices the area behind the button in the Accused Products, asserting that one side is the vent chamber and the other side is the vent aperture. (RESP 14; Ex. 3 - Colton Initial Rpt. ¶¶ 178-222). Colton did not run any tests or do any calculations to calculate the pressure of, or determine any pressure reduction in, the three different vent chambers he asserts. He simply cited

the ideal gas law for his opinion that the pressure of gas entering his asserted vent chambers will decrease. (RESP 60-62; *see generally* Ex. 3 - Colton Initial Rpt.).

The fact that Colton opines three different possible vent chambers, depending on where he draws the line between vent chamber and vent aperture, is completely subjective and confirms the absence of a vent chamber in the Accused Products. (RESP 14; Ex. 3 - Colton Initial Rpt. ¶¶ 178-222). So too is Colton's assumption of a vent chamber at a moment in time as a user pushes the button. (RESP 14; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 86-87). This is pure inadmissible *ipse dixit*. *Timm v. Goodyear Dunlop Tires North America*, 932 F.3d 986, 993 (7th Cir. 2019) (affirming summary judgment and exclusion of ex parte opinion as *ipse dixit*); *Parallel Networks, L.L.C. v. Abercrombie & Fitch Co.*, 704 F. 3d 958, 970 (Fed. Cir. 2013) (expert *ipse dixit* "not sufficient to avoid summary judgment"); *Weber-Stephen Products, L.L.C. v. Sears Holding Corporation*, 2015 WL 9304343, at * 5 (N.D. Ill. 2015) (striking as *ipse dixit* infringement opinions that "amount to nothing more than the conclusions themselves").

C. The Experts' Conflicting Opinions Cannot Be Resolved on Summary Judgment

Accepting for the sake of argument that Colton's arbitrary line drawing and assumption are sufficient to identify an alleged vent chamber, PMI's experts dispute that the area Colton identifies is a vent chamber and that dispute cannot be resolved on summary judgment. *Morningware, Inc. v. Hearthware Home Prod., Inc*. 898 F. Supp. 2d 1018, 1031-33 (N.D. Ill. 2012) (St. Eve) ("competing expert testimony" of whether accused device met claim limitation precluded summary judgment); *Kenall Mfg. Co. v. Genlyte Thomas Group LLC,* 439 F. Supp. 2d 854, 866 (N.D. Ill. 2006) (Castillo), *citing Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F. 3d 1353, 1361-62 (Fed. Cir. 2002) ("[s]ummary judgment is inappropriate where, as here, a case may ultimately turn on the credibility of the expert witnesses").

Ignite asserts that PMI's expert Stein agreed that there is "some lowering of pressure in the space identified by Ignite as the vent chamber" of the '442 Patent." (Ignite Br. 9). What Stein opined is that, as a result of friction, "practically all of the expansion of vapors leaving the fluid chamber in PMI's" Accused Products "occurs as the vapors flow through the so-called entrance aperture, with almost no expansion or corresponding pressure drop" occurring in the area directly behind the button. (SAUMF 3; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 62-71). To be clear, this is in the beginning of the narrow passageway between points "A" and "B" in the image on page 22, above, not in the area behind the button. (*Id.*) Indeed, as the user pushes the button, the volume of the area behind the button decreases, which is the exact opposite of what the '442 Patent teaches. (SAUMF 1; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 86-87).

This is significant because the Court did not construe the term "vent chamber" as including an entrance and an exit, as Ignite sought. (ECF 155; May 29, 2018 Mem. Op. at 9-10). The Court recognized that, like a courtroom with a door, a vent chamber "may have an exit, but including exit in the definition of vent chamber does not mean a vent chamber now only consists of an exit aperture." (*Id*). Ignite's argument is like saying that if a courtroom is a space where legal cases are heard, any door to any room is itself a courtroom since a door is part of a courtroom. The space to reduce vapors and gas in the '442 Patent is the vent chamber, not the entrance aperture to the vent chamber. So even if there is pressure reduction in the entrance aperture of the Accused Products, that does not meet the vent chamber limitation.[14]

Ignite also attacks Stein's methodology. Stein analyzed CAD models of the backside cavities of the buttons in the Accused Products, dividing them into Colton's "theorized" entrance

---

[14] In every instance, the patent itself refers to the area where Stein opined that nearly all of the pressure is reduced in the Accused Products due to friction as the "entrance aperture" or the like, not the "vent chamber." (Ex. 1 - '442 Patent at 17:53-57; 13:26-36). The patent simply does not describe the entrance aperture as providing any pressure reducing effect.

aperture, vent chamber and vent aperture. (RESP 15; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 64-80). This analysis supported Stein's opinion that "[t]he button cavity of the Accused Products would not 'reduce the pressure of the vapor or gas,' as required by the '442 Patent, because, by the time the vapor reaches the button cavity, the vapors would have already decreased in pressure by nearly 100%." (RESP 15; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 64-80). Significantly, Colton did not dispute Stein's calculation of pressure loss in the narrow passageway. Nor did Colton calculate any pressure loss at any other location, such as in the cavity behind the button. Instead, Colton accused Stein of improperly using Darcy-Weisbach (and Bernoulli's Law) to calculate the amount of pressure dissipation in the narrow passageway due to friction by ignoring that the vapor flow in the Accused Products was not "steady state and fully developed" and that "the vent chambers have a "*non-circular* state." (Ignite Br. 9-10, emphasis included; Ignite SMF ¶¶ 42-44, 50, 57-58, 68).

Stein testified that Darcy-Weisbach nonetheless still applies to the flows through the narrow passageway in the Accused Products because "the pressure loss to each of those lengths (defined by Colton's "theorized" entrance aperture, vent chamber and vent aperture) is proportional to the velocity squared." (RESP 15; Ex. 23 - Stein Rebuttal Rpt. ¶ 30). The faster the flow, the lower the pressure and vice versa. (*Id*.). Indeed, after Stein died, Troian performed simulations for so-called "time-dependent" or non-steady state flows, which showed that their pressure diminished, as Stein had opined. (Ex. 25 - Troian Dep. at 161-165). Colton may disagree, but the Court cannot resolve on summary judgment the conflict between Colton and Stein/Troian as to whether Darcy applies or not. *Morningware*, 898 F. Supp. 2d at 1031-33; *Kenall*, 439 F. Supp. 2d at 865.

Ignite further attempts to impugn Stein's use of Darcy-Weisbach by saying that he did not use the formula in his invalidity opinion, invoking it for the first time "only *after* review of Dr. Colton's infringement report." (Ignite Br. 9, 13, emphasis included). Stein served his invalidity report at the same time that Colton served his infringement report. Both then served simultaneous rebuttal reports. Stein testified that he decided to calculate the effects of Darcy-Weisbach "when I was thinking about the relative effects of the -- flow through what Colton claims is our outlet orifice . . . while I was working on my rebuttal report." (RESP 41; Ex. 24 - Stein Dep. at 185-191). By that time he had already submitted his invalidity report.

But there is nothing contradictory or insufficient about Stein using Darcy-Weisbach on infringement but not invalidity. (Ignite Br. 8-9). The structures of the vent chamber in the prior art are different than that alleged in the Accused Products and Stein did not need to calculate any loss of pressure in the prior art vent chamber due to friction. In Chaffin for example, the vent chamber is a designated space of increased volume, unlike the narrow passageway of the Accused Products. As Stein testified, "the amount [of pressure loss] due to friction is minimal if the size of the vent chamber is significantly larger than . . . the size of the orifices." (RESP 41; Ex. 24 - Stein Dep. at 268-269). In the Accused Products, however, nearly all of the pressure dissipates before the hot air reaches the ever-decreasing cavity behind the button. (SAUMF 3; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 62-71).

Indeed, Colton ultimately agreed with Stein:

> But it is incorrect to assume that if the ideal gas law applies to theoretically reduce the pressure because gas is flowing through any structure, that such structure meets the limitation of a "vent chamber" for lowering the pressure of vapor or gas as recited in the '442 patent. Rather, the structure of a vent chamber must remove energy from the vapor or gas such as by providing an "expansion" area as described in the '442 patent. (Ex. 26 - Colton Rebuttal Rpt. ¶ 178).

In other words, just because pressure is reduced in the narrow passageway leading to the button in the Accused Products does not make that passageway a vent chamber.

After Stein died unexpectedly, PMI retained Troian. Troian opined that she agreed with Stein that claims 3 and 12 were invalid as obvious over a combination of Chaffin and Albert. (SUMF 8 and 9; Ex. 9 - Troian Rpt. ¶¶ 24-28). Troian also agreed that the Accused Products do not contain a vent chamber, but instead that the back of the button contains "a series of deflector plates which impede and slow the flow of gas." (RESP 70-72; Ex. 27 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). Troian criticized how Colton used Bernoulli's law to support his opinion that gases "dwell" and lose pressure in the alleged vent chamber in the Accused Products. (RESP 43, 70-72; Ex. 9 - Troian Rpt. ¶¶ 8-14; *see also* Ex. 26 - Colton Rebuttal Rpt. ¶ 121). She ran various fluid dynamics tests showing that gases flowing through a smaller tube to a larger purported vent chamber "would cause an increase, not a reduction in pressure."(RESP 70-72; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16).

Ignite erroneously asserts that Troian's results "actually support Ignite's infringement position" because they show reductions in pressure as air flows through a tube with an intermediary vent chamber. (Ignite Br. 11). This is erroneous for two reasons. First, Troian did not purport to test or simulate the Accused Products, she was simply simulating how Bernoulli's law works. (RESP 66-67; Ex. 9 - Troian Rpt. ¶¶ 13-16 and Ex. 7 to Troian Rpt. ¶¶ 3-4, Fig 1; Ex. 25 - Troian Dep. at 10-11, 81, 108). She simulated air flow through uniform entrance and exit tubes with an intermediary vent chamber four times as large as those tubes. (RESP 66-67; Ex. 9 - Troian Rpt. Ex. 7 at ¶¶ 3-4, Fig 1). As she testified, these simulations were "not intended to represent either the '442 patent or the accused products." (RESP 66; Ex. 9 - Troian Rpt. ¶¶ 4-17; Ex. 25 - Troian Dep. at 60, 86, 87). Second, her simulation showed (in the bottom graph that

Ignite reproduces in its brief ) that pressure *increased* in the intermediary vent chamber. (Ignite Br. 11). The pressure decreased between the points identified by Ignite because of the higher flow speed through the passageway. (RESP 73; Ex. 9 - Troian Rpt. Ex. 7 at ¶¶ 3-4. Fig. 1). In short, the vent chamber worked the exact opposite as taught by the '442 Patent.[15]

Finally, Stein's (and Troian's) non-infringement opinions do not contradict their invalidity opinions, as Ignite asserts. (Ignite Br. 13).[16] As discussed above, Chaffin and the Accused Products have different structures. (*supra* p. 29; RESP 62; Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 24 - Stein Dep. at. 268-269; Ex. 9 - Troian Rpt. ¶¶ 5-16; Ex. 25 - Troian Dep. at 150-151 and 212). Troian testified that "the Chaffin geometry leads to pressure reduction" and she attributed that primarily "to the Bernoulli effect." (Ex. 9 - Troian Rpt. ¶¶ 24-27; Ex. 25 - Troian Dep. at 183). That is completely in line with her noninfringement opinion. But as Ignite acknowledges, Troian also used the ideal gas law and agreed with the conclusion reached by the PTAB in the '233 IPR based on the ideal gas law that the vent chamber in Chaffin is a space to reduce the pressure of vapor or gas. (RESP 58-59; Ex. 9 - Troian Rpt. ¶¶ 24-27; Ex. 25 - Troian Dep. at 185-188).

Colton's theorized vent chamber in the Accused Products is not a space to lower the pressure of vapor or gas. The pressure of hot air in the Accused Products is lowered in the uniform, narrow passageway leading to the button. By the time that hot air reaches the back of the button, nearly all of its pressure has dissipated. The hot air is then deflected by the back of

---

[15] Ignite's assertion that it was only "after Dr. Colton's criticism of Mr. Stein that Dr. Troian determined to apply a 'flow model' or CFD simulations" is misleading. (Ignite Br. 13). Troian was only engaged after Colton's criticisms.

[16] Such asserted contradictions would, in any event, be grist for cross-examination, not grounds for summary judgment.

the button before escaping around the button's periphery. Ignite and Colton may dispute these facts, or the science behind them, but those disputes cannot be resolved on summary judgment.

### 4. Whether The Accused Products Have a Trigger Mechanically Connected To A Drink Aperture and Vent Seal Is Disputed

The Court did not construe "mechanically connected" and it is therefore interpreted according to its plain and ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

Stein and Troian agreed that both they and a POSITA would not consider the cam mechanism in the Accused Products to be a mechanical connection. As Stein opined:

> In my opinion, the trigger stem contacting the cam surface is not "mechanically connected" to the cam surface. One of ordinary skill would instead interpret a "mechanical connection" as a linkage, fastener, gear, pulley, belt, etc. that physically connects two or more objects. I do not consider simple contact, or sliding contact, as being "mechanically connected" to something. For example, if I opened a door by pushing my shoulder against the door, I would not consider myself "mechanically connected" to the door. However, if I grasped a door handle and pulled that door open with my clenched hand, I would consider my hand to be "mechanically connected" to the door handle until I release my grasp. (RESP 31; Ex. 24 - Stein Dep. at 296-301; and Ex. 23 - Stein Rebuttal Report ¶¶ 89-93).

Troian opined:

> As Mr. Stein stated in his report, the trigger mechanisms of the Accused Products operate the drink aperture shutter with a cam mechanism. In my opinion, one of ordinary skill would consider a "mechanical connection" to require the joining of two or more elements by mechanical fasteners of some type to provide mechanical linkage, or an O-ring riding on a shaft (see, e.g., figures of '442 Patent describing a mechanical linkage; and col. 20 lines 22-29 describing an O-ring (vent seal 683) as being "mechanically connected" to the trigger 610 via the shaft upon which the O-ring sits). One of ordinary skill in the art would view a cam mechanism as a simple sliding contact between elements and not a "mechanical connection." (RESP 27; Ex. 9 - Troian Rpt. ¶ 17).

32

Ignite's expert Colton opined that a mechanical connection is any "physical connection that enables performing or transmitting mechanical forces and energy between two components." (RESP 29; Ex. 3 - Colton Initial Rpt. ¶ 149).

This is another expert dispute that cannot be resolved on summary judgment. *Morningware*, 898 F.Supp.2d at 1031-33; *Kenall*, 439 F.Supp.2d at 885. In a similar case, *AG v. Thyssen Krupp Elevator Corp*, 2014 WL 468897, at * 4 (D. Del. Feb. 3, 2019), the parties disputed whether a device was "connected" to floor terminators in the accused elevators, as required by the patent. The "defendant argue[d] that because the floor terminal and the modernized device are not directly connected, they are not connected," while the Plaintiff argued that "the claim can be satisfied by an *indirect* connection." *Id.* The Court declined to decide on summary judgment whether the accused device met the undefined claim term "connected:"

> The Court has not been asked to construe the term "connected" as part of Claim 1 of the 465 method patent and does not choose to do so now. It is a question of fact for the jury as to whether or not the two components are connected in a way sufficient to meet the claim term. Summary judgment as related to this issue is denied.

*See also Whirlpool Corp. v. TST Water, LLC*, 2018 WL 1536875, at *3 (E.D. Tex. Mar. 29, 2018) (terms not construed during *Markman* should go to the jury to determine whether the accused products infringe the claims based on their plain and ordinary meaning); *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, CV 15-819-LPS-CJB, 2018 WL 1664971, at *2 (D. Del. Apr. 6, 2018) (Court's role in claim construction "does not mean that every dispute about the proper application of a claim term to an accused product is itself a question of law the Court must resolve."); *Cellular Commun. Equip. LLC v. HTC Corp.*, 6:16-cv-363-KNM, 2018 WL 1804518, at *6 (E.D. Tex. Apr. 17, 2018) ("[I]f there remain any disputes as to the application of [the construed claim terms], such disputes raise questions of fact regarding infringement rather than any question of law for claim construction").

Ignite does not deny the dispute between the experts over whether the Accused Products meet the "mechanically connected" limitation. Instead, Ignite argues that Stein's and Troian's opinions are wrong. (Ignite Br. 4-5). Ignite starts its argument with the incorrect statement that "PMI contends that there must be a direct physical contact in order to prove a 'mechanical connection.'" (Ignite Br. 5). From there, Ignite asserts that the '442 Patent discloses that there can be a mechanical connection through "intermediary components." (Ignite Br. 5). Ignite then argues that Figure 17 of the '442 Patent discloses a mechanical connection when the trigger arm merely slides within the pin-shaped linkage. (Ignite Br. 6).

The premise of Ignite's argument is incorrect. It is not PMI's contention that "there must be a direct physical contact in order to prove a mechanical connection." PMI's contention is that there must be a connection through a linkage, gear, pulley, belt, or other mechanical fastener, in order for two items to be "*mechanically* connected." (RESP 30-31; Ex. 9 - Troian Rpt. ¶ 17; Ex. 24 - Stein Dep. at 296-301; and Ex. 23 - Stein Rebuttal Report ¶¶ 89-93). A chemical connection such as through an adhesive, or a connection without a mechanical fastener, would not be a mechanical connection. Indeed, the word "mechanical" would be superfluous if, as Ignite asserts, two items merely touching constituted a mechanical connection. That would make every connection a mechanical connection.

Stein testified that Figure 17 of the '442 Patent discloses a mechanical connection because the arm (pin-shaped element 708) and linkage member (hook-shaped element 800) "interlock," not because they merely touch. (RESP 33-34; Ex. 24 - Stein Dep. at 300-301).



This pin and hock system is unlike the cam in the Accused Products, in which the stem slides against a slanted surface with no mechanical fastener of any kind.[17]

At bottom, since the Court did not construe "mechanically connected" it is for the jury to determine whether the Accused Products meet this limitation. The Court cannot resolve the conflicting expert opinions on summary judgment.

**5.    Conclusion**

Summary judgment of infringement should be denied because there are disputes over whether the Accused Products meet the vent chamber and mechanically connected limitations.

**DATED:** October 14, 2019                PACIFIC MARKET INTERNATIONAL, LLC

By:    _/s/Patrick T. Muffo_ _____

One of Its Attorneys

Michael R. Levinson
mlevinson@seyfarth.com
Patrick T. Muffo
pmuffo@seyfarth.com
SEYFARTH SHAW LLP
233 S. Wacker Dr., Suite 8000
Chicago, Illinois 60606
Telephone:    (312) 460-5000
Facsimile:    (312) 460-7000

---

[17] See *McGraw-Hill Dictionary of Architecture and Construction* 2003 defining "mechanical connection" as: "The joining of two or more elements by mechanical fasteners such as bolds, rivets, or screws (but not by non-mechanical means, such as adhesives)." (https://encyclopedia2.thefreedictionary.com/mechanical-connection).

59544463v.1

**APPENDIX**
**COMPARISON OF CLAIM TERMS**

| Claim 3 of the '442 Patent | Invalid '233 Patent Claims | Invalid '933 Patent Claim |
|---|---|---|
| 3. "The drinking container of Claim 1, further comprising"* | | |
| "a vent chamber between the vent seal and the vent aperture" | Claim 5: "a vent chamber located between the vent seal and the vent aperture" | Claim 11: "a vent chamber between the vent seal and the vent aperture" |
| "the vent chamber having a cross-sectional area greater than a cross sectional area of the vent aperture" | Claim 21: "the vent chamber having a cross-sectional area greater than a cross-sectional area of the vent aperture" | |

| Claim 12 of the '442 Patent | Invalid '233 Patent Claims | Invalid '933 Patent Claim |
|---|---|---|
| 12. "The drinking container of claim 8, further comprising"* | | |
| "a vent chamber between the vent seal and the vent aperture" | Claim 11: "a vent chamber between the vent seal and the vent aperture" Claims 5: "a vent chamber located between the vent seal and the vent aperture" Claim 21: "a vent chamber located between the vent seal and the vent aperture" | Claim 11: "a vent chamber between the vent seal and the vent aperture" |
| "and wherein the trigger extends partially through the vent chamber" | Claim 5: "the trigger extending partially through the vent chamber" Claim 22: "wherein the trigger extends at least partially through the vent chamber" | Claim 11: "and wherein the trigger extends partially through the vent chamber" |

---

* Claims 3 and 8 were found to be invalid in the '442 IPR.

**<u>CERTIFICATE OF SERVICE</u>**

I, Patrick T. Muffo, an attorney, certify that I caused the foregoing to be filed

electronically with the Clerk of the Court for the Northern District of Illinois using the Court's

Electronic Case Filing System, which will send notification to the registered participants of the

ECF System as listed in the Court's Notice of Electronic Filing, on October 14, 2019.

*/s/Patrick T. Muffo*

Patrick T. Muffo
233 S. Wacker Dr.
Suite 8000
Chicago, Illinois 60606
(312) 469-5000 – Telephone
(312) 460-7000 – Facsimile
pmuffo@seyfarth.com

59544463v.1