**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IGNITE USA, LLC,

                Plaintiff,

                Civil Action No. 1:14-CV-00856

      v.

                Honorable Edmond E. Chang

PACIFIC MARKET INTERNATIONAL,
LLC,

                Defendant.

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
RULE 56.1 STATEMENT OF MATERIAL FACTS**

Defendant, Pacific Market International, LLC ("PMI") responds to Ignite's Statement of

Undisputed Material Facts as follows:

**Parties**

**MATERIAL FACT NO. 1:**

Ignite is an Illinois limited liability company, having a principal place of business 180
North LaSalle Street, Suite 700, Chicago, Illinois 60601.  Ignite is engaged in the business of
designing, developing, manufacturing, and selling drinking containers.  R. 73 ¶ 2.[1]

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 2:**

Defendant Pacific Market International, LLC ("PMI") is a Washington limited liability
company, having a principle place of business at 2401 Elliot Ave, 4th Floor, Seattle, Washington
98121.  R. 86 ¶ 3.

---

[1] As noted in Ignite's Statement of Undisputed Material Facts, citations to this Court's docket are noted as "R."
followed by the docket entry number.

**RESPONSE:**

PMI admits the allegations of this paragraph.

**Jurisdiction and Venue**

**MATERIAL FACT NO. 3:**

The Court has subject matter jurisdiction over Ignite's claim of patent infringement under 28 U.S.C. §§ 1331 and 1338. R. 86 ¶ 4. This Court has personal jurisdiction over PMI. R. 86 ¶ 5. Venue is proper in this district under 28 U.S.C. §§ 1391, and PMI does not challenge venue in this district. R. 86 ¶ 6.

**RESPONSE:**

PMI admits the allegations of this paragraph.

**Background of the U.S. Patent No. 7,997,442**

**MATERIAL FACT NO. 4:**

This suit concerns infringement of U.S. Patent No. 7,997,442 ("the '442 patent"), which issued on August 16, 2011 and concerns a novel drinking container. Ignite is the sole owner, by assignment, of the entire right, title and interest in and to the '442 patent. '442 patent (Ex. A).

**RESPONSE:**

PMI admits this suit is a patent infringement lawsuit involving U.S. Patent No.

7,997,442, which issued on August 16, 2011 and describes a drinking container. PMI further

admits Ignite is the sole owner, by assignment, of the entire right, title and interest in and to the

'442 patent. PMI denies the drinking container is "novel." For example, the Patent Trial and

Appeal Board (PTAB) held all claims of the '442 Patent for which review was instituted to be

invalid (Ex. 2 - '442 FWD); and has also found every feature of claims 3 and 12 of the '442

Patent to obvious based on the combination of Chaffin 5,711,452 and Albert 3,967,748. (*See,*

*e.g.*, Ex. 2 - '442 FWD; Ex. 10 - '233 FWD; Ex. 7 - '933 FWD; Ex. 15 - Albert; Ex. 12 -

Chaffin).

**MATERIAL FACT NO. 5:**

Asserted claims 3 and 12 are directed to a drinking container that vents hot gases before a user drinks from the container by (in part) providing a "vent chamber" having a defined cross-sectional area or a "trigger" that extends at least partially through the vent chamber. Claim 3 depends from independent claim 1, and claim 12 depends from independent claim 8. Thus, each asserted claim includes the limitations of its respective independent claim. '442 patent (Ex. A), 23:32–24:35.

**RESPONSE:**

PMI admits claim 3 of the '442 Patent depends from independent claim 1, and claim 12

depends from independent claim 8, and by virtue of this dependence, that each asserted claim

includes the limitations of its respective independent claim. PMI denies Ignite's characterization

of these claims and submits that the claims speak for themselves. Claim 3 is therefore directed to

the features of claim 1 found invalid before the PTAB, as well as the additional features "a vent

chamber between the vent seal and the vent aperture, the vent chamber having a cross-sectional

area greater than a cross-sectional area of the vent aperture." (Ex. 1 - '442 Patent, claim 3).

Claim 12 is directed to the features of claim 8 found invalid before the PTAB, including the

additional features "a vent chamber between the vent seal and the vent aperture, and wherein the

trigger extends partially through the vent chamber." (Ex. 1 - '442 Patent, claim 12). The PTAB

found claims 1 and 8 to be invalid over Albert. (Ex. 2 - '442 FWD at p. 2).

**PMI's Infringing Beverage Containers**

**MATERIAL FACT NO. 6:**

Ignite alleges infringement of the '442 patent by the following products ("Accused Products") that have been made, sold, and offered for sale by PMI: Perfect Vacuum Insulated Mug, Aladdin Press-to-Sip Mug, Aladdin Flip & Sip Mug, Aladdin Vacuum Insulated Mug including "Push-Button Lid with LEAK-LOCK™," Stanley One-Hand Mug (both the "Classic" and "Mountain" labeled products), Stanley Nineteen13 One-Hand Vacuum Mug, and Stanley Mountain Vacuum Insulated Switchback Mug products. PMI Answer, R. 81 ¶ 8.

3

**RESPONSE:**

PMI admits the allegations of this paragraph, but denies the Accused Products infringe at least because the Accuse Products do not include a "vent chamber"; a "vent aperture"; a vent chamber having "a cross-sectional area greater than a cross-sectional area of the vent aperture"; and a trigger mechanism "mechanically connected" to the drink aperture shutter and to a vent seal. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 24 - Stein Dep. at 296-301; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-17).

**Claim Elements**

**MATERIAL FACT NO. 7:**

The lids of each Accused Product are substantially the same and operate in generally the same way. Stein Non-inf. Report (Ex. B) ¶¶ 47–48; Colton Inf. Report (Ex. C), ¶¶ 94–100; Troian Expert Report (Ex. M, ¶2).

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 8:**

Each of the Accused Products is a "drinking container" and includes "a container body having a cavity" and "a removable lid covering the cavity of the container body, the lid having a drink aperture" as required by claims 3 and 12. Stein Non-inf. Report (Ex. B), ¶¶ 47– 48; Colton Inf. Report (Ex. C), ¶¶ 103–112, 118, 124, 130, 136, 140, 306–308; PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 2; Troian Expert Report (Ex. M, ¶2).

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 9:**

Each of the Accused Products includes "a drink aperture shutter" and "a vent seal" where "the trigger mechanism mov[es] the shutter and the vent seal from a closed position to an open position," as required by claim 3. Similarly, as required by claim 12, each of the Accused Products includes "a drink aperture ... [and] a shutter that is movable between a closed position and an open position, and a vent seal that is moveable between a closed position and an open position" and a "trigger having an actuation stroke." Stein Non-inf. Report (Ex. B), ¶ 48; Colton Inf. Report (Ex. C), ¶¶ 147–169, 309–310; PMI Non-inf. Cont. Exhibit A (Ex. D), p. 1–2; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 2.

4

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 10:**

Each of the Accused Products "pre-*vent*" because each includes a "trigger mechanism [having] an actuation stroke, wherein the vent seal is initially actuated during a first portion of the actuation stroke of the trigger mechanism" and "the shutter is initially actuated during a second portion of the actuation stroke of the trigger mechanism, the first potion of the actuation stroke being initiated prior in time to the initiation of the second portion of the actuation stroke," as required by claim 3, (Stein Non-inf. Report (Ex. B), 48; Colton Inf. Report (Ex. C), ¶¶ 168–172; PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2–3), and "the vent seal is actuated during a first portion of the actuation stroke of the trigger, wherein the shutter is actuated during a second portion of the actuation stroke of the trigger, and wherein the first portion of the actuation stroke is initiated prior in time to the initiation of second portion of the actuation stroke," as required by claim 12 Stein Non-inf. Report (Ex. B), 48; Colton Inf. Report (Ex. C), ¶¶ 309, 312–313; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 4; Dan Hill Depo. (Ex. F) at 411:25–412:11; Troian Expert Report (Ex. M, ¶2).

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 11:**

Of the limitations recited in each of claims 3 and 12, PMI contends that only the "vent aperture," "trigger mechanism," "mechanically connected" and "vent chamber" limitations of claims 3 and 12 are not found in the Accused Products. Specifically, PMI contends that the Accused Products do not include a "vent aperture," a "trigger mechanism," a trigger mechanism "mechanically connected" to the drink aperture shutter and to a vent seal, and a "vent chamber" having "a cross-sectional area greater than a cross-sectional area of the vent aperture" (claim 3), and "the trigger extends partially through the vent chamber" (claim 12). No other limitations of the asserted claims are in dispute. PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2–5; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 2–4.

**RESPONSE:**

PMI admits that it disputes whether the Accused Products include a "vent chamber"; a "vent aperture"; a vent chamber having "a cross-sectional area greater than a cross-sectional area of the vent aperture"; and a trigger mechanism "mechanically connected" to the drink aperture shutter and to a vent seal. PMI does not dispute the Accused Products include a trigger mechanism.

5

**"Vent Aperture"**

**MATERIAL FACT NO. 12:**

PMI contends that the Accused Products do not include a "vent aperture" as recited in claims 3 and 12. PMI contends that Ignite's alleged "vent aperture" is "simply the gap between the alleged trigger and the structure upon which the alleged trigger sits" and is "merely [a] portion[] of the button." PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2, 5; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 2, 4.

**RESPONSE:**

PMI admits it contends that the Accused Products do not include a "vent aperture" as

recited in claims 3 and 12, but disputes the basis for the denial as set forth in this paragraph.

Instead, PMI denies the existence of the vent aperture in its products due to the fact that Dr.

Colton draws arbitrary lines to define the "vent chamber" and "vent aperture" features, and due

to the fact that the Accused Products do not include a vent chamber. (Ex. 23 - Stein Rebuttal Rpt.

¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16).

**MATERIAL FACT NO. 13:**

(Unused)

**RESPONSE:**

No response necessary.

**MATERIAL FACT NO. 14:**

Ignite's Expert, Dr. Colton, testified that a "vent is an opening or channel provided in a structure that enables fluid communication between the inside of the structure and the external environment. As such, a lid having a vent would require the lid have an opening or channel that enables fluid communication between the inside of the container and the external environment." Colton Inf. Report (Ex. C), ¶ 110. Dr. Colton identified a "vent aperture" at the periphery of the button in each of the Accused Products where gas and vapor exit lid to the external environment. Colton Inf. Report (Ex. C), Stanley Classic (¶¶ 113–117), Stanley Switchback (¶¶ 119–123), Stanley Nineteen13 (¶¶ 125–129), Aladdin Flip & Sip (¶¶ 131–135), Aladdin Press-to-Sip (¶¶ 137–139), Aladdin Leak-Lock (¶¶ 141–144).

59430570v.2

**RESPONSE:**

PMI admits paragraph 14 includes an incomplete quotation from Ignite's Expert, Dr.

Colton; and that Ignite's Expert identified where he argues the "vent aperture" to be located on

each of the Accused Products. The full paragraph 110 of Dr. Colton's report reads:

> I have been informed and am aware that PMI contends that the accused drinking containers to not include a 'vent aperture' because PMI contends the identified 'vent aperture' is 'the gap between the trigger and the structure upon which the trigger sits.' See PMI's Final Non-Infringement Contentions, dated January 13, 2017, Exhibit B. I do not agree. A vent is an opening or channel provided in a structure that enables fluid communication between the inside of the structure and the external environment. As such, a lid having a vent would require the lid have an opening or channel that enables fluid communication between the inside of the container and the external environment. As will be explained below, each of the accused drinking containers includes structures that enable fluid communication between the central cavity of the container body and the external environment.

PMI disputes Dr. Colton "identified a 'vent aperture' at the periphery of the button in

each of the Accused Products where gas and vapor exit lid to the external environment" and

instead submits that Dr. Colton's report speaks for itself. (Ex. 3 - Colton Initial Rpt. ¶¶ 178-222).

Dr. Colton identified three different infringement theories, one of which identifies the vent

aperture as being the space surrounding the button at an outer boundary to the exterior ("Theory

1"); the second of which identifies the vent aperture as being the space surrounding the button at

an inner-most location of the button ("Theory 2"); and the third of which identifies the vent

aperture as being the exit opening of the back of the button ("Theory 3"). (*Id.*) None of these are

"vent apertures" pursuant to the '442 Patent because the Accused Products do not include "vent

chambers" based on any of the above theories. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and

76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). Due to the nature of

his three different theories, Dr. Colton interprets the boundaries of the alleged vent chamber at a

moment in time as a user pushes the button. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 86-87).

## MATERIAL FACT NO. 15:

PMI products "pre-*vent*" to relieve built-up pressure inside the lid by venting the pressure into a space behind the products' button, which then allows the reduced pressure to exit through an aperture around the button to the outside. Stein Non-inf. Report (Ex. B) ¶¶ 48, 63; Troian Expert Report (Ex. M, ¶2),

PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2–3; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 4; PMI 0002282 (Ex. G), p. 2. PMI designed products such as the Stanley Nineteen13 product to intentionally vent pressurized gas into the space behind the button. Dan Hill Depo. (Ex. F), 417:25–419:9, 420:13–421:18; PMI 0002282 (Ex. G), p. 2; Tyler Gilbert Depo. (Ex. H), 33–34; PMI 0002218 (Ex. I), p. 4; Troian Dep., May 9, 2019, (Ex. N), 198:19-22.

## RESPONSE:

PMI admits the Accused Products vent hot gases through the back of the button, but deny

the remaining allegations of this paragraph. The Accused Products release hot air from within a

drink receptacle by passing the air through a passageway in the back of the button when a user

pushes the button inward. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-51, 63, 75, and 76). The button

removes a seal from a stem to permit the gas to flow through the stem, and in doing so, the gas

incurs "significant frictional losses … before entering the … so-called chamber." (Ex. 23 - Stein

Rebuttal Rpt. ¶¶ 47-51, 63, 75, and 76; and Ex. 25 - Troian Dep. at 150-151). Mr. Stein referred

to this passageway as a "thin annular gap" that is defined by the button's shaft or stem and the

surrounding tubular plastic main cap body. (Ex. 23 - Stein Rebuttal. Rpt. ¶ 63). Virtually all of

the pressure is reduced in that narrow passageway before the hot air reaches the space behind the

button. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 64-80). This analysis supported Stein's opinion that

"[t]he button cavity of the Accused Products would not 'reduce the pressure of the vapor or gas,'

as required by the '442 Patent, because, by the time the vapor reaches the button cavity, the

vapors would have already decreased in pressure by nearly 100%." (Ex. 23 - Stein Rebuttal Rpt.

¶ 164). This is because the gas exiting the narrow passageway will then enter a passageway behind the button, deflect off the back of the button, and ultimately escape through the surrounding gap between the button and the remainder of the lid. (*Id.*). The back of the button therefore acts as a deflector plate to reduce the velocity of the gas before it is expelled to atmosphere. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-51, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 15 and 16). When the air hits the back of the button, its speed decreases and its pressure increases. (Ex. 9 - Troian Rpt. ¶¶ 8-16). In contrast, the pressure loss to each of the lengths of the narrow entrance passageway is proportional to the velocity squared. (Ex. 23 - Stein Rebuttal Rpt. ¶ 30).

## MATERIAL FACT NO. 16:

Mr. Stein defines an "aperture" as an "opening." Matthew Stein Depo. (Ex. J), 70:18–71:6 ("So typically you look at an opening as an aperture. And most of the time its a smaller opening, but it can be any opening.")

### RESPONSE:

PMI admits the allegations of this paragraph.

## MATERIAL FACT NO. 17:

Consistent with the foregoing, Mr. Stein does not dispute that the Accused Products include a "vent aperture" as claimed. Instead, Mr. Stein's report states that each of the Accused Products "vents around the edges of the button, allowing the air to escape through the gap between the perimeter of the button and the cavity in the mug cap's main body that surrounds the button." Stein Non-inf. Report (Ex. B), ¶ 48.

### RESPONSE:

PMI denies that Mr. Stein did not dispute the existence of a vent aperture in the Accused Products. Mr. Stein opined that the Accused Products do not include a vent aperture because the Accused Products do not include a vent chamber. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 50-58; Ex. 9 - Troian Rpt. ¶¶ 4-14). PMI admits Mr. Stein opined that the Accused Products "vent[] around the

edges of the button, allowing the air to escape through the gap between the perimeter of the button and the cavity in the mug cap's main body that surrounds the button."

**MATERIAL FACT NO. 18:**

Mr. Stein identifies the "vent aperture" of the '442 patent as the "exit aperture" or "exit orifice" of the vent chamber. Stein Non-inf. Report (Ex. B), ¶¶ 63, 71; Stein Invalidity Report (Ex. K) ¶ 96; Matthew Stein Depo. (Ex. J), 116:23–117:7.

**RESPONSE:**

PMI denies the allegations of this paragraph. Instead, Mr. Stein identified what Ignite contends to be the "vent aperture" of the Accused Products as an "exit aperture" or "exit orifice." (Ex. 23 - Stein Rebuttal Rpt. ¶ 71). Mr. Stein further opined that he believed the '442 Patent referred to the vent aperture with different words for different embodiments, including "exit aperture," and that he thought Dr. Colton used the same terminology. (Ex. 24 - Stein Dep. at 116-117).

**MATERIAL FACT NO. 19:**

PMI's expert Dr. Troian agrees with the positions taken by Mr. Stein regarding the opening around the button. Troian Expert Report (Ex. M, ¶2). She states that the accused products all contain a recessed push button whose perimeter region was designed to provide an opening through which gas or vapors can escape to the external environment. Troian Expert Report Ex. M, ¶15. She testified that she witnessed gas or vapors "venting through the perimeter of the button." Troian Depo., May 9, 2019, (Ex. N), 198:19-199:1, 199:11-200:6

**RESPONSE:**

PMI admits the allegations of this paragraph.

**"Trigger Mechanism"**

**MATERIAL FACT NO. 20:**

PMI contends that the Accused Products do not include a trigger and that instead "each include[s] a button." PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 2.

**RESPONSE:**

PMI admits the Accused Products include a "trigger" or "trigger mechanism."

**MATERIAL FACT NO. 21:**

PMI describes all the Accused Products as including an "actuation trigger" and a "trigger vent hole." Dan Hill Depo. (Ex. F), 410:20–412:11, 421:9–18.

    **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 22:**

PMI describes the Accused Products as each including a "button ... connected to a shaft, and on that shaft there is a fork with two cams" that rub against corresponding cams on the shutter/plunger as the button and shaft move inward, thereby moving the plunger down to open the drink orifice. Dan Hill Depo. (Ex. F), 420:13–23.

    **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 23:**

PMI's industrial designer, Tyler Gilbert, explained how he examined various "types of ... fluid containers that operated with *a trigger of some sort*" when evaluating potential designs for PMI's first iteration of the accused products. Tyler Gilbert Depo. (Ex. H), 21:14– 22:14.

    **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 24:**

Ignite's Expert, Dr. Jonathan Colton, identified the claimed "trigger mechanism" in each of the Accused Products. Colton Inf. Report (Ex. C), Stanley Classic (¶¶ 147, 148), Stanley Switchback (¶¶ 151, 152), Stanley Nineteen13 (¶¶ 154, 155), Aladdin Flip & Sip (¶¶ 157, 158), Aladdin Press-to-Sip (¶¶ 160, 161), Aladdin Leak-Lock (¶¶ 164, 165).

    **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 25:**

PMI's expert, Mr. Stein, does not dispute that the Accused Products include a "trigger." He contends only that "the trigger of the accused products" is not "mechanically connected" to the shutter and the vent seal. Stein Non-inf. Report (Ex. B) ¶¶ 90, 92.

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 26:**

PMI's expert, Dr. Troian, likewise contends only that the PMI products do not include a trigger or a trigger mechanism that is "mechanically connected to a drink shutter and vent seal." Troian Expert Report, Ex. M, ¶17. More particularly, Dr. Troian contends that the "trigger mechanism is not fastened or mechanically linked to the shutter or seal." Troian Expert Report, Ex. M, ¶3.

**RESPONSE:**

PMI admits the allegations of this paragraph.

**Mechanically Connected**

**MATERIAL FACT NO. 27:**

PMI contends that the Accused Products do not include a trigger mechanism that is "mechanically connected" to the drink aperture shutter and to a vent seal as recited in claims 3 and 12. PMI contends that "in each of the Accused Products, the alleged 'trigger' contacts a cam mechanism that displaces a base upon which the alleged shutter is connected" and that the "button does not contact the alleged shutter, nor does the cam mechanism contact the alleged shutter." PMI Non-inf. Cont. Exhibit A (Ex. D), p. 2–3; PMI Non-inf. Cont. Exhibit B (Ex. E), p. 2–3.

**RESPONSE:**

PMI admits paragraph 27 includes an incomplete recitation of PMI's position regarding

whether the Accused Products include a trigger mechanism "mechanically connected" to a drink

aperture shutter and to a vent seal. Dr. Troian further opined, for example,

> [T]he trigger mechanisms of the Accused Products operate the drink aperture shutter with a cam mechanism. In my opinion, one of ordinary skill would consider a 'mechanical connection' to require the joining of two or more elements by mechanical fasteners of some type to provide mechanical linkage, or an O-ring riding on a shaft (see, e.g., figures of '442 Patent describing a mechanical linkage; and col. 20 lines 22-29 describing an O-ring (vent seal 683) as being 'mechanically connected' to the trigger 610 via the shaft upon which the Oring sits). One of ordinary skill in the art would view a cam mechanism as a simple sliding contact between elements and not a "mechanical connection."

12

(Ex. 9 - Troian Rpt. ¶ 17). Dr. Troian therefore distinguished between a simple sliding contact, such as that used by the Accused Products, and a mechanical connection, such as that discussed in the '442 Patent. (*Id*.)

## MATERIAL FACT NO. 28:

The '442 patent describes an embodiment of the drinking container as including a drink shutter 710 mechanically connected to the trigger 610 through the first and second linkage members 800, 802. '442 patent (Ex. A), 18:52–57, 20:22–29, 21:62–22:3. In each embodiment described in the '442 patent, the trigger does not directly contact the drink shutter; rather, these parts are "mechanically connected" to each other through intermediate components. '442 patent (Ex. A), 20:22–29, 22:1–3; Matthew Stein Depo. (Ex. J), 299:24–300:15.

> **RESPONSE:**

PMI admits the allegations of this paragraph, but denies that the Accused Product include such a "mechanical connection." For example, the Accused Products include a cam mechanism with a button coupled to a shaft that contacts an angled surface to effect vertical movement and therefore open the drink aperture. (Ex. 9 - Troian Rpt. ¶ 17; Ex. 23 - Stein Rebuttal Rpt. ¶ 92) This arrangement is not a linkage system, which in Dr. Troian's opinion constitutes a "mechanical connection" consistent with the '442 Patent. (*Id*.).

## MATERIAL FACT NO. 29:

Ignite's Expert, Dr. Colton, testified that, "In general, a mechanical connection is a physical connection that enables performing or transmitting mechanical forces and energy between two components." Dr. Colton also states that "[t]he accused drinking containers operate by mechanical means through the application and transmission of mechanical forces, and contain mechanical components, such as wedges, seals, O-rings, buttons, and springs," therefore the "[m]echanical components must be mechanically connected to allow the transmission of the forces required for lid operation, such as opening the vent seal and the drinking aperture." Colton Inf. Report (Ex. C), ¶ 149.

> **RESPONSE:**

PMI admits the allegations of this paragraph but denies the substance of Dr. Colton's opinion. Dr. Colton and Dr. Troian disagree on the meaning of the term "mechanically connected" as applied to the Accused Products. (Compare Ex. 3 - Colton Initial Rpt. ¶ 149 with

Ex. 9 - Troian Rpt. ¶ 17). For example, the Accused Products include a cam mechanism with a button coupled to a shaft that contacts an angled surface to effect vertical movement and therefore open the drink aperture. (Ex. 9 - Troian Rpt. ¶ 17; Ex. 24 - Stein Dep. at 296-301; and Ex. 23 - Stein Rebuttal Rpt. ¶¶ 89-93). This arrangement is not a linkage system, which in Dr. Troian's opinion constitutes a "mechanical connection" consistent with the '442 Patent. (*Id.*).

## MATERIAL FACT NO. 30:

Dr. Colton testified that each of the Accused Products include a trigger mechanism "mechanically connected" to a drink aperture shutter and a vent seal. Colton Inf. Report (Ex. C), Stanley Classic (¶¶ 147–150), Stanley Switchback (¶¶ 151–153), Stanley Nineteen13 (¶¶ 154–156), Aladdin Flip & Sip (¶¶ 157–159), Aladdin Press-to-Sip (¶¶ 160–163), Aladdin Leak-Lock (¶¶ 164–167).

### RESPONSE:

PMI admits the allegations of this paragraph but denies the substance of Dr. Colton's opinion. Dr. Colton and Dr. Troian disagree on the meaning of the term "mechanically connected" as applied to the Accused Products. (*Compare* Ex. 3 - Colton Initial Rpt. ¶ 149 with Ex. 9 - Troian Rpt. ¶ 17). For example, the Accused Products include a cam mechanism with a button coupled to a shaft that contacts an angled surface to effect vertical movement and therefore open the drink aperture. (Ex. 9 - Troian Rpt. ¶ 17; Ex. 24 - Stein Dep. at 296-301; and Ex. 23 - Stein Rebuttal Rpt. ¶¶ 89-93). This arrangement is not a linkage system, which in Dr. Troian's opinion constitutes a "mechanical connection" consistent with the '442 Patent. (*Id.*).

## MATERIAL FACT NO. 31:

Mr. Stein asserts that a "mechanical connection" requires "a linkage, fastener, gear, pulley, belt, etc. that physically connects two or more objects," and "do[es] not consider simple contact, or sliding contact, as being 'mechanically connected' to something." Stein Non-inf. Report (Ex. B), ¶ 92. Mr. Stein does not rely on the '442 patent for this assertion.

14

**RESPONSE:**

PMI admits Mr. Stein asserts that a "mechanical connection" requires "a linkage, fastener, gear, pulley, belt, etc. that physically connects two or more objects," and "do[es] not consider simple contact, or sliding contact, as being 'mechanically connected' to something." PMI denies Mr. Stein does not rely on the '442 Patent for this assertion. (Ex. 24 - Stein Dep. at 296-301; and Ex. 23 - Stein Rebuttal Rpt. ¶¶ 89-93).

**MATERIAL FACT NO. 32:**

As testified by Mr. Stein, the '442 patent describes a "mechanical connection" between the trigger and the shutter and the vent seal. Matthew Stein Depo. (Ex. J), 298:11–21 (Q. Do you believe that the '442 patent shows a mechanical connection? A. I believe it shows a mechanical connection ... [it] has, like, the ball and socket type connection.")

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 33:**

As testified by Mr. Stein, in the closed position, the trigger 610 and the linkages 800, 802 of the '442 patent are "touching and resting and sliding within each other in Figure 16" (Matthew Stein Depo. (Ex. J), 300:18–23), and that "They're touching the whole time." Matthew Stein Depo. (Ex. J), 301:3–4.

**RESPONSE:**

PMI admits this paragraph includes an incomplete quotation from Mr. Stein's deposition.

The full quotation in fact reads:

> Q. Are they connected, mechanically connected in Figure 16 in your mind?
>
> A. No, but it's clear they are in Figure 17 when you push the button forward, yeah. They're certainly resting on each other and sliding -- you know, they're touching and resting and sliding within each other in Figure 16.
>
> Q. But that's you leaning up against the door; isn't it?

A. Somewhat. They're -- they're sliding upon each other. They're
touching the whole time. And then they interlock and rotate
forward in Figure 17.

(Ex. 24 - Stein Dep. at 300-301).

## MATERIAL FACT NO. 34:

As testified by Mr. Stein, in the '442 patent, the trigger 610 and the shutter 710 are
"mechanically connected" in Figure 17 "when you push the button forward" and the trigger 610,
first and second linkage 800, 802, and shutter 710 "interlock and rotate forward" to rotate the
shutter 710 away from the drink aperture.  Matthew Stein Depo. (Ex. J), 300:18–301:5.  Mr.
Stein concedes that while the shutter and trigger are separated, they are "mechanically
connected" in operation (as shown in Figure 17) "when you push the button forward."  Matthew
Stein Depo. (Ex. J), 300:7–23.  Fig. 17 of the '442 patent is as follows:



FIG. 17

'442 patent (Ex. A), Fig. 17.

### RESPONSE:

PMI admits Mr. Stein testified that, in the '442 patent, the trigger 610 and the shutter 710

are "mechanically connected" in Figure 17 "when you push the button forward" and the trigger

610, first and second linkage 800, 802, and shutter 710 "interlock and rotate forward" to rotate

the shutter 710 away from the drink aperture. PMI denies Mr. Stein concedes that while the

shutter and trigger are separated, they are "mechanically connected" in operation. (Ex. 24 -  Stein

Dep. at 296-301). Instead, Mr. Stein testified "it's not connected at that point in time." (*Id*. at

299).

16

**MATERIAL FACT NO. 35:**

PMI expert Dr. Troian similarly testified that a mechanical "linkage" is capable of being a "mechanical connection." Troian Depo., May 9, 2019, (Ex. N), 217:16-219:22. Accordingly, she admitted that when the '442 patent shows a trigger arm 708 in contact with a slot wall 815 in Fig. 18, that shows a "mechanical connection," Troian Depo., May 9, 2019, (Ex. N) 217:25-218:6, and that the shutter and trigger are "mechanically connected" when activated by moving the trigger arm 708 into contact with the slot wall 815 as shown in Fig. 18 of the '442 patent:



'442 patent (Ex. A), Fig. 18; Troian Depo., May 9, 2019, (Ex. N) 217:25-218:6.

**RESPONSE:**

PMI admits Dr. Troian testified that a mechanical linkage system is one type of mechanical connection, as well as "the joining of two or more elements by mechanical fasteners … or an O-ring riding on a shaft." (Ex. 9 - Troian Rpt. ¶ 17). PMI admits Dr. Troian opined when the '442 patent shows a trigger arm 708 in contact with a slot wall 815 in Fig. 18, that shows a "mechanical connection," and that the shutter and trigger are "mechanically connected" when activated when the trigger arm 708 is in contact with the slot wall 815 as shown in Fig. 18 of the '442 patent. PMI denies Dr. Troian testified the shutter and trigger are "mechanically connected" ***when activated*** and instead Dr. Troian required a direct physical connection in the form of a mechanical linkage, joining of two elements by mechanical fasteners, or an O-ring riding on a shaft. (*Id.*)

17

**"Vent Chamber"**

**MATERIAL FACT NO. 36:**

  With reference to the claimed vent chamber, Ignite's expert Dr. Colton explained that by "providing a space with a larger cross-sectional area and increased volume, hot vapor/gas that is first vented into the ['442 Patent] vent chamber 738 will dissipate energy as it expands into the enclosed volume of the vent chamber 738. The energy dissipation/expansion lowers the pressure of the hot vapor/gas before it exits the lid at the vent aperture 682. The novel approach taught by the '442 patent, and embodied in Ignites products, provides for a drinking container that prevents hot vapor/gas within an enclosed chamber within the lid in order to dissipate the built-up pressure, creating a safer and more user-friendly product." Colton Inf. Report (Ex. C), ¶83; Supp Colton Report (Ex. P), ¶24.

  **RESPONSE:**

  PMI admits the allegations of this paragraph, but denies the substance of Ignite's expert's

allegations. First, the "approach" of the '442 Patent is hardly novel. For example, the PTAB held

all claims of the '442 Patent for which review was instituted to be invalid (Ex. 2 - '442 FWD);

and has also found every feature of claims 3 and 12 of the '442 Patent to obvious based on the

combination of Chaffin 5,711,452 and Albert 3,967,748. (*See, e.g.*, Ex. 2 - '442 FWD; Ex. 10 -

'233 FWD; Ex. 7 - '933 FWD; Ex. 15 - Albert; Ex. 12 - Chaffin). PMI also denies that by

providing the structure described above, that the mug is "a safer and more user-friendly product"

and in fact Mr. Stein opined that the deflector plate of the Ignite products is what safely vents the

vapors from the passageway leading to the button. (Ex. 16 - Stein Initial Rpt. ¶ 166).

**MATERIAL FACT NO. 37:**

  Dr. Colton determined that each of the Accused Products meet the vent chamber requirement because, during the initial stroke of the trigger when the vent seal opens, pressurized gas flows past the vent seal into an expanded chamber within the lid where the pressure is lowered before the gas flows out of the lid through the vent aperture. Colton Inf. Report (Ex. C), ¶¶ 178–206. Dr. Colton illustrates the alleged vent chamber as shown below:



Figure 65. Stanley Classic Cross Section (vent chamber)

Colton Inf. Report (Ex. C), ¶ 179.

**RESPONSE:**

PMI admits the allegations of this paragraph, but denies the substance of the allegations. For example, PMI denies the alleged vent chamber is in fact a "vent chamber" as construed by the Court. The alleged "vent chamber" is merely a passageway that leads to the back of the button, which acts as a deflector plate to reduce the velocity of the gas before it escapes to atmosphere. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16; *see also* Ex. 26 - Colton Rebuttal Rpt. ¶¶ 156, 159-162, 168, 173, 176, 178, 180, 181, 184-186, 188, and 189 (distinguishing a "passageway" from a "vent chamber")).

**MATERIAL FACT NO. 38:**

PMI contends that the alleged "vent chamber" and "vent aperture" are "merely portions of the button." PMI Non-inf. Cont. Exhibit A (Ex. D), p. 5.

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 39:**

PMI's expert, Mr. Stein, contends that the alleged vent chamber is simply "a deflector plate" because "by the time the hot vapor reaches the button cavity, virtually all of the pressure of the vapor has already been dissipated through the entrance aperture to the button cavity." Stein Non-inf. Report (Ex. B), ¶¶ 61, 72.

**RESPONSE:**

PMI admits Mr. Stein opined that the alleged vent chamber is merely a deflector plate

because "by the time the hot vapor reaches the button cavity, virtually all of the pressure of the

vapor has already been dissipated through the entrance aperture to the button cavity." Mr. Stein

also disputed that the entrance passageway leading to the back of the button can be considered

part of the alleged "vent chamber." (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 81-85). Mr. Stein opined that

the vast majority of the pressure drop in the flowing gas occurs before the gas reaches the back

of the button; and that once the gas reaches what Ignite contends to be the vent chamber, the gas

is at virtually "0 PSI." (Ex. 24 - Stein Dep. at 122-125).

**MATERIAL FACT NO. 40:**

Mr. Stein applies a version of the "Darcy Formula" in his analysis of the pressure losses in the expanding gas or vapor flow from the container body in the '442 patent and the Accused Products. Stein Non-inf. Report (Ex. B) ¶¶ 30–31, 70–71.

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 41:**

Mr. Stein did not apply the Darcy-Weisbach equation in his analysis of the validity of the '442 patent or applicability of the cited art (*e.g.,* Nergard, Valenzona, Chaffin) to the pending claims until after reviewing Dr. Colton's report, approximately a year and a half after being engaged by PMI. Stein Invalidity Report (Ex. K), ¶¶ 104–168 (showing no analysis of cited references using Darcey Formula); Stein Depo. (Ex. J), 135:23–136:15, 189:23–191:7).

**RESPONSE:**

PMI admits Mr. Stein did not apply the Darcy-Weisbach equation in his analysis of the

validity of the '442 patent or applicability of the cited art (*e.g.,* Nergard, Valenzona, Chaffin) to

the pending claims until after reviewing Dr. Colton's report. Mr. Stein testified that "the amount [of pressure loss] due to friction is minimal if the size of the vent chamber is significantly larger than … the size of the orifices," as with Chaffin. (Ex. 24 - Stein Dep. at 268-269). Stein testified that he decided to calculate the effects of Darcy-Weisbach "when I was thinking about the relative effects of the -- flow through what Colton claims is our outlet orifice . . . while I was working on my rebuttal report." (Ex. 24 - Stein Dep. at 185-191).

**MATERIAL FACT NO. 42:**

Application of the Darcy-Weisbach and Bernoulli equations to the beverage containers of the '442 patent and the Accused Products, requires that specific restrictive engineering assumptions be first met: (a) incompressible flow, (b) steady state flow, (c) fully developed flow, (d) frictionless flow, and (e) no work or energy inputs to or outputs from the system. Colton Dec. (Ex. L) ¶¶ 9–10.

**RESPONSE:**

PMI denies the allegations of this paragraph. The Darcy-Weisbach equation is an empirical equation used to estimate approximate pressure loss that occurs for flow within a smooth or rough cylindrical pipe due to frictional losses caused by surface roughness and/or turbulence effects. (Ex. 27 - Troian Decl. ¶¶ 2-4). While the original equation assumes (a) incompressible flow, (b) steady state flow (not dependent on time), (c) fully developed flow (not dependent on the position along the flow path), (d) isothermal flow and (e) no work or energy inputs to or outputs from the system, forms of the Darcy-Weisbach equation is commonly used even in situations where the pipe is not circular in cross section or cylindrical about its entrance aperture. (*Id*.). The Darcy-Weisbach equation is also commonly used where the flow is not fully developed flow i.e., cases in which the local cross-sectional area, flow speed and pressure do vary with position. (*Id.*). Here, too, engineers often use Darcy-Weisbach as an approximation even when the fully developed flow condition is not met. (*Id*.).

There are many versions of the Bernoulli equation depending on the assumptions used. While Dr. Colton used the simplest version, Dr. Troian used a more generalized version of the Bernoulli equation. (*Id.* at ¶¶ 6-8). Dr. Colton used the equation $P_1 + \frac{1}{2}\rho v_1{}^2 + \rho g h_1 = P_2 + \frac{1}{2}\rho v_2{}^2 + \rho g h_2$ in his analysis, where P represents the pressure of the system, ρ represents the density of the fluid, v represents the velocity of the fluid, g represents the gravity constant, and h represents the height of the fluid. (Ex. 26 - Colton Rebuttal Rpt. ¶ 121). Dr. Troian opined that this is one of the simplest forms of the Bernoulli equation. (Ex. 27 - Troian Decl. ¶ 6). Dr. Troian used a form of the Bernoulli's equation $P_2 + KE_2 = P_1 + KE_1 - K_{EL}{}^{(1\rightarrow2)}$, where P represents the pressure at two separate points along a distance, KE represents the kinetic energy per unit volume, and $K_{EL}{}^{(1\rightarrow2)}$ represents frictional or minor losses in kinetic energy incurred in traversing the distance from "1" to "2". (Ex. 9 - Troian Rpt. ¶ 10; Ex. 27 - Troian Decl. ¶ 7).

## MATERIAL FACT NO. 43:

The Darcy-Weisbach (as well as the Bernoulli) formula is not applicable to the beverage containers of the '442 patent and the Accused Products because the flow of vapor/gas is compressible, non-steady state, and non-fully developed, in contradiction to the above referenced restrictive engineering assumptions. Colton Dec. (Ex. L) ¶¶ 12–20, 21.

### RESPONSE:

PMI denies the allegations of this paragraph. Dr. Troian specifically performed simulations to show similar behavior for "time-dependent" (i.e., unsteady state) flow and determined her analysis was accurate. (Ex. 25 - Troian Dep. at 162). Dr. Troian similarly considered the effects of fully developed flow versus flow that was not fully developed when using the above equations. (*Id.* at 165). When performing her simulations, Dr. Troian considered compressible flow and incompressible flow to determine the effect this factor would have on her calculations. (*Id.* at 112-114). Ignite's expert also conceded Bernoulli's equation is applicable to the present analysis and used it himself. (Ex. 26 - Colton Rebuttal Rpt. ¶ 121).

**MATERIAL FACT NO. 44:**

In the context of the beverage containers of the '442 patent and the Accused Products, the flow of hot vapor or gas is compressible. When a hot beverage is poured into the cavity of the drinking container and the lid sealed, the air above the liquid heats and compresses. When the vent seal is opened, the heated air expands in volume as it moves through the lid, out the vent aperture, to the environment. The air's volume will increase by the ratio of the pressure change as represented by Boyle's law, calculated by Dr. Colton as a 27% expansion which corresponds to a 27% reduction in density, thus demonstrating that the heated air flowing through the container/lid is compressible. Colton Dec. (Ex. L) ¶¶ 12–16.

**RESPONSE:**

PMI admits in the context of the beverage containers of the '442 patent and the Accused Products, the flow of hot vapor or gas is compressible; and that when a hot beverage is poured into the cavity of the drinking container and the lid sealed, the air above the liquid increases in temperature. This air also increases in pressure (PV=nRT) which is different from air "compressing," which means the volume of air shrinking. There is no disclosure in the '442 Patent where the volume above the liquid within the drink receptacle shrinks so as to compress the gas. (*See generally*, Ex. 1 - '442 Patent).

PMI further admits when the vent seal of the '442 Patent is opened, the heated air increases in volume as it moves through the lid, out the vent aperture, to the environment; and the air's volume will increase by the ratio of the pressure change as represented by Boyle's law. PMI admits Dr. Colton calculated this expansion as 27% expansion which corresponds to a 27% reduction in density. PMI further admits the air flowing through the container and lid is compressible.

**MATERIAL FACT NO. 45:**

Mr. Stein testified that the Darcey-Weisbach equation was "typically applied to liquid fluid flows" (*i.e.*, incompressible fluids). Mr. Stein explains that because the flow in the '442 patent does not experience "a huge difference in volume in terms of expansion" the Darcey-Weisbach equation was "relatively applicable." Matthew Stein Depo. (Ex. J), 266:6–19.

**RESPONSE:**

PMI admits the allegations of this paragraph.

## MATERIAL FACT NO. 46:

In the context of the beverage containers of the '442 patent and in the Accused Products, the flow of hot vapor or gas is not steady state. This is because, when venting, both the pressure and the velocity of the hot vapor/gas are continuously changing. Colton Dec. (Ex. L) ¶¶ 17–18.

**RESPONSE:**

PMI admits the allegations of this paragraph.

## MATERIAL FACT NO. 47:

As testified by Mr. Stein, as the beverage container vents the pressure through the vent aperture, the pressure is "starting out at 4 [PSI] and then it's rapidly dropping down to zero PSI." Matthew Stein Depo. (Ex. J), 248:16–249:13.

**RESPONSE:**

PMI admits Mr. Stein testified to this effect based on an estimate of the pressure. PMI

denies this calculation applies for all instances of the Accused Products. A hotter beverage, for

example, would provide a higher pressure within the drink receptacle. PV=nRT.

## MATERIAL FACT NO. 48:

In the context of the beverage containers of the '442 patent and the Accused Products, the flow of hot vapor or gas is not fully developed. This is because the pressure driving the flow is continuously changing. As a result, the input velocity of the flow is not steady, the velocity profile is not steady, and the input momentum constantly changes. Colton Dec. (Ex. L) ¶¶ 19–20.

**RESPONSE:**

PMI admits the allegations of this paragraph.

## MATERIAL FACT NO. 49:

Mr. Stein testified that he did not account for whether the flow was fully developed even though he was applying the Darcy-Weisbach equation to identify relationships between the pressure drop, friction losses, velocity, and cross-sectional area. Matthew Stein Depo. (Ex. J), 247:5–248:15.

**RESPONSE:**

PMI denies the allegations of this paragraph. Mr. Stein accounted for whether the flow was fully developed but testified he was not interested in calculating a "precise number" but was instead focused on the "relative" pressure drop due to friction. (Ex. 24 - Stein Dep at 247).

## MATERIAL FACT NO. 50:

Mr. Stein's Darcy-Weisbach/Bernoulli analysis is invalid because at least three of the engineering assumptions required to apply the Darcy-Weisbach equation and/or the Bernoulli equation are violated. Colton Dec. (Ex. L), ¶¶ 11–20. Particularly, the required conditions of steady state and fully developed flow are not met in a decreasing pressure source situation such as this. Colton Dec. (Ex. L), ¶¶17-20; Supp. Colton Report (Ex. P, ¶22; Troian Expert Report, (Ex. M), Ex. 6, ¶¶4, 9-10; Troian Depo., May 9, 2019 (Ex. N), 162:22-163:5, 166:17-167:18.

**RESPONSE:**

PMI denies the allegations of this paragraph. Dr. Troian specifically performed simulations to show similar behavior for "time-dependent" (i.e., unsteady state) flow and determined her analysis, including with respect to friction, was accurate. (Ex. 25 - Troian Dep. at 162). Dr. Troian similarly considered the effects of fully developed flow versus flow that was not fully developed when using the above equations. (*Id*. at 165). When performing her simulations, Dr. Troian considered compressible flow and incompressible flow to determine the effect this factor would have on her calculations. (*Id*. at 112-114).

## MATERIAL FACT NO. 51:

Even if the Darcy-Weisbach/Bernoulli equations were applicable to the beverage container of the '442 patent or the Accused Products (*e.g.,* if all the necessary engineering assumptions were met), Mr. Stein applied a wrong version of the Darcy-Weisbach equation. Mr. Stein did not consider the *non-circular* shape of the flow through vent chamber and applied the version of the Darcy-Weisbach equation relevant to flow through a *circular* pipe/duct to his analysis. Stein Non-inf. Report (Ex. B) ¶ 30; Colton Dec. (Ex. L), ¶¶ 4–6; Matthew Stein Depo. (Ex. J), 180:20–181:6; 289:17–23.

**RESPONSE:**

PMI denies the allegations of this paragraph. While Mr. Stein did use a circular cross-section in his analysis, PMI denies this assumption negates Mr. Stein's opinion, who was not attempting to calculate a precise number but was instead seeking an understanding of the "relative" pressure drop due to friction through the narrow passageway leading to the back of the button of the Accused Products. (Ex. 24 - Stein Dep. at 247). Dr. Troian applied a hydraulic diameter (non-circular) form of the equation so as to remove any doubt as to the validity of Mr. Stein's assumption. (Ex. 25 - Troian Dep. at 170). PMI's friction analysis is proper because, as Ignite concedes, Dr. Troian applied a "corrected version of the equation." (Ignite Br. 10, n. 10).

**MATERIAL FACT NO. 52:**

Mr. Stein acknowledges that the vent chambers of the Accused Products are not circular. Matthew Stein Depo. (Ex. J) 77:1–78:23. So, even if the engineering assumptions for the application of the Darcy-Weisbach equation were otherwise met, the geometry of the flow paths of the '442 patent and Accused Products require that the Darcy-Weisbach equation for non-circular pipes be used. Colton Dec. (Ex. L), ¶ 6. After Dr. Colton's critique, Dr. Troian applied the hydraylic diameter (non-circular) form of the equation. Troian Depo., May 9, 2019 (Ex. N), 170: 14-17.

**RESPONSE:**

PMI admits Mr. Stein acknowledged that the alleged vent chambers of the Accused Products are not circular, and that even if the engineering assumptions for the application of the Darcy-Weisbach equation were otherwise met, the geometry of the flow paths of the '442 patent and Accused Products would, if calculating precise measurements, require that the Darcy-Weisbach equation for non-circular pipes be used. PMI denies this assumption negates Mr. Stein's opinion, who was not attempting to calculate a precise number but was instead seeking an understanding of the "relative" pressure drop due to friction. (Ex. 24 - Stein Dep. at 247). PMI admits Dr. Troian applied a correct form of the equation once she was engaged in this lawsuit.

**MATERIAL FACT NO. 53:**

Mr. Stein presents a table between ¶¶ 75 and 76 of his noninfringement report purporting to illustrate the pressure drops in the entrance and exits apertures to the vent chamber, disregarding any pressure drop that might occur in the vent chamber. Stein Non-inf. Report (Ex. B) ¶ 75–76. Mr. Stein testified that while his analysis did not account for the pressure loss due to friction *in the vent chamber* of the '442 patent (Matthew Stein Depo. (Ex. J), 268:14–270:1), there will be "some" pressure loss due to friction in a vent chamber constructed in accordance with the '442 patent. *Id.*, 268:14–19.

**RESPONSE:**

PMI admits Mr. Stein presented a table between ¶¶ 75 and 76 of his noninfringement report illustrating pressure loss due to friction. PMI denies the remaining allegations of this paragraph. Mr. Stein opined that the vast majority of the pressure drop in the flowing gas occurs before the gas reaches the back of the button; and that once the gas reaches what Ignite contends to be the vent chamber, the gas is at virtually "0 PSI." (Ex. 24 - Stein Dep. at 122-125). Mr. Stein also disputed that the entrance passageway leading to the back of the button can be considered part of the alleged "vent chamber." (Ex. 23 - Stein Rebuttal Rpt. ¶¶81-85).

**MATERIAL FACT NO. 54:**

The '442 patent expressly contemplates a gas expansion and pressure reduction model in accordance with the ideal gas law. Supp Colton Report (Ex. P), ¶ 10; *see also*, *e.g.* '442 patent at 17:53-57; 13:26-36.

**RESPONSE:**

PMI denies the allegations of this paragraph. The cited passages of the '442 Patent state: "The vent chamber 738 provides a chamber with an increased volume capacity to lower the pressure and volume of the vapor/gas as it is expelled past the vent seal 683 but before it exits through the vent aperture 682." (Ex. 1 - '442 Patent at 17:53-57); "The cross-sectional area and volume of the vent chamber 238 being larger than that of the third aperture 180. Thus, the size of the vent chamber 238 is substantially larger than the size of the opening to the third aperture 180 such that as the sealing mechanism 18 is actuated and gas and/or liquid is released through the

third aperture 180 in the lower lid 168, the pressure is dissipated in the vent chamber 238 and is not transferred out through the vent hole 182, which has generally the same area as the third aperture 180. This is to prevent a chimney effect through the vent holes." (Ex. 1 - '442 Patent at 13:26-36). The above passages state that the intent of the "vent chamber" is to "lower the pressure" of the gas or dissipate the pressure to prevent a chimney effect.

## MATERIAL FACT NO. 55:

Evaluating the '442 patent from the perspective of a POSITA as defined and applied by the Court, Dr. Colton applied a gas expansion model to understand the "pressure-lowering" teaching of the '442 patent with reference to the well-known ideal gas law. Supp Colton Report (Ex. P), ¶¶11-12. Dr. Colton employed the ideal gas law to conceptualize how the pressure of the gas would be lowered by expanding into the vent chamber. *Id.*

### RESPONSE:

PMI admits Dr. Colton refers to his infringement theory, in part, as a "gas expansion model" that explains the "pressure-lowering" intent of the claimed vent chamber, and that the ideal gas law is part of that analysis. PMI denies a POSITA would view the Accused Products in that manner, and would instead view the PMI buttons as acting as a deflector plate, not any pressure-reducing cavity. (Ex. 9 - Troian Rpt. ¶¶ 5-16). The button in the Accused Products is similar to the deflector plate in invalid claim 7, not the vent chamber of claims 3 and 12.

## MATERIAL FACT NO. 56:

The inventor of the '442 patent, Steven Pinelli, testified to his understanding that the vent chamber could "allow the pressure to sort of dissipate before it is released outward" or "serve some sort of pressure dissipation chamber" [sic]. Supp Colton Report (Ex. P), ¶ 13; *see also,* Pinelli Dec. 22, 2016, Dep. Tr. (Ex. Q) 79:15–80:15; *see also id.* at 148:7–22 (testifying that pressure would "diffuse into that larger chamber").

### RESPONSE:

PMI admits Mr. Pinelli testified as stated in this paragraph. PMI denies the PMI Accused Products operate in this manner. (Ex. 9 - Troian Rpt. ¶¶5-16).

**MATERIAL FACT NO. 57:**

In 2017, PMI argued in an *inter partes* review (IPR) proceeding before the U.S. Patent Office (for a related patent to the '442 patent, sharing the same written description) that the prior art disclosed lowering the pressure of gas in an expanded vent chamber, by operation of the ideal gas law. Stein Aug. 16, 2018 Invalidity Report (Ex. K) ¶ 134 (quoting Stein Ex. 30). PMI's expert in that IPR proceeding, Mr. Dahlgren, opined that the ideal gas law applied in the context of the prior art beverageware publications. *Id.* Ultimately, in that IPR, a panel of judges of the Patent Trial and Appeal Board (the PTAB) also agreed with and adopted the position of Mr. Dahlgren and PMI that the ideal gas law applied. *Id. See also,* Supp Colton Report (Ex. P), ¶14.

  **RESPONSE:**

PMI admits in 2017, PMI argued in an *inter partes* review (IPR) proceeding before the

U.S. Patent Office (for a related patent to the '442 patent, sharing the same written description)

that the prior art disclosed lowering the pressure of gas and used the ideal gas law in its analysis.

PMI admits its expert in that IPR proceeding, Mr. Dahlgren, opined that the ideal gas law applied

in his analysis; and that a panel of judges of the Patent Trial and Appeal Board (the PTAB) also

agreed with and adopted the position of Mr. Dahlgren and PMI that the ideal gas law applied.

PMI denies the use of the term "expanded vent chamber" because the vent chamber of the '442

remains the same size. (*See generally*, Ex. 1 - '442 Patent).

**MATERIAL FACT NO. 58:**

In his invalidity report, PMI expert Mr. Stein stated that he "agree[d] with the PTAB that the vent chamber 27 of Chaffin lowers the pressure of vapor or gas, as required by the definition of 'vent chamber' in this proceeding," incorporating and quoting the PTAB's reasoning (based on PMI's argument and Mr. Dahlgren's testimony) discussed above. Stein Aug. 16, 2018 Invalidity Report (Ex. K) ¶ 134.

  **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 59:**

Dr. Troian stated in her report that she "agree[d] with Mr. Stein and the guidance from the [PTAB]" regarding their conclusions that the claims of the related patent were obvious because they included the required vent chamber. Troian Report (Ex. M), ¶ 24. Dr. Troian did not disavow the PTAB rationale but rather agreed with the PTAB's application of the ideal gas

law to conclude that the vent chamber of Chaffin leads to a pressure reduction. Troian Depo. May 9, 2019, (Ex. N) 177:14-182:9; 186:3-10; 194:5-11. *See*, Troian Depo. May 9, 2019, (Ex. N) 182:89 (concluding that "Chaffin['s] geometry leads to pressure reduction.").

**RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 60:**

Dr. Colton's gas expansion model is consistent with the '442 patent. *See, e.g.,* '442 patent at 13:32–34 ("the pressure is dissipated in the vent chamber [] and is not transferred out through the vent hole"), 17:53–57 ("The vent chamber [] provides a chamber with an increased volume capacity to lower the pressure and volume of the vapor/gas as it is expelled past the vent seal [] but before it exits through the vent aperture [].").  Supp Colton Report (Ex. P), ¶17.

**RESPONSE:**

PMI admits the '442 Patent includes quotes such as "the pressure is dissipated in the vent chamber [] and is not transferred out through the vent hole"; and "The vent chamber [] provides a chamber with an increased volume capacity to lower the pressure and volume of the vapor/gas as it is expelled past the vent seal [] but before it exits through the vent aperture []." PMI denies Dr. Colton's "gas expansion model" for purposes of infringement is consistent with the '442 Patent because the Accused Products include structures completely different from the '442 Patent. For example, the Accused Products vent hot gases off the back of the button after dissipating most of the pressure of the gas prior to the gas reaching the back of the button, and the back of the button acts as a deflector plate rather than a pressure-reducing space. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). Nothing about the Accused Products, or Dr. Colton's infringement theories for the Accused Products, is consistent with the '442 Patent.

**MATERIAL FACT NO. 61:**

Dr. Colton's gas expansion model is consistent with PMI's previous position (in 2017), including PMI's IPR expert Mr. Dahlgren as stated in IPR proceedings before the U.S. Patent Office.  Supp Colton Report (Ex. P), ¶18.

**RESPONSE:**

PMI denies Dr. Colton's gas expansion model is consistent with PMI's previous positions taken before the PTAB. PMI denies the specific application of this theory to the Accused Products is the same because the Accused Products have a completely different structure and operate in a different manner. For example, the Accused Products vent hot gases off the back of the button after dissipating most of the pressure of the gas prior to the gas reaching the back of the button, and the back of the button acts as a deflector plate rather than a pressure-reducing space. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). The button in the Accused Products is similar to the deflector plate in invalid claim 7, not the vent chamber of claims 3 and 12. (Ex. 23 - Stein Rebuttal Rpt. ¶ 62; Ex. 9 - Troian Rpt. ¶ 15).

**MATERIAL FACT NO. 62:**

Dr. Colton's gas expansion model is consistent with: (1) the testimony of the inventor Mr. Pinelli; (2) Mr. Stein's agreement with the PTAB; and (3) Dr. Troian's agreement with the PTAB. Each contemplated a gas expansion model; and each either explicitly or implicitly referenced the ideal gas law in discussion of the beverageware subject matter at issue. Supp Colton Report (Ex. P), ¶18.

**RESPONSE:**

PMI admits Dr. Colton used the ideal gas law in his analysis and that Mr. Pinelli, Mr. Stein, the PTAB, and Dr. Troian also used this equation. PMI denies Dr. Colton's use of this equation is the same as that used by Mr. Pinelli, Mr. Stein, the PTAB, and Dr. Troian, because both the Accused Products have a completely different structure than that shown in the '442 Patent or Chaffin in view of Albert. Chaffin and the '442 Patent include a small entrance aperture, large vent chamber, small vent aperture combination. (Ex. 12 - Chaffin Figs. 4-5 and corresponding portions of specification; Ex. 1 - '442 Patent at Figs. 16-18 and corresponding

31

portions of specification). The Accused Products, on the other hand, vent hot gases off the back

of the button after dissipating most of the pressure of the gas prior to the gas reaching the back of

the button, and the back of the button acts as a deflector plate rather than a pressure-reducing

space. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 24 - Stein Dep. at. 268-269; Ex.

25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). The button in the Accused

Products is similar to the deflector plate in invalid claim 7, not the vent chamber of claims 3 and

12. (Ex. 23 - Stein Rebuttal Rpt.. ¶ 62; Ex. 9 - Troian Rpt. ¶ 15).

## MATERIAL FACT NO. 63:

In Mr. Stein's noninfringement report, he opined that the "Darcy formula" for "friction pressure loss" could be employed to show a significant pressure reduction as gas/vapor flows through the vent chamber's entrance aperture and into the "button cavity." *See* Stein Sept. 27, 2018, Rebuttal Report ¶¶ 30–31, 61, 63. Specifically, Mr. Stein opined: "by the time the hot vapor reaches the button cavity, virtually all of the pressure of the vapor has already been dissipated through the entrance aperture to the button cavity within the lid of the PMI accused products." *Id.* ¶ 61. Mr. Stein also testified that friction (specifically the Moody Friction Factor) was important to his analysis. *See, e.g.*, *Id.* ¶¶ 30, 71; Matthew Stein Depo. (Ex. J), 283:19–23. Mr. Stein's noninfringement report generally relied on a model where pressure losses occurring as a result of friction within the lid. Supp Colton Report (Ex. P), ¶19.

### RESPONSE:

PMI admits the allegations of this paragraph.

## MATERIAL FACT NO. 64:

Dr. Troian, in contrast to Mr. Stein, employed applied [sic] a fluid dynamics model and essentially ignored friction. Supp Colton Report (Ex. P), ¶20.

### RESPONSE:

PMI admits Dr. Troian used computational fluid dynamics in her analysis. PMI denies

the remaining allegations of this paragraph. Dr. Troian explained during her deposition that the

computational fluid dynamics software used in her analysis automatically takes friction into

account. (Ex. 25 - Troian Dep at 81, 108, 127). Dr. Troian also agreed with Mr. Stein's

conclusion that there was significant pressure loss in the gas prior to entering the back of the button due to friction. (*Id*. at 151).

## MATERIAL FACT NO. 65:

Dr. Troian utilized computational fluid dynamics (CFD) in two studies involving tubes; the first simulated flow through a tube of a uniform cross-sectional area while the second simulated flow through a series of three tubes, where tubes 1 and 3 were of the same cross-sectional area and tube 2 was of a greater cross-sectional area. With this simplified model, Dr. Troian applied Bernoulli's energy equation to argue that centerline flow pressure can increase "within the vent chamber" because of the geometry of the vent chamber relative to the entrance and exit apertures. Troian Report (Ex. M), ¶ 7 (citing Exhibits 6 and 7 to her report), Ex. 7 to Troian Expert Report, ¶¶2-3.

### RESPONSE:

PMI admits Dr. Troian utilized computational fluid dynamics (CFD) in two studies involving tubes; the first simulated flow through a tube of a uniform cross-sectional area while the second simulated flow through a series of three tubes, where tubes 1 and 3 were of the same cross-sectional area and tube 2 was of a greater cross-sectional area. PMI further admits that, with this simplified model, Dr. Troian applied Bernoulli's energy equation to opine that centerline flow pressure can increase within the vent chamber. PMI denies the only basis for this increase in pressure is the geometry of the vent chamber relative to the entrance and exit apertures. (Ex. 9 - Troian Rpt. ¶¶ 4-17). Dr. Troian explained that the geometry of the button independent of the entrance and exit apertures, the temperature of the gas, the existing pressure of the gas, and the manner in which the button was pushed inward all contribute to pressure increases in the back of the button. (*Id*.)

## MATERIAL FACT NO. 66:

The geometry used in Dr. Troian's CFD model was not intended to represent the '442 patent or any particular PMI products, but rather to designed to "mimic a crude system where the entrance aperture ... was smaller than the so-called vent chamber, which was larger than the exit." Troian Depo. May 9, 2019, (Ex. N) 87:1–4; see also id. at 86:21-87:7, 169:18170:4, 173:4-10. Dr. Troian used some length and diameter dimensions similar to those reported by Mr. Stein as well as her own measurements of a Stanley Classic mug. Troian Depo. May 9, 2019,

(Ex. N) 86–103, *see also* Troian Report (Ex. M), ¶ 13 (explaining her CFD simulations were modeled using a "a simplified geometry to illustrate the behavior of the gas flow using dimensions similar to those reported by Mr. Stein" where "the central portion of that tube was replaced by one of larger cross-sectional area to mimic a vent chamber.")

**RESPONSE:**

PMI admits the geometry used in Dr. Troian's CFD simulations was designed to mimic a

simplified system where the first tube has a small cross-sectional area, the second tube has a

larger cross-sectional area, and the third tube has a small cross-sectional area. PMI denies the

simulations were not intended to represent the '442 patent or any particular PMI products in any

manner, because the CFD simulations showed the general application of Bernoulli's equation,

which is applicable to the '442 Patent and the Accused Products. (Ex. 9 - Troian Rpt. ¶¶ 4-17;

Ex. 25 - Troian Dep. at 60, 86-87). These simulations showed Dr. Troian's assumptions with

respect to her use of the Bernoulli's equation were correct. (Ex. 9 - Troian Rpt. ¶¶ 4-17 and Ex. 7

to Troian Rpt. ¶¶ 3-4, Fig 1).

**MATERIAL FACT NO. 67:**

Dr. Troian states that the "frictional or minor losses in kinetic energy" ($K_{EL}$) are "normally much smaller than the other terms in Bernoulli's law." Troian Report (Ex. M), ¶ 10, n.10. Exhibit 6 to Dr. Troian's report at paragraph 5 provides that "For this initial estimate, the frictional ($f$) losses and minor losses ($K$) in the Bernoulli equation are ignored." Troian Report, (Ex. M), Exhibit 6, ¶ 5. Paragraph 6 of Exhibit 6, in calculating the flow speed through the vent chamber, Troian provides that "Though this represents an upper bound on the flow speed since frictional and minor losses have been neglected for purposes of estimation, the computational fluid dynamical simulations in Exh. 6 yield smaller but comparable flow speeds." Troian Report (Ex. M), Ex. 6, ¶ 6. This contrasts with Mr. Stein who repeatedly emphasized effects of friction losses. Supp Colton Report (Ex. P), ¶21.

**RESPONSE:**

PMI admits Dr. Troian stated that the "frictional or minor losses in kinetic energy" ($K_{EL}$)

are "normally much smaller than the other terms in Bernoulli's law"; that Exhibit 6 to Dr.

Troian's report at paragraph 5 provides that "For this initial estimate, the frictional ($f$) losses and

minor losses ($K$) in the Bernoulli equation are ignored."; and that Paragraph 6 of Exhibit 6, in

calculating the flow speed through the vent chamber, Dr. Troian provided that "Though this

represents an upper bound on the flow speed since frictional and minor losses have been

neglected for purposes of estimation, the computational fluid dynamical simulations in Exh. 6

yield smaller but comparable flow speeds." PMI denies this contrasts with Mr. Stein who

repeatedly emphasized effects of friction losses. For example, Dr. Troian explained during her

deposition that the computational fluid dynamics software used in her analysis automatically

takes eddies and friction into account. (Ex. 25 - Troian Dep at 10-11, 81 and 108).

## MATERIAL FACT NO. 68:

In Paragraph 4 of Exhibit 6 to her report, Dr. Troian stated: "[T]he Bernoulli equation requires steady, non-uniform, isothermal, incompressible, viscous and turbulent flow." Troian Expert Report (Ex. M), Ex. 6, ¶4.

### RESPONSE:

PMI admits the allegations of this paragraph.

## MATERIAL FACT NO. 69:

Dr. Troian assumes a "constant pressure gradient," which is required for the application of Bernoulli's equation, but the pressure within the container—the source of pressure—reduces from its initial value of approximately 4 psig to zero when the vent seal opens. Dr. Troian's CFD simulations (Exhibit 7 to Ex. M) also assume a constant pressure source. As the pressure source—and as a result the pressure gradient—are not constant, it is not clear that the Bernoulli's equation (or, by extension, Mr. Stein's use of Darcy-Weisbach) can be used. Supp Colton Report (Ex. P), ¶22; Troian Expert Report (Ex. M), Ex. 6, ¶4.

### RESPONSE:

PMI admits Dr. Troian assumed a "constant pressure gradient," which is required for the

application of Bernoulli's equation. Ignite fails to provide the basis for their position "but the

pressure within the container—the source of pressure—reduces from its initial value of

approximately 4 psig to zero when the vent seal opens" and PMI therefore denies this allegation.

PMI admits Dr. Troian's CFD simulations also assume a constant pressure source. PMI denies

"it is not clear that the Bernoulli's equation (or, by extension, Mr. Stein's use of Darcy-

Weisbach) can be used" because the Bernoulli equation is often used just to obtain estimates of the local pressure or local speed, and is therefore typically used by engineers even when the pressure gradient is not constant; and the Darcy-Weisbach equation is commonly used even in situations where the pipe is not cylindrical in cross section or where the flow is not fully developed flow. (Ex. 27 - Troian Decl. ¶¶ 5-8).

**MATERIAL FACT NO. 70:**

Dr. Troian opines that the PMI accused products do not have vent chambers but instead have "a series of deflector plates which impede and slow the flow of gas." Troian Report (Ex. M), ¶15. Dr. Troian states that the series of bends in the PMI buttons "repeatedly dissipate energy from the original flow stream," which "reduces the final speed of the exiting hot gas." *Id.* Dr. Troian referred to the back of the PMI button as successive 90 degree turns which "repeatedly dissipate energy" by providing an "aerodynamic redirection" of a "jet" of gas/vapor that loses force quickly, at least by the time it reaches the exit aperture. Troian Expert Report (Ex. M), ¶¶15-16; Troian Depo., May 9, 2019, (Ex. N), 161:21-163:5; 214:12-23.

  **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 71:**

Claim 12 requires that the "the trigger extends partially through the vent chamber." In the context of claim 12, the trigger provides "aerodynamic redirection" like what Dr. Troian describes in the PMI accused products. A similar "aerodynamic redirection" likewise occurs in a vent chamber that has a greater cross-sectional area than the exit opening by virtue of the relative size of the aperture to that of the chamber (as in claim 3). The fluid in the larger vent chamber must "redirect[]" from its initial direction of flow to pass through the narrower exit. In such a design, the geometry will provide for energy dissipation; eddies may be created that act to reduce energy." Colton Supp. Report (Ex. P), ¶¶ 23-24; Troian Depo., May 9, 2019, (Ex. N), 107:24-108:13.

  **RESPONSE:**

PMI admits claim 12 requires the "the trigger extends partially through the vent chamber." PMI denies the trigger of the '442 Patent provides aerodynamic redirection like what Dr. Troian describes in the PMI accused products; or that aerodynamic redirection likewise occurs in a vent chamber that has a greater cross-sectional area than the exit opening by virtue of

the relative size of the aperture to that of the chamber, as the '442 Patent is silent regarding these features. The Accused Products include structures completely different from the '442 Patent. For example, the Accused Products vent hot gases off the back of the button after dissipating most of the pressure of the gas prior to the gas reaching the back of the button, and the back of the button acts as a deflector plate rather than a pressure-reducing space, requiring four 90 degree turns of the gas before exiting the back of the button. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). This type of aerodynamic redirection is simply not found in the '442 Patent, which begins with a small entrance aperture, leading to a larger vent chamber, and exiting from a smaller vent aperture. (*See, e.g.*, Ex. 1 - '442 Patent at Figs. 16-18).

PMI admits the fluid in a larger vent chamber may redirect from its initial direction of flow to pass through a narrower exit in some circumstances, and that in such a design, the geometry will provide for energy dissipation; and eddies may be created that act to reduce energy. PMI denies that the '442 Patent necessarily requires this type of flow or contemplates such flow, as the '442 Patent is silent regarding these features. (*See generally* Ex. 1 - '442 Patent).

## MATERIAL FACT NO. 72:

Thus, although Dr. Troian uses a different model than Dr. Colton (and others), her results are consistent with Dr. Colton's results in that the vent chamber between the vent seal and vent aperture within the lid of the claimed drinking container and the accused products "dissipates the pressure" of the gas before it exits the lid. Colton Supp. Report (Ex. P), ¶¶ 23-24.

### RESPONSE:

PMI admits Dr. Troian applied, in some areas, different scientific principles to analyze the Accused Products and the '442 Patent as a whole as compared to those scientific principles that Dr. Colton used. PMI denies Dr. Troian agrees that the alleged "vent chamber" of the

Accused Products provides any pressure reduction effect and instead Dr. Troian's opinion is that the back of the button reduces the energy of the hot gases like a deflector plate. The alleged "vent chamber" is merely a passageway that leads to the back of the button, which acts as a deflector plate to reduce the velocity of the gas before it escapes to atmosphere. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16).

## MATERIAL FACT NO. 73:

All three "tubes" in Dr. Troian's model—Tube 1, Tube 2, and Tube 3—are to be considered. *See*, for example, Colton Initial Report ¶ 179, Figure 65. So, even if Dr. Troian's CFD analysis is considered, then it shows a pressure drop (a lowering of the gas/vapor pressure) in the vent chamber that is the combination of her three tubes (Tube 1 + Tube 2 + Tube 3). *See* Troian Report (Ex. M), Ex. 7, Fig. 1:



Dr. Troian explained that the red lines represent a simplified measurement of Bernoulli's energy equation. Troian Depo., May 9, 2019, (Ex. N), 134:7-135:4; Troian Depo., May 20, 2019 (Ex. O), 251:6-11, 255: 5-16.

**RESPONSE:**

It is unclear what is meant by "All three 'tubes' in Dr. Troian's model—Tube 1, Tube 2, and Tube 3—are to be considered" and PMI therefore denies this allegation. PMI further denies that even if Dr. Troian's CFD analysis is considered, then it shows a pressure drop (a lowering of the gas/vapor pressure) in the vent chamber that is the combination of her three tubes (Tube 1 + Tube 2 + Tube 3). Dr. Troian does not consider Tubes 1 and 3 to be part of the vent chamber. (Ex. 9 - Troian Rpt. Ex. 7; *see also* Ex. 23 - Stein Rebuttal Rpt. ¶¶81-85, disputing the entrance passageway to the back of the button is a "vent chamber" consistent with the '442 Patent). Regardless, in Tubes 1 and 3, the pressure decreased through these tubes because of the higher flow speed through the tubes. (Ex. 9 - Troian Rpt. Ex. 7 at ¶¶ 3-4. Fig. 1).

**MATERIAL FACT NO. 74:**

Dr. Troian shows a pressure drop (green solid line, tube with chamber) in the opening that she calls "Tube 1." Similarly, she shows a pressure drop (green solid line) in the opening that she calls "Tube 3." Therefore, even if only two of Dr. Troian's simulation opening "tubes" are considered as an opening to the vent chamber, such as Tubes 1, 2 or Tubes 2, 3, her analysis supports the conclusion that a vent chamber is a space for lowering the pressure of vapor or gas.

**RESPONSE:**

PMI admits Dr. Troian shows a pressure drop (green solid line, tube with chamber) in Tubes 1 and 3. PMI denies the remaining allegations of this paragraph because Dr. Troian does not consider Tubes 1 and 3 to be part of the vent chamber and therefore the pressure does not increase within the purported vent chamber. (Ex. 9 - Troian Rpt. Ex. 7; *see also* Ex. 23 - Stein Rebuttal Rpt. ¶¶ 81-85, disputing the entrance passageway to the back of the button is a "vent chamber" consistent with the '442 Patent).

59430570v.2

**MATERIAL FACT NO. 75:**

PMI did no testing on any Ignite product to determine the amount of pressure reduction in the vent chamber.  Matthew Stein Depo. (Ex. J), 129:2–22.

**RESPONSE:**

PMI admits the allegations of this paragraph.

<b>Vent Chamber Cross-Sectional Area</b>

**MATERIAL FACT NO. 76:**

Assuming each of the Accused Products include a "vent chamber" and "vent aperture," each of the Accused Products includes a vent chamber with a cross-sectional area greater that a cross-sectional area of the vent aperture.  Colton Inf. Report (Ex. C) ¶¶ 240, 243, 246, 249, 251 (Stanley Classic), ¶¶ 256, 258, 260, 262, 264 (Stanley Switchback), ¶¶ 269, 271, 273, 275, 277 (Stanley Nineteen13), ¶¶ 282, 284, 286, 288, 290 (Aladdin Flip & Sip), ¶¶ 295, 297 (Aladdin Press-to-Sip), ¶¶ 302, 304 (Aladdin Leak-Lock); Stein Non-inf. Report (Ex. B) ¶¶ 74, 76–79.

**RESPONSE:**

PMI admits the allegations of this paragraph only when the larger area behind the button is considered a vent chamber. PMI denies the allegations of this paragraph if the entrance passageway leading to the back of the button is considered the claimed "vent chamber" As Mr. Stein states in his report, the entrance passageway has a smaller cross-sectional area than the exit aperture, and therefore does not meet the features of claim 3. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 74, and 76–79).

**MATERIAL FACT NO. 77:**

Mr. Stein includes a table showing his vent chamber and (exit) vent aperture calculations for each accused product, which each show a larger vent chamber cross-section than the vent aperture cross-section.  Stein Non-inf. Report (Ex. B) ¶¶ 74, 76–79.

| MODEL | AREA Entrance Aperture | AREA Vent Chamber | AREA Exit Aperture | A$_{exit}$:A$_{entrance}$ | (V$_{exit}$/V$_{entrance}$)$^2$ |
|---|---|---|---|---|---|
| Stanley Classic One-Handed Mug | 0.171 in$^2$ | 0.614 in$^2$ | 0.102 in$^2$ | 5.96 | 0.028 |
| Stanley Classic One-Handed Mug w/ Dust Guard | 0.171 in$^2$ | 0.614 in$^2$ | 0.102 in$^2$ | 5.96 | 0.028 |
| Stanley Switchback Mug | 0.012 in$^2$ | 0.753 in$^2$ | 0.063 in$^2$ | 5.25 | 0.036 |
| Aladdin Press-to-Sip Mug | 0.007 in$^2$ | 0.499 in$^2$ | 0.079 in$^2$ | 11.29 | 0.008 |
| Aladdin Flip-and-Sip Mug | 0.018 in$^2$ | 0.412 in$^2$ | 0.068 in$^2$ | 3.78 | 0.070 |
| Aladdin Push Button Mug w/Leak Lock | 0.005 in$^2$ | 1.338 in$^2$ | 0.125 in$^2$ | 25 | 0.002 |

**Trigger extends through the vent chamber**

> **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 78:**

PMI contends that "the alleged 'vent chamber' and the alleged 'trigger' are one and the same. The trigger therefore extends entirely through, and makes up, the vent chamber." PMI Non-inf. Cont. Exhibit A (Ex. D), p. 4.

> **RESPONSE:**

PMI admits the allegations of this paragraph.

**MATERIAL FACT NO. 79:**

As shown, each of the Accused Products meet the "vent chamber" and "trigger" limitations of claim 12. Further, and accordingly, each of the Accused Products include a trigger extending partially through the vent chamber. Colton Inf. Report (Ex. C) ¶¶ 315–316 (Stanley Classic), ¶¶ 317–318 (Stanley Switchback), ¶¶ 319–320 (Stanley Nineteen13), ¶¶ 321–322 (Aladdin Flip & Sip), ¶¶ 323–324 (Aladdin Press-to-Sip), ¶¶ 325–326 (Aladdin Leak-Lock). Mr. Stein (and Dr. Troian) offers no opinion regarding the limitation and therefore does not dispute that "the trigger extends partially through the vent chamber" as set forth in claim 12. Stein Non-inf. Report (Ex. B) ¶¶ 74, 76–79; Troian Expert Report (Ex. M, ¶2).

> **RESPONSE:**

PMI denies each of the Accused Products meet the "vent chamber" limitations as

discussed above. The alleged "vent chamber" is merely a passageway that leads to the back of

the button, which acts as a deflector plate to reduce the velocity of the gas before it escapes to

atmosphere. (Ex. 23 - Stein Rebuttal Rpt. ¶¶ 47-58, 63, 75, and 76; Ex. 25 - Troian Dep. at 150-

151 and 212; Ex. 9 - Troian Rpt. ¶¶ 5-16). PMI admits the Accused Products include a "trigger"

and that the trigger extends partially into what Ignite refers to as the "vent chamber."

**DATED: October 14, 2019**                    Respectfully submitted,

                                               PACIFIC MARKET INTERNATIONAL,
                                               LLC


                                               By: */s/Patrick T. Muffo*
                                               _____
                                                    One of Its Attorneys

Patrick T. Muffo
pmuffo@seyfarth.com

SEYFARTH SHAW LLP
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Telephone:     (312) 460-5000
Facsimile:     (312) 460-7000

59430570v.2