**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IGNITE USA, LLC, | CIVIL ACTION NO. 1:14-CV-00856 |
|         Plaintiff, | Honorable Edmond E. Chang |
|     v. | **REDACTED PUBLIC VERSION** |
| PACIFIC MARKET INTERNATIONAL, LLC, | |
|         Defendant. | |

**REPLY IN SUPPORT OF IGNITE'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT AND OPPOSITION TO PMI'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT IN SUPPORT OF IGNITE'S MOTION FOR PARTIAL SUMMARY
       JUDGMENT OF INFRINGEMENT ............................................................... 1

   A.  The accused products include a *vent chamber* ........................................... 2

       1.  The Experts Agree that "some" pressure is reduced in the accused vent chamber (the
           button cavity) ...................................................................................... 2

       2.  PMI's attempts to create a fact issue fail .................................................. 4

       3.  The Deflector Plates In the "Button Cavity" Constitute Part of the Vent Chamber..... 7

       4.  Dr. Troian's Opinion Do Not Establish That Pressure Increases In The Accused
           Products' "Vent Chamber" ....................................................................... 8

   B.  There is a "Mechanical Connection" ...................................................... 10

III.   ARGUMENT IN OPPOSITION TO PMI'S MOTION FOR SUMMARY JUDGMENT
       OF INVALIDITY ........................................................................................ 11

   A.  There is no collateral estoppel ............................................................... 11

       1.  Background ........................................................................................ 11

       2.  Collateral Estoppel Does Not Apply in this Case ...................................... 12

       3.  The issues are not identical .................................................................. 15

       4.  There is a dispute of material fact as to whether and how Chaffin and Albert would be
           combined .......................................................................................... 19

       5.  There is a dispute of material fact as to whether the hypothetical combination of
           Chaffin and Albert has the *vent chamber* of claims 3 and 12 ...................... 23

   B.  There are genuine issues of material fact as to whether PMI's infringement was willful 25

       1.  Background Facts ............................................................................... 26

       2.  PMI has infringed willfully with knowledge of the '442 Patent ................... 27

IV.    CONCLUSION ........................................................................................... 29

## **TABLE OF AUTHORITIES**

CASES                                                                     Page(s)

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*
   713 F. 3d 1377, 1380 (Fed. Cir. 2013)....................................................................13

*Allergan, Inc. v Sandoz, Inc.*
   681 F. App'x 955, 959 (Fed. Cir. 2017) ..............................................................13

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
   882 F.3d 1056, 1068 (Fed. Cir. 2018)....................................................................21

*Commonwealth Sci. & Indus. Research Organization v. Buffalo Tech. (USA), Inc.*,
   542 F.3d 1363, 1376 (Fed. Cir. 2008)....................................................................18

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
   No. 2:15-CV-00011-RSP, 2017 WL 5137401, at *2 (E.D. Tex. Nov. 4, 2017).....................27

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
   879 F.3d 1332, 1353 (Fed. Cir. 2018)....................................................................26

*Fellowes, Inc. v. Acco Brands Corp.*,
   10:cv-7587, 2019 WL 1762910 (N.D. Ill. Apr. 22, 2019) ....................................14

*Freeman United Coal Min. Co. v. Office of Workers' Comp. Program*
   20 F.3d 289, 294 (7th Cir. 1994) ..........................................................................12

*Greatbatch, Ltd. v. AVX Corp*,
   2016 WL 7217625 at *5 (D. Del. Dec. 13, 2016)..................................................24

*Guenther v. Holmgreen*
   738 F.2d 879, 888 (7th Cir. 1984) ........................................................................12

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923, 1933, 195 L. Ed. 2d 278 (2016)..................................................26

*In re Stepan Co.*,
   868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017)..............................................................20

*In re Baxter Intern., Inc.*,
   678 F.3d 1357, 1364 (Fed. Cir. 2012)....................................................................15

*InTouch Technologies, Inc. v. VGO Communications, Inc.*,
   751 F.3d 1327, 1352 (Fed. Cir. 2014)..............................................................19, 22

*Kratville v. Runyon,*
    90 F.3d 195, 198 (7th Cir. 1996) ...................................................................12

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398, 418 (2007) ...........................................................................18

*Metavante Corp. v. Emigrant Sav. Bank,*
    619 F.3d 748, 761 (7th Cir. 2010) .................................................................7

*Microsoft v. i4i Ltd. P'ship,*
    131 S. Ct. 2238, 2242 (2011) ......................................................................14

*One Lot Emerald Cut Stones and One Ring v. U.S.,*
    409 U.S. 232, 235 (1972) ...........................................................................13

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,*
    563 F.3d 1358, 1366 (Fed. Cir. 2009) ...........................................................15

*SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.,*
    127 F.3d 1462, 1468 (Fed. Cir. 1997) ......................................................18, 28

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292, 1321 (Fed. Cir. 2011) ...........................................................14

*Unisone Strategic IP, Inc. v. Life Technologies Corp.,*
    No. *13-cv-1278-GPC-LL,* 2019 WL 4015836 (S.D. Cal. Aug. 26, 2019) ..................17, 18

*Walker v. Macy's Merch. Group, Inc.,*
    288 F. Supp. 3d 840, 853-54 (N.D. Ill. 2017). ..................................................7

## I.      INTRODUCTION

Ignite USA, LLC ("Ignite") files this brief in support of its motion for summary judgment of infringement and in opposition to Pacific Market International, LLC's ("PMI") motion for summary judgment of invalidity.  The parties' respective motions are directed to separate and distinct issues.  There are no genuine issues of material fact as to infringement.  The accused PMI products each include a button cavity that constitutes a "vent chamber" as defined by the Court.  The accused PMI products each include a trigger that is mechanically connected to the drink aperture and the vent seal by a cam mechanism.  In contrast, there are genuine issues of material fact regarding invalidity.  First, PMI's reliance on collateral estoppel is misplaced, both because it fails to apply the appropriate law and also because the issues presented are different.  Second, the issue of obviousness is based on factual inquires that are disputed, including the scope and content of the prior art (e.g., Chaffin) and the differences between the claimed '442 Patent invention and that prior art.  Third, as to willfulness, PMI's reliance on filing an IPR against the '442 Patent (on different prior art) does not excuse its knowing and intentional infringement.  Accordingly, Ignite's motion should be granted and PMI's motion should be denied.

## II.     Argument in support of Ignite's motion for partial summary judgment of infringement

Distilled to its essence, PMI's opposition to Ignite's motion for summary judgment is twofold.  PMI contends that the accused products do not have: (1) a "vent chamber"; and/or (2) a trigger mechanically connected to a drink aperture and a vent seal.  PMI's contentions notwithstanding, there is no material issue of fact on either issue.  Even applying PMI's proffered definition of vent chamber, each of the accused products provide a space, the "button cavity," for lowering pressure.  Similarly, each of the accused products provide a trigger mechanically

connected by a cam mechanism to the drink aperture and the vent seal. There is no disagreement between experts on the necessary points.

**A.      The accused products include a _vent chamber_**

The Court, at PMI's urging, construed vent chamber as "a space to lower the pressure of vapor or gas." R. 155 at 9–10.  Unlike the PTAB, the Court did not include either entrance or exit in the definition of vent chamber.  R. 155 at 7–8.  Thus, PMI's summary judgment argument effectively ignores the entrance and exit and contends that there is an issue of fact whether pressure is reduced in the remaining space – the "vent chamber."[1]  PMI's argument fails, largely because its own experts acknowledge that pressure is reduced in that area of the button cavity.

**1.      The Experts Agree that "some" pressure is reduced in the accused vent chamber (the button cavity)**

Even if the entrance and the exit are wholly ignored as PMI argues, the vent chamber is still characterized by a first area where expanding gas passes two corners to enter the chamber, and a second area where the expanding gas exits the chamber at two corners to exit through the "vent aperture."  The first area, even as modeled by PMI's expert Dr. Troian, is an area of rapid expansion where the gas/vapor expands into the chamber as it passes a corner. Pl.'s Resp. DSOF (Infringement) No. 3 (citing Troian Report, Ex. 7, p. 8 (R. 212-10 at 105) ("tube 1" to "tube 2")). The second area, as also modeled by Dr. Troian, is one of rapid contraction where the gas/vapor passes to the vent aperture, again encountering a corner. _Id._ ("tube 2" to "tube 3"). Such corners in the vent chamber create an effect that results in the lowering of pressure in the vent chamber. Dr. Troian admits that corners create eddies or backflow.  Pl.'s Resp. DSOF (Infringement) No. 3 (citing Troian Depo. (R. 212-11) at 108:10).  Dr. Neitzel explains that eddies or backflow create

---

[1] PMI, for example, argues that "[t]he space to reduce vapors and gas in the '442 Patent is the vent chamber, not the entrance aperture to the vent chamber."  Br. at 27.

or result in a loss of energy and that "the pressure on the downstream side of the sudden expansion is lower than the pressure on the upstream side. *Id*. (citing Neitzel Depo. (Ignite Ex. U) at 19:14–20:3). In other words, eddies can create a loss of pressure in the vent chamber. Dr. Neitzel provides a visual representation of such effects in his report. *Id*. (citing Neitzel Report (R. 214-16) ¶¶ 19, 45; citing Ex. AA, Exhibit C to Neitzel Report (Ignite Ex. AA). Thus, merely by the fact some gas or vapor expands into the vent chamber, eddies are created that cause a resulting "loss" of energy and a resulting reduction in pressure. The POSITA would understand that such a geometry (as described in the '442 Patent) would result in a reduction in pressure. Neitzel Report (R. 214-16) ¶¶19, 20.

As to flow of vapors and gas into the button cavity of the PMI products, Dr. Troian personally witnessed steam exiting around the button of a PMI mug. Troian Depo. (R. 212-11) at 198:3–199:1. Thus, PMI's expert confirms that gas/vapor enters and exits the PMI button cavity, which Ignite identifies and accuses as the claimed vent chamber. PSOF ¶ 37 (citing Colton Inf. Report (R. 214-5) ¶¶ 174-77, Def's Resp. PSOF (Infringement) ¶76 (undisputed if the area behind the button is a vent chamber); Colton Inf. Report (R. 211-02) ¶¶ 178–206). As to pressure reduction, PMI's expert Mr. Stein opined that at least "some" of the pressure would be dissipated (i.e., lowered) in a vent chamber according to the "'442 Patent. Stein Depo. (R. 211-07) at 268:14–270:1. Similarly, PMI's expert Dr. Troian concedes that the PMI button cavity provides a series of "switchbacks" that reduce the speed (*i.e.*, reduce energy) of the expanding gas. Troian Report (R. 212-10) ¶¶15–16. Thus, PMI's experts concede that gas/vapor expands into the accused vent chamber (the button cavity) and that at least some pressure is reduced in that accused vent chamber. Dr. Neitzel explains it as follows:

> Dr. Troian contends that the four ninety-degree turns the gas must make to
> navigate this "switchback" geometry in the Stanley Classic are there to "reduce[]

the final speed of the exiting hot gas and deflect[] the hot gas away from 21 the
user's hand or face." (Troian Expert Report April 1, 2019 at ¶ 16). This is exactly
the loss-inducing purpose of the vent chamber as taught by the '442 patent.
Directional changes not only induce frictional losses, as stated by Dr. Troian, but
also contribute to secondary flows (see the flow in a ninety-degree bend at the
right-hand side of Figure 1) that constitute minor losses. This is exactly the
interpretation that POSITA would attach to this flow behavior, as stated above at
Paragraphs 19-20.

Neitzel Report (R. 214-16) ¶ 41. Accordingly, while the experts may dispute various details as to

how that reduction occurs, there is no dispute that gas/vapor enters and exits the button cavity

and that at least "some pressure" is reduced in the accused vent chamber, the button cavity.  It is

a space for lowering pressure of vapor or gas.

> **2.     PMI's attempts to create a fact issue fail**

PMI challenges Dr. Colton's opinion because he identifies different theories of where to

locate the vent aperture.  In fact, Dr. Colton's theories merely reflect that however one defines or

assigns the "exit" to PMI's button cavity, the structure still constitutes a vent chamber that

provides a space for lowering pressure.  For example, in reference to the accused products, the

"vent aperture" or exit may be defined at the outer edge of the button, which is the "opening

provided by the gap between the perimeter of the button and the [button] cavity in the body of

the lid in which the button sits" (PSMF (Infringement) ¶ 14 (citing Colton Inf. Report (R. 211-

02) ¶ 115));



or it may be defined as being a bit inward of the perimeter, as in the back side of the button

housing (*id.* (citing Colton Inf. Report (R. 211-02) ¶ 116);



or the exit may be defined at an inner most point "between the button shroud and the collar

projecting from the lid that the button rides in (*id.* (citing Colton Inf. Report (R. 211-02) ¶ 117);



In each case, the button cavity provides a space between the entrance and the exit for lowering

pressure of gas or vapor.  For purposes of this motion, no theory asserted by Dr. Colton creates

an issue of fact because the area between the entrance and the exit in each instance comprises a "space for lowering pressure." PSOF ¶ 37 (citing Colton Inf. Report (R. 211-02) ¶¶ 178–206).

PMI contends that Dr. Colton's opinions are merely *ipse dixit*. But there is nothing arbitrary or unproven whatsoever in his opinions. Rather, for each accused product Dr. Colton provides a detailed explanation of why the accused product infringes. In fact, PMI dispute only a relatively few elements of the asserted claims. *See* Def's Resp. to PSOF (Infringement) No. 11 (R. 214-33). Dr. Colton specifically identified a vent chamber in each accused product and explained that vapor/gas expands into that chamber within the lid where pressure is lowered. PSOF (Infringement) ¶ 37 (citing Colton Inf. Report ¶¶ 178–206); *id.* ¶ 60 (citing Supp. Colton Report (R. 212-13) ¶ 17); *id.* ¶¶ 72–74; Supp. Colton Report (R. 212-13) ¶ 33–34. Dr. Colton further explained that each PMI accused product includes a vent chamber with a cross sectioned area greater than that of the vent aperture. *Id.* ¶ 76 (citing Colton Inf. Report); Def.'s Resp. PSOF (Infringement) ¶ 76 (undisputed if the area behind PMI's button is a vent chamber). Dr. Colton did not merely express unsupported conclusions.

The resultant effect of Dr. Colton's opinion is to preclude PMI from using semantics to avoid the undisputed fact that the accused products each include a space for lowering pressure (the button cavity between the entrance and the exit). Dr. Colton identified a space for lowering pressure for each accused product. PMI's experts, as shown above, agree that gas or vapor expand into that button cavity and at least some pressure is reduced there. Moreover, having argued successfully for a construction of "vent chamber" that omits an entrance and an exit, PMI's criticism that Dr. Colton has somehow been arbitrary or conclusory in his location of the exit should be disregarded. Dr. Colton's alternative theories of how to identify the vent chamber in the PMI button cavity do not create an issue of fact.

6

In this case, Dr. Colton applied his expertise, which includes practical experience and a Ph.D. in Mechanical Engineering, reviewed the '442 Patent and its file history in detail and based on that review, identified three theories by which PMI could define the exit to the vent chamber. After considered and thoughtful review, Dr. Colton provided a detailed opinion of why each alternate theory resulted in infringement of Claims 3 or 12. There was nothing arbitrary or subjective. To the contrary, Dr. Colton's work and opinion are remarkably methodical and complete. With respect to determining the presence of a vent chamber, Dr. Colton went into significant detail. See Colton Initial Report (R. 211-02) ¶¶ 174–177. As a further example, see Dr. Colton Rebuttal (Validity) Report (R. 214-28) ¶¶ 178 (providing a detailed discussion of why the Chaffin reference does not disclose a "vent chamber" as contemplated by the '442 Patent, and referring to paragraphs 174–177 of his Initial (Infringement) Report explaining what is necessary for a space to be one that lowers the pressure of vapor or gas). Such an opinion is the antithesis of *ipse dixit*. *See*, *e.g.*, *Walker v Macy's Merch. Group, Inc.*, 288 F. Supp. 3d 840, 853-54 (N.D. Ill. 2017) (report that used mathematical formulas and data to render expert conclusions was appropriate). Of course, to the extent that PMI contends Dr. Colton's testimony lacks foundation or an appropriate rationale, it had the opportunity to cross-examine him on such point. That opportunity resolves any concern that the testimony was *ipse dixit*. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

### 3. The Deflector Plates In the "Button Cavity" Constitute Part of the Vent Chamber

PMI attempts to create an issue of fact by asserting that its button cavity is merely a collection of "deflector plates" that reduce the velocity of hot air exiting the lid. Br. at 22. In that regard, Ignite further contends that its button cavity is not a vent chamber because the volume of space will change depending on how far the button is depressed. *Id.* at 22–23.

7

PMI ignores the express teaching of the '442 patent. A disclosed embodiment of the '442 Patent expressly contemplates both a vent chamber volume change and deflection of gas or vapor in that vent chamber. Referring to Fig.'s 16–18, as the trigger 610 is pressed, the wiper seal 685 travels inward so as to reduce the volume of the vent chamber 738. Moreover, the trigger 610, which is preferably generally shaped as a cross (see Fig. 15 at 694) extends, at least partially into the vent chamber 738. Thus, the trigger deflects or interrupts the flow of vapor or gas to cause a "loss," despite energy and reduce pressure. The POSITA would recognize that such an arrangement enhances pressure reduction. See Neitzel Report (R. 214-16) ¶¶ 26–27, 42. POSITA would recognize a loss-generating "change in flow area" results from a sudden expansion or constriction (*id.* ¶ 26), and by the "wake" create by the trigger that adds to the tortuosity as the flow is "impeded in some manner by the trigger." *Id.* ¶ 27. Thus, the fact that the accused products include a series of deflector plates establishes and confirms that the button cavity comprises a "space for lowering pressure;" a vent chamber.

### 4. Dr. Troian's Opinion Do Not Establish That Pressure Increases In The Accused Products' "Vent Chamber"

Dr. Troian does criticize Dr. Colton's use of Bernoulli's energy equation, but that criticism does not create a material fact because Dr. Colton was responding to Mr. Stein's selective use of the "Darcy formula" in his non-infringement report. *See* Stein Report, (R. 211-01) ¶¶ 30-31, 61, 63. Mr. Stein, however, used only a gas expansion model based on Boyle's law (as previously named by PMI and the PTAB) for his invalidity position. This contradiction cannot be explained away. See Colton Supplemental Report (R. 212-13) ¶¶10-15. PMI does not create an issue of fact by changing theoretical horses.

Regardless, even if Dr. Troian's Bernoulli criticism is considered, she still underlines agrees that the Bernoulli equation requires at least an incompressible gas and a steady state flow – neither of

which are present here.[2]  See PSMF ¶¶ 46, 47; Pl.'s Resp. DSOF (Infringement), No. 4 (citing Ex. BB, Troian Depo., 114:24-115:6).  More importantly, it is undisputed that Dr. Troian's simulations do not relate to the issue at hand.  PMI admits, as it must, that Dr. Troian's simulations did not model or "represent either the '442 patent of the accused products." Br. at 30. As a result, they are of no assistance to the trier of fact regardless of Dr. Troian's contentions regarding an incompressible gas and a steady state of flow and do not create any genuine dispute.[3]

PMI concludes its argument by admitting that the [b]y the time that [the pressure of] hot air reaches the back of the button, <u>nearly all</u> of its pressure has dissipated.  Br. at 31.  Nearly, but not all.  Thus, PMI admits that gas/vapor under pressure reaches the vent chamber (the button cavity) where remaining pressure is reduced and the associated energy is dissipated.  Use of a series of deflector plates within the vent chamber does not detract from the pressure reduction. Arguing that the pressure could increase in Dr. Troian's hypothetical simulations does not detract from the pressure reduction feature in the accused products. The fact of at least "some" pressure reduction is undisputed, and that fact renders the button cavity to be "a space for lowering the pressure of a vapor or gas."

---

[2] The exiting gas is compressible—it is heated and then expends (or contracts as it cools).  The gas is not steady state—it decreases in at least volume as the pressure is first reduced in the vent chamber and then released to the environment. See Def's Resp. to PSOF Nos. 44 and 46.

[3] Dr. Troian's simulations do nothing more than prove the well known principle that, under certain circumstances represented by Bernoulli's equation, if a steady flow is to be maintained, the pressure in a cylindrical pipe of greater cross-sectional area increases so as to maintain a constant flow speed throughout the system.  Not only is the initial pressure here decreasing, but neither the '442 patent nor the accused products provide a cylindrical vent chamber.  Her simulations, as she concedes (not intended to represent either the accused PMI products or the '442 Patent) are not material to the undisputed facts before the Court.

### B.     There is a "Mechanical Connection"

In a further effort to create a generic issue of fact, PMI characterizes its contention as "there must be a connection through a linkage, gear, pulley, belt or other mechanical fastener, in order for two items to be "mechanically connected."  PMI refines its position by adding that a mechanical connection is one where parts "interlock;" they do not merely touch.  All of this to argue that its mechanism does not provide a "mechanical connection." In effect, PMI's argument is that the term *mechanical connection* should be limited to a "linkage system" (as in the '442 patent) but would exclude a "cam system" (as in the PMI accused products). PMI's belated attempt to redefine the plain meaning of *mechanical connection* to gin up a fact issue should be rejected.

In the normal or closed position, the PMI trigger does not touch the cam that operates to open (and close) the PMI shutter.  Def's Resp. PSOF (Infringement) ¶ 27; Colton Inf. Report (R. 211-02) ¶¶ 149–150.  Pushing the button of an accused PMI product causes the wedge-shaped arms of the PMI trigger to engage a cam and rotate to open the drink opening (the shutter).  *Id.* It is also undisputed that the trigger 610 of the '442 Patent, when in the normal or closed position, does not touch a "linkage" member 800 that operates to open (and close) the '442 Patent shutter 710.  It is further undisputed that the '442 Patent trigger 610 engages the link 800 and rotates the link 800 to open the shutter 710. Def's Resp. PSOF (Infringement) ¶ 33.

The disclosed embodiment need not describe each and every possible form of mechanical connection.  A cam connection is an alternative that would be readily known to the POSITA.  A "mechanical connection" under the '442 Patent does not require a "linkage, gear, pulley, belt or mechanical fastener."  It requires a "connection" that acts "mechanically" to open and close the shutter.  A cam is nothing more than a form of mechanical linkage that provides for movement of a follower.  Here, the PMI trigger has a cam-wedge shaped arms, that engage a camming surface

10

on the shutter to effect opening and closing of the shutter. Colton Inf. Report (R. 211-02) ¶¶ 149–167. There is no genuine issue that a "mechanical connection" (the wedge-arms and camming surfaces) is provided in each accused PMI product to open and close the shutter. PMI's contention that the definition of a mechanical connection is limited to or requires a specific "linkage, gear, pulley, belt or mechanical fastener" that "interlocks" elements unduly restricts the definition of mechanical connection. It is not that difficult, or so limited. In fact, if it were, one would have to take the ridiculous position that a camshaft is not connected to the valves in order to effect opening and closing.[4] Such an interpretation is not consistent with the plain and ordinary meaning to a POSITA. PMI has failed to raise a genuine issue of material fact.

## III. ARGUMENT IN OPPOSITION TO PMI'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

### A. There is no collateral estoppel

PMI's attempt to apply the equitable doctrine fails both legally and factually. Under the applicable Seventh Circuit law, the doctrine is not to be applied. And, by virtue of PMI's own doing, the vent chamber issue here is different from what was presented to the PTAB. For these and other reasons, collateral estoppel does not apply.

### 1. Background

PMI did seek an *inter partes* review (IPR) of the '442 Patent. Importantly, in seeking that review, PMI asserted that the claims were not patentable in view of two patents: the Albert '748 Patent, which is at issue in this motion; and U.S. Patent No. 4,303,173 (Nergard), which is <u>not</u> at

---

[4] Even WIKIPEDIA acknowledges that a "cam is a rotating or sliding piece in a mechanical linkage used especially in transforming rotary motion into linear motion." Wikipedia – CAM Definition, https://en.wikipedia.org/wiki/Cam (last visited Nov. 25, 2019).

issue in this motion. As the Court is aware, the PTAB expressly refused to initiate an IPR review of Claim 3 and 12, the claims at issue here.

PMI also sought IPR review of two other patents-the '233 and the '933 Patents. In those instances, PMI asserted the two prior art references at issue here: Albert '748 and Chaffin. However, neither the '233 Patent nor the '933 Patent were asserted in this case.

In the '233 Patent IPR, the parties agreed to and the PTAB adopted a construction of the term "vent chamber." Specifically, Ignite contended that the term should be construed as "a space having an entrance and an exit for lowering the pressure of vapor or gas." Final Written Decision in IPR2016-01584, '233 Patent (R. 214-12), p. 7. PMI then agreed with that definition. *Id.* The PTAB adopted the parties agreed-to meaning of "vent chamber." Applying that definition, the PTAB found claims of the '233 Patent to not be patentable. Final Written Decision in IPR2016-01584, '233 Patent (R. 214-12).[5] While the '233 and '933 Patents are related to the '442 Patent at issue here, they are <u>not</u> the same patent or the same claims.

## 2. Collateral Estoppel Does Not Apply in this Case

At the outset, collateral estoppel is an affirmative defense that can be waived, *see* Fed. R. Civ. P. 8(c)(1); *cf. Kratville v. Runyon*, 90 F.3d 195, 198 (7th Cir. 1996) (related defense of claim preclusion is waived). PMI did not plead collateral estoppel as a defense. R. 86, p. 10, Aff. Defense 9.[6] In fact, even in its Final Invalidity Contentions, PMI only "adopted and relied upon" the "conclusions of the Board" from the PTAB's '933 Patent IPR (not the '233 IPR now asserted) "for the claim charts regarding" the asserted claims. PMI has waived any such issue in

---

[5] The '933 Patent IPR Petition also relied on Albert '748 and Chaffin.

[6] PMI merely summarily asserted that the relief requested was "barred by the doctrine of waiver, laches, acquiescence, estoppel and/or unclear hands." R. 86, Aff. Defense 9.

this case. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (rejecting party's attempt to seek leave to amend his pleading via summary judgment briefing).

Regardless, as PMI necessarily admits, Seventh Circuit law, <u>not</u> Federal Circuit law, governs the question of whether the collateral estoppel criteria apply in this case. Br. at 9. The Seventh Circuit is clear that a difference in the burdens of proof between two proceedings precludes the application of collateral estoppel. *See generally Freeman United Coal Min. Co. v. Office of Workers' Comp. Program*, 20 F.3d 289, 294 (7th Cir. 1994) (citing Restatement (Second) of Judgments § 28(4) (1982) ("Collateral estoppel should not apply where the party against whom preclusion is sought faced a heavier burden of persuasion in the first action compared with the second.")); *Guenther v. Holmgreen*, 738 F.2d 879, 888 (7th Cir. 1984) ("It is, of course, well established that issue preclusion may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required."). PMI's collateral estoppel argument, however, relies entirely on Federal Circuit law ("Two recent Federal Circuit cases … together warrant summary judgment of invalidity … based on collateral estoppel." Br. at 11. The Seventh Circuit follows the Restatement[7] and recognizes that different burdens of proof are an

---

[7] Restatement (Second) of Judgments § 27 (1982). If, however, the clear-and-convincing standard applies, the prior judgment could not be given collateral estoppel effect. *Id.* § 28(4).

exception to the application of collateral estoppel. Federal Circuit law is not applicable to this issue.[8] That ends this inquiry: collateral estoppel does not apply.[9]

Even if Federal Circuit law applied, PMI's reliance on *XY v. Trans Ova* is misplaced. In that case, the question of whether to apply collateral estoppel in the face of differing burdens of proof was not at issue because the claims invalidated by the PTAB were identical to the claims being asserted in the district court litigation. The cancellation of the identical claims by the PTAB extinguished the patentee's separate cause of action. The different burdens of proof in the PTAB and district court were not addressed by the court. The parties in *XY* did not raise that issue or even dispute that the underlying cause of action in the district court was extinguished. Unlike *XY*, neither claim 3 or claim 12 of the '442 Patent has been invalidated in an IPR. To the contrary, these claims were not instituted against – PMI failed to show that these claims were even likely to be found unpatentable in the '442 Patent IPR. Instead, PMI seeks to apply IPRs regarding other patents[10]—determined under a lower burden of proof—to this proceeding in an

---

[8] There is nothing "unique" or "special" in the application of this collateral estoppel principle to patent law. "[For] aspects that may have special or unique application to patent cases, Federal Circuit precedent is applicable." *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013). For example, "the question whether a particular claim in a patent case is the same as or separate from another claim has special application to patent cases, and we therefore apply our own law to that issue. *Allergan, Inc. v Sandoz, Inc.*, 681 F. App'x 955, 959 (Fed. Cir. 2017). The application of different burdens of proof are not unique to patent law. See, for example, *One Lot Emerald Cut Stones and One Ring v. U.S.*, 409 U.S. 232, 235 (1972) ("[T]he difference in the burden of proof in criminal and civil cases precludes the application of the doctrine of collateral estoppel.").

[9] More recently, the District Court for the District of New Jersey also concluded that the difference in the burden of proof between the PTAB and the district court precluded application of collateral estoppel under the Supreme Court's B&B Hardware decision. *Sanofi-Aventis U.S. LLC v. Mylan GmbH*, No. CV 17-9105 (SRC), 2019 WL 4861428, at *1 (D.N.J. Oct. 2, 2019) (concluding that *B&B Hardware, Inc* "states clearly" that "[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same" (quoting 135 S. Ct. 1293, 1306 (2015)).

[10] The '233 Patent IPR and the '933 Patent IPR.

attempt to do an end around on its failed decision to institute against those claims in the '442 Patent IPR.

There is no dispute that the burden here differs from that before the PTAB. Under the appropriate Seventh Circuit law, the PTAB decisions in the '233 and '933 IPRs have no collateral estoppel effect in this case because the PTAB required petitioners in those proceedings to establish invalidity by a "preponderance of the evidence," a standard of proof that is substantially lower than the "clear and convincing evidence" standard that a defendant must satisfy in a civil case.[11] 35 U.S.C. § 316(e) ("petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence"); *Microsoft v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) (presumption of validity under 35 U.S.C. § 282 requires invalidity in a civil case to be proved by clear and convincing evidence); *Uniloc USA v. Microsoft*, 632 F.3d 1292, 1321 (Fed. Cir. 2011) (same); *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.,* 563 F.3d 1358, 1366 (Fed. Cir. 2009) (same). *See also In re Baxter Intern., Inc.*, 678 F.3d 1357, 1364 (Fed. Cir. 2012) (the standard of proof for invalidity before the PTO—a preponderance of the evidence—"is substantially lower than in a civil case"). Likewise, the presumption of patent validity applicable in civil cases did not apply in the IPR proceedings. Collateral estoppel does not apply in this case.

### 3.    The issues are <u>not</u> identical

PMI contends that there is an identity of issues that were litigated in the '233 and '933 Patent IPR's as are being litigated here. Unable to rely on its failed '442 Patent IPR, PMI points

---

[11] Ignite acknowledges the holding cited by PMI, *Fellowes, Inc. v. Acco Brands Corp.*, 10:cv-7587, 2019 WL 1762910 (N.D. Ill. Apr. 22, 2019) (Leinenweber), and respectfully disagrees. In that case, the Court failed to acknowledge the applicability of Seventh Circuit law to procedural aspects of the test; it merely assumed *XY* resolved the issue.

to similarities between claim 3 of the '442 Patent and a combination of claims 2, 5, 21 and 22 of the '233 Patent and between claim 12 of the '442 Patent and claim 11 of the '933 Patent. Br. at 4-5. However, by virtue of PMI's own actions, the issues presented are not identical.

First, PMI could have, but did not, assert the combination of Albert '748 and Chaffin against either claim 3 or claim 12 in the '442 Patent IPR. Instead, evidently believing it was a superior combination, PMI asserted the combination of Albert '748 and Nergard. In contrast, in the '233 and '933 Patent IPRs, PMI asserted the different combination of Albert '748 and Chaffin. Those facts, standing alone, demonstrate that PMI perceived a patentably district basis between the claims of the '442 Patent and those of the '233 and '933 Patents. Stated otherwise, PMI's affirmative act of <u>not</u> asserting Albert '748 and Chaffin before the PTAB demonstrates that PMI considers the '442 Patent claims to be materially and patentably distinct from the '233 and '933 Patent claims against which PMI did assert the Albert '748 and Chaffin combination.

Second, PMI paints with too broad of a brush when it states that these parties "litigated in both IPR's whether the '233 and '933 claims were obvious over Chaffin in view of Albert <u>based on the same claim limitations at issue here</u>." Br. at 12 (emphasis added.) That is incorrect. Aside from the facial differences in the cited claims (PMI's charts show such differences), PMI's assertion is incorrect as a result of PMI's own actions -- the same claim limitations are not at issue because PMI successfully persuaded the Court to adopt a different construction of "vent chamber." In the '233 and '933 IPR's, vent chamber was expressly construed to have an entrance and an exit. Here, however, PMI argued in its claim construction briefing that such a construction was "nonsensical." R. 122 at 5; *see also* R. 155 (Claim Construction Order) at 9. To make that argument, PMI asserted the doctrine of claim differentiation, contending that different claim terms are presumed to have different meanings. R. 122 at 5 ("Different claim

16

terms are presumed to have different meanings.").[12]  PMI argued that including an entrance and exit in the definition was importing such differentiating elements from the '442 specification into the claims.  Thus, the parties have never litigated the issue presented here, namely whether the prior art teaches a "vent chamber" as now defined.  That difference is significant, as evidenced by PMI's own briefing.

Further, even if applicable, PMI's reliance on the Federal Circuit cases of *XY* and *Ohio Willow* is misplaced.  In *XY*, the Federal Circuit held, in a 2-1 decision, that pending actions involving that same patent and the same claims were collaterally estopped.  Here, as recognized by PMI and its various pleadings, there are different patents.  In *Ohio Willow*, the asserted claims and the disallowed claims were not patentably distinct (used only "slightly different damage to describe substantially the same invention") such that the same issues were presented.  But here, the claims are substantially different if for no other reason than the different interpretations of "vent chamber."  As a result, issues before this Court that were not before the PTAB include what the POSITA would understand in terms of "energy dissipation" and how the expanding gas would encounter eddies or obstructions in the vent chamber to lower pressure.  PMI goes so far as to now argue, unlike before, that rather than the pressure being reduced, the "flow pressure" in the accused PMI products actually increases.  That argument has significant repercussion in PMI's assertion of the Chaffin reference, as its new argument necessarily concedes that Chaffin too does not have a vent chamber because the pressure would increase (rather than decrease) in the prior art. Ignite responds, in contrast, that the POSITA would understand the vent chamber to reduce pressure by virtue of an expansion or contraction of the geometry (*i.e.*, the eddies), and/or

---

[12] *Comark Comm. Inc. v Harris Corp.*, 156 F 3d 1182, 1187 (Fed. Cir. 1998) (doctrine of claim differentiation creates a "presumption that each claim in a patent has a different scope").

by the provision of an obstruction in the vent chamber (e.g., the trigger extending partially therein or the back of the button cavity). Such issues and arguments were not made before the PTAB because the parties both applied a gas expansion model (as did the PTAB). But now, in view of the different definition of vent chamber, PMI (and Ignite) assert new theories. The issues are not identical.

Rather than the inapplicable Federal Circuit cases cited by PMI, this case is more in keeping with *Unisone Strategic IP, Inc. v. Life Technologies Corp.*, No. 13-cv-1278-GPC-LL, 2019 WL 4015836 (S.D. Cal. Aug. 26, 2019), where the Court refused to apply collateral estoppel. In that case, the patent claims at issue were materially different from those found unpatentable by the PTAB. The differences were such that invalidity of the remaining claims "was not a foregone conclusion." The remaining patent claims had not been litigated and the issues were not identical. As here, the claims at issue in *Unisom* had <u>not</u> been the subject of a Final Written Decision by the PTAB. To the contrary, the claims at issue here survived PMI's challenge in the '442 Patent IPR. Like in *Unisone*, there "is at least some question that the claims are not collaterally estopped."

That is particularly true here given the different issues presented by the different construction of the term "vent chamber." Collateral estoppel is an equitable defense. It is hardly equitable for PMI to assert and succeed in having the parties and the Court consider this new definition, conduct discovery on the basis of that new definition, brief summary judgment in view of that new definition, and then argue that the issue is "identical" to that addressed by the PTAB under a different definition. As found by the court in *Unisone*, there is no binding precedent that a finding of invalidity under the preponderance of the evidence standard in an IPR collaterally estops invalidity arguments for separate, unadjudicated claims under the clear and convincing

standard in a district court. *Unisone Strategic IP, Inc. v. Life Technologies Corp.*, No. 13-CV-1278-GPC-LL, 2019 WL 4015836, at *3 (S.D. Cal. Aug. 26, 2019).

**4.   There is a dispute of material fact as to whether and how Chaffin and Albert would be combined**

Whether a POSITA would have been motivated to combine references is a question of fact. *E.g.*, *Commonwealth Sci. & Indus. Research Organization v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1376 (Fed. Cir. 2008) (vacating district court's summary judgment of obviousness because there because there was a genuine dispute of material fact as to motivation to combine).

To support a finding of obviousness, "there must be some *articulated reasoning with some rational underpinning* to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (emphasis added). The Federal Circuit has clearly stated that whether a combination *could* be made is not the relevant inquiry; rather, the question is whether a person of skill actually *would* do so. *InTouch Technologies, Inc. v. VGO Communications, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (finding expert's testimony failed to articulate a reasoning with rational underpinning where it "primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so" (emphasis in original)). The *InTouch* Court explained the necessity of providing an express reason to combine *specific elements* within the teachings of a prior art reference in view of another. *Id*. at 1351.

Chaffin discloses three distinct embodiments. The first embodiment is shown in Figures 1–8, and it is this embodiment that PMI points to for the *vent chamber* limitation of claims 3 and 12. PSOF (Invalidity) ¶ 7; *see also* PMI Br. 5–6, 14 (citing Chaffin Figs 1, 4–5, 6 and describing

19

"vent chamber" in the open and closed positions).[13] The second and third embodiments, shown

in Chaffin's Figures 9–11 and 12, respectively, have a different shape for the actuator rod and

position for the valve heads relative to the vent and drink passageways. PSOF (Invalidity) ¶ 8.

The "lost motion" arrangement of Albert was applied and discussed only in reference to the third

embodiment.  Importantly, there is no dispute that neither of Chaffin's second or third

embodiments include the vent chamber 27—by label, description, or illustration of any structure

whatsoever. PSOF (Invalidity) ¶ 8.



Fig. 12

However, when PMI argues that Chaffin and Albert may be combined to render the

claims obvious, PMI points to a hypothetical modification of the third embodiment shown in

Figure 12. *See* PMI Br. at 8 ("As illustrated above, a gap in the Chaffin *actuator rod 152"* allows

the *vent seal 162"* to be engaged first and the drink shutter 162' to be engaged second, thus

*implementing the "lost motion" relationship of Albert*." (emphasis added)).  PMI failed to

properly support a motivation to combine to render claims 3 and 12 of the '442 Patent obvious.

First, as illustrated above, PMI is impermissibly mixing embodiments of Chaffin to arrive

at the claimed invention without pointing to any evidence of a motivation to combine those

---

[13] For example, PMI identifies "Chaffin's 'T-shaped actuator element'" as one of the components
comprising the claimed trigger mechanism."

embodiments. *See In re Stepan Co.*, 868 F.3d 1342, 1346 n.1 (Fed. Cir. 2017) (explaining that there must be a motivation to combine even when "combining multiple embodiments from a single reference, … otherwise a skilled artisan would not arrive at the claimed combination"). Neither of PMI's invalidity experts, neither Mr. Stein nor Dr. Troian, offer *any opinion* on whether or how a POSITA would have been motivated to combine Chaffin and Albert. PSOF (Invalidity) ¶ 9.[14] Consequently, PMI has offered no opinion or evidence on (1) *whether* or how a POSITA would have incorporated Albert's lost motion into the T-shaped actuator of Chaffin's first embodiment or (2) whether or how a POSITA would have modified Chaffin's second or third embodiments to include the alleged *vent chamber* structures from Chaffin's first embodiment. PSOF (Invalidity) ¶ 10.

Second, Ignite's expert Dr. Colton, on the other hand, opined that a POSITA would *not* have been motivated to make either of these modifications. Dr. Colton explained why A POSITA would *not* have been motivated to succeed in implementing Albert "'748's lost motion in Chaffin's first, preferred embodiment because the T-shape of the actuator was "not conducive to inclusion" of the "simple cuts described by Mr. Stein for the embodiment of Figure 12." PSOF (Invalidity) ¶ 11. And Dr. Colton explained that a POSITA also would not have been motivated to add Chaffin Figure 5's "vent chamber 27" structure or shape into Chaffin's Figure 11 or 12 embodiments because there would be no reason to redesign Chaffin's latter covers to add the other, different structures from a distinct lid mechanism absent hindsight bias. PSOF (Invalidity) ¶¶ 12–13.

---

[14] While Mr. Stein's invalidity report included same figure "illustrat[ing] the combination of Chaffin and Albert," his report states that it was "for demonstrative purposes" only, and he testified in his deposition that had not "been asked to form an opinion on" motivation to combine. *Compare* R. 211-08, at 71–72 (¶¶ 140–143)*, with* PSOF (Invalidity) ¶ 14 (citing Ex. W, Stein Depo Tr. 200:5–201:2).

In fact, as explained by Dr. Neitzel, the motivation would be the opposite. Chaffin's so-called vent chamber seeks to insure smooth fluid flow smoothly out through the drink opening. A POSITA would not want to include a "vent chamber" in Chaffin to impede air flow by inducing losses (from eddies, obstructions, etc.) as taught by the '442 Patent. See Neitzel Report (R. 214-16) ¶52; PSOF (Invalidity) ¶ 12.

PMI argues that Colton "admitted that a POSITA *could* 'add a lost motion mechanism' of Albert to at least two of the Chaffin embodiments," referring to the embodiments of Figures 11 and 12. PMI Br. 19 (emphasis added). This may be true, but it is immaterial. *Cf. Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068 (Fed. Cir. 2018) (error for fact-finder to "focus[] on what a skilled artisan would have been *able* to do, rather than what a skilled artisan would have been *motivated* to do at the time of the invention" (citing *InTouch*, 751 F.3d at 1352)). Moreover, PMI's motion for summary judgment does *not* contest Dr. Colton's affirmatively stated opinions that a POSITA would *not* have added Albert's lost motion mechanism to Chaffin's embodiment Figure 5 embodiment nor would have mixed the embodiments of Chaffin with each other.[15]

Rather, PMI's basis for combining Chaffin and Albert is provided in the summary of its position that a POSITA would have been "motivated to improve Chaffin's drinking container by adding the push-button actuated, lost-motion mechanism of Albert," without explaining or distinguishing among Chaffin's three distinct embodiments. PSOF (Invalidity) ¶ 15. At best, PMI's hypothetical combination of Albert with Chaffin's embodiment of Figure 12 would yield a lid that has a straight tube to the exit and thus lacks a vent chamber as recited in the claims. This

---

[15] PMI quotes Dr. Colton's agreement with the vague, generic assertion that a POSITA "could[] … combine **elements** from one embodiment with another embodiment." PMI SMF ¶ 22 (emphasis added). But, to the extent the question was even referring to Chaffin, the question did not refer to any particular element or any particular embodiment. *Cf. Stepan*, 868 F.3d at 1346 n.1.

difference in embodiments is important because Dr. Colton explained that his conclusion that the combination of Albert '748 and Chaffin lacked a *vent chamber* as claimed was "particularly true" when considering the implementation in Figures 11-12 because the "straight 'tube' passageway in which the gas flows" would the "marginal change in volume … would not be effective to reduce the pressure of the gas before it exited the container." PSOF (Invalidity) ¶ 13.

Accordingly, and particularly when facts are viewed in the light most favorable Ignite, a dispute of material fact exists as to whether and how Chaffin and Albert might be combined. A jury would be entitled to find that there is no motivation to combine the references in a way that produces the vent chamber as alleged by PMI. Summary judgment of obviousness is improper on this basis alone.

    **5.**    **There is a dispute of material fact as to whether the hypothetical combination of Chaffin and Albert has the *vent chamber* of claims 3 and 12**

Summary judgment of obviousness is also improper because the experts disagree whether PMI's hypothetical combination meets the *vent chamber* limitation of the subject claims. PMI argues that "Ignite's own experts agree" that Chaffin's vent chamber 27 is a space that "would lower the pressure of vapor or gas because as vapors expand into the space, their pressure decreases." While Ignite's experts consistently state that some incidental pressure reduction or energy dissipation may take place, they also explain why the hypothetical structure is nevertheless *not* a vent chamber as described and claimed in the '442 Patent. A jury is entitled to weigh the competing experts' positions.

Dr. Colton has always consistently conceded that, if Chaffin and Albert were combined as proposed by PMI, then there may be some "incidental" reduction of pressure when the lid is opened. But Dr. Colton also explained that in his opinion, a POSITA "would not have appreciated, predicted, or expected that Chaffin's vent chamber 27 would provide a pressure

reduction feature[,] even if hypothetically combined with Albert '748's teaching," and that any pressure reduction would have been "incidental." PSOF (Invalidity) ¶ 16; *see also id.* (citing ¶ 178) ("I do not dispute that there could be some incidental or miniscule reduction of pressure reduction within the vent (or relief vent) passageway. ... But it is incorrect to assume that if the ideal gas law applies to theoretically reduce the pressure because gas is flowing through any structure, that such a structure meets the limitation of a "vent chamber" for lowering the pressure of vapor or gas as recited in the '442 patent. Rather, the structure of a vent chamber must remove energy from the vapor or gas such as by providing an "expansion" area as described in the '442 patent."). Thus, even though Dr. Colton conceded there was some "incidental" or "miniscule" pressure reduction effect, even using his Ideal Gas Law model, he still opined that such minimal effect did not meet the function of a vent chamber described and claimed in the '442 patent.

Likewise, Dr. Neitzel, applying his fluid dynamics perspective, opined that Chaffin did not disclose or teach the claimed *vent chamber*. PSOF (Invalidity) ¶ 17 (citing Neitzel Report ¶ 51). He explained the basis for his opinion that the "vent chamber 27" of Chaffin does not (and was not intended to) perform the same function as that of the '442 patent" and did not disclose or teach the patent's vent chamber, even though he conceded that "there may be some energy dissipation due to the passageway 25 to 45 not being completely straight." *Id.* (citing Neitzel Report (R. 214-16) ¶ 51). As referenced above, Dr. Neitzel explained that because Chaffin teaches its vent chamber 27 is designed to allow *air* to flow *into* the container at the same rate *liquid* is flowing *out*, a POSITA would not want include a structure that would induce "minor losses" and impede air flow, as the '442 patent's vent chamber does. Neitzel Report (R. 214-16) ¶ 52. Thus, a POSITA would not understand Chaffin's vent chamber 27 to be the claimed *vent chamber*, in Dr. Neitzel's opinion, either. *Id.*

PMI correctly notes[16] that the '442 Patent does not require a "minimum pressure reduction," but a fact-finder could nonetheless conclude that the Chaffin "vent chamber 27" did not rise to the level of a vent chamber as claimed. As a counter-example, the lid of a Starbucks or McDonald's coffee cup also has a vent hole that would provide a "space" for some miniscule reduction of pressure as air flows through. Yet it would be reasonable to reject that vent hole as a "vent chamber" claimed in the '442 patent. Not every hole through which hot gas or vapor flows is the claimed *vent chamber*, even though PMI may argue it is so. The dispute of fact over whether Chaffin's vent passageway constitutes a *vent chamber* as claimed makes summary judgment inappropriate.

## B. There are genuine issues of material fact as to whether PMI's infringement was willful

PMI argues that its infringement was not willful, citing case law that relied on an infringer's prior legal opinion that cited the same prior art as that infringer asserted in a subsequent IPR.[17] Here, however, PMI initially introduced its product without doing a patent search, exercising due care to avoid infringing, obtained no legal opinion, initiated an unsuccessful IPR (as to the asserted claims) relying on wholly different prior art, and then stalled Ignite for over two years while continuing to offer new infringing products into the marketplace – even after Ignite had repeatedly addressed the issue with PMI. PMI knew very well the risk of infringement in this case. PMI nonetheless proceeded with full knowledge of that risk, including

---

[16] It is to be noted that PMI's experts take differing positions depending on whether the issue is infringement or validity. For example, on infringement, they argue that reducing "some pressure" in the accused vent chamber is not infringement. However, for validity, they argue that Chaffin's so-called vent chamber reduces at least some pressure and therefore the reference invalidates. PMI cannot have it both ways.

[17] *Greatbatch, Ltd. v AVX Corp*, 2016 WL 7217625 at *5 (D. Del. Dec. 13, 2016).

by offering new infringing products. At minimum, these and the facts set forth below preclude summary judgment on the issue of willful infringement.

**1.      Background Facts**

In January of 2012, Ignite first saw a PMI "Stanley 1913" travel mug that it believed could infringe the '442 Patent.  In March, Ignite's then CEO, Sami El Saden, raised the issue with PMI's CEO, Rob Harris.  PSOF (Invalidity) ¶ 1.  Mr. El Saden informed Mr. Harris of the '442 Patent.  That was the first that Mr. Harris had heard of Ignite's patent.  Despite being so informed, three days later on March 10, 2012, PMI displayed infringing mugs at the International Home & Housewares show in Chicago.  *Id*. ¶ 2.  In May 2012, counsel for Ignite informed PMI that certain PMI products were infringed claim of the '442 Patent.  *Id*. ¶ 3.  In June 5, PMI provided a "position statement," but did not reference the Albert '748 and Chaffin patents, or the combination of those patents.

Later in 2012, Ignite learned that PMI was selling infringing products at independent sporting goods stores.  PSOF (Invalidity) ¶ 4.  In February of 2013, Ignite learned that PMI was selling infringing products at Target.  *Id.* ¶ 13.  While there was sporadic communication between the parties, it took unduly long to address the issues and Ignite was essentially forced to file suit in February of 2014, approximately two years after Ignite had first raised the issue with PMI.  In discovery, Ignite learned that PMI had not conducted a formal patent search but had instead relied upon its project team to "know the marketplace."  Specifically, PMI's witness Mr. Hill testified that the "project team gets together and they talk about any products that are similar in the marketplace and whether or not they may be too close to what we are trying to develop."  PSOF (Invalidity) ¶ 4.  PMI offers no evidence of a patent search or opinion of counsel or even a mention of the now asserted Albert '748 and Chaffin references prior to filing an IPR against another patent (the '933 patent in 2014).

Thus, unlike the case law on which PMI relies, here there was no prior opinion letter and no common prior art. PMI essentially acted only after Ignite filed suit. And when PMI did seek an IPR of the '442 Patent, it asserted different ('Albert '748 and Nergard) than it now relies on. Of course, as to claims 3 and 12 of the '442 Patent, the PTAB refused to institute an IPR against those claims other based on those references.

### 2. PMI has infringed willfully with knowledge of the '442 Patent

Willful infringement is a question of an accused infringer's subjective intent. The subjective intent of a patent infringer, intentional or knowing, may warrant enhanced damages without regard to whether his infringement was objectively reckless. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933, 195 L. Ed. 2d 278 (2016). The subjective intent requirement is shown where the risk of infringement was either known or so obvious that it should have been known to the accused infringer. *Id.* Willful infringement is a jury issue. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018).

The only fact upon which PMI bases its summary judgment motion on this issue is the filing of an IPR (Br. at 21, "PMI acted based on prior art that the PTAB found sufficient not only to initiate review, but also to invalidate Ignite's related and nearly identical claims.")) PMI's assertion is carefully stated to avoid the clear differences between this case and the cited law. First, there is no prior legal opinion here. In fact, as testified to by Mr. Hill, PMI was not doing patent searches on these projects. Second, the IPR initiated by PMI against the '442 Patent at issue in this case did not assert the same prior art. In fact, PMI asserted different prior art against the '442 Patent and was unsuccessful as to Claims 3 and 12; the PTAB refused to institute against those claims. Third, PMI waited for over 2 years until after Ignite was forced to file suit before asserting that different prior art and was ultimately unsuccessful. Even if PMI had obtained an opinion of counsel and had relied upon the same art, such facts (not present here)

27

would not necessarily show that PMI had a subjective intent to avoid patent infringement. *See, e.g., Ericsson Inc. v. TCL Commcn Tech. Holdings, Ltd.* , No. 2:15-CV-00011-RSP, 2017 WL 5137401, at *2 (E.D. Tex. Nov. 4, 2017).

Rather, PMI's subjective intent here is shown by its actions. Construed in the light most favorable to Ignite, the non-movant, the facts show that PMI introduced its infringing product into the marketplace without conducting a patent search. Once told of its infringement, PMI effectively stalled for two years while continuing to offer its infringing products. PSOF (Invalidity) ¶ 6. PMI tactically delayed its response, forced Ignite to bring suit, and when it did institute an IPR, it altered different prior art from that on which it now relies. PMI did not "act based on prior art that the PTAB found sufficient." BR. at 21. PMI was effectively stalling, searching for an invalidity position while continuing to offer more and new infringing products. To the extent PMI relies on the IPRs initiated against the '233 and '933 Patents, those issues are patentably distinct as shown above, in large part based on PMI's own actions.

The facts here are that at no time prior to suit, or even after suit was filed, did PMI assert in the Patent Office the combination of Albert '748 and Chaffin against the '442 Patent. In contrast, PMI knew full well and knowingly assumed the risk of infringement. Despite repeated opportunities to meaningfully address the issue, PMI effectively refused to do so. In short, PMI offered infringing products without doing a search or otherwise exercising due care in regard to possible patent infringement, delayed for over 2 years, and simultaneously sought to benefit from that delay by introducing more infringing products. Such facts demonstrate a subjective intent to infringe and preclude summary judgment for PMI on this issue. *Cf. SRI Intl, Inc. v. Advanced Tech. Labs., Inc*., 127 F.3d 1462, 1468 (Fed. Cir. 1997) ("The district court found that ATL 'deliberately prolonged its dealings with SRI, imposing delay after delay, in order to fend off SRI

as long as possible and allow its profitable infringement of the [750] patent to continue. ' The record evidences delays, silences, misinformation, non-responses, and various other means of 'putting SRI off as long as possible.' The district court, reviewing this conduct, described it as 'outrageous.' Commercial conduct may be relevant in determining whether the infringer exercised the due care owed to a patent holder.").  At minimum, there are genuine issues of material fact as to willfulness.

## IV.     CONCLUSION

The '442 Patent is directed to a novel and unobvious invention. It was the first product to include a vent chamber in the lid interposed along the hot vapor/gas venting route to lower the pressure of that exiting vapor/gas to protect a user.  It was the first beverage container product to include a vent chamber in the lid interposed along the hot vapor/gas venting route to lower the pressure of that exiting vapor/gas to protect a user.  The disclosed "vent chamber" enhanced safety by reducing or even eliminating the rapid expulsion of hot vapor or gas.

PMI has done the same thing by the use of a cavity behind its button.  PMI's denial of a vent chamber is belied by its own experts.  It points to no prior art that recognizes or even discusses this feature or its advantages.  There is no genuine issue of fact as to PMI's infringement.  In contrast, PMI belated contentions of invalidity raise, at minimum, many issues of fact.  Ignites motion for summary judgment of infringement should be granted, and PMI's motion for summary judgment of invalidity should be denied.

DATED: November 25, 2019                  Respectfully submitted,

                                          IGNITE USA, LLC

                                          By:     /s/ Stephen M. Schaetzel
                                                  Stephen M. Schaetzel

29

GA Bar No. 628653 (pro hac vice)
Warren J. Thomas (pro hac vice)
GA Bar No. 164714
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street, NE, Suite 1300
Atlanta, Georgia 30309
Phone: 404-645-7700
Fax: 404-645-7707
sschaetzel@mcciplaw.com
wthomas@mcciplaw.com

Jonathan M. Cyrluk (ARDC No. 6210250)
Joshua S. Goldberg (ARDC No. 6277541)
Steven C. Moeller (ARDC No. 6290263)
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2640
Chicago, Illinois  60601
Phone:  312-777-4300
Fax:  312-777-4839
cyrluk@carpenterlipps.com
goldberg@carpenterlipps.com
moeller@carpenterlipps.com
*Counsel for Plaintiff, Ignite USA, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 25, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record, and I served the document on counsel of record via email as well.

By:     /s/ Stephen M. Schaetzel
        One of the Attorneys for Plaintiff Ignite USA, LLC